```
 1               IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                           - - -
     MAACO FRANCHISING, INC.,     :
 3                                :
                 Plaintiff,       :  09-cv-04548
 4                                :
            v.                    :  Philadelphia, Pennsylvania
 5                                :  March 17, 2010
     PIERRE PHILIPPE AUGUSTIN,    :  2:13 p.m.
 6   et al.,                      :
                                  :
 7               Defendants.      :

 8                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE LOUIS H. POLLAK
 9                  UNITED STATES DISTRICT JUDGE
                             - - -
10   APPEARANCES:

11    For the Plaintiffs:   CONSTANTINE T. FOURNARIS, Esquire
                            WIGGIN AND DANA LLP
12                          Two Liberty Place
                            50 South 16th Street, Suite 2925
13                          Philadelphia, PA  19102

14                          ERIKA L. AMARANTE, Esquire
                            WIGGIN AND DANA LLP
15                          One Century Tower
                            P.O. Box 1832
16                          New Haven, CT  06508-1832

17    For the Defendants:   JEFFREY D. BUKOWSKI, Esquire
                            STEVENS & LEE
18                          111 N. 6th Street
                            P.O. Box 679
19                          Reading, PA 19603

20    Audio Operator:       A.J. FOLLMER

21    Transcribed by:       LAURA A. JIMENEZ
                            JIMENEZ REPORTING
22                          & TRANSCRIPTION SERVICE
                            1501 Larkin Road
23                          Boothwyn, PA 19061
                            Telephone:  (610) 235-9046
24                          Email:  Laura@Jimenez-Reporting.com

25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

```
 1                    (The following was heard in open court at

 2    2:13 p.m.)

 3                    THE COURT:  Good afternoon.

 4                    MR. FOURNARIS:  Good afternoon, Your Honor.

 5                    MR. BUKOWSKI:  Good afternoon, Your Honor.

 6                    MS. AMARANTE:  Good afternoon.

 7                    (Pause in proceedings.)

 8                    THE COURT:  Please sit down.

 9                    (Pause in proceedings.)

10                    THE COURT:  I'm glad you were able to find

11    your way to this courtroom, which is a courtroom that

12    I'm not familiar with.  But it's fortunate that we don't

13    need a jury.  I guess one could have an eight person

14    jury here.

15             Well, this afternoon we'll be addressing

16    plaintiff's motion for a preliminary injunction.  And it

17    behooves us to use our time in some rigor because we

18    have a lot of work to do with relatively little time to

19    do it in.  So I'll go right ahead and call on

20    plaintiff's counsel to proceed.

21             MR. FOURNARIS:  Would you like brief

22    introductory remarks or would you like us to start with

23    the first witness, Your Honor?

24                    THE COURT:  That's really -- that's really

25    up to you.  I mean, I have a general sense of what
```

1   you're urging.  If you think there's something

2   specific --

3                MR. FOURNARIS:  No.  I --

4                THE COURT:  -- that can be stated with

5   brevity.

6                MR. FOURNARIS:  Yes.  Yes, Your Honor.

7   Thank you, Your Honor, for entertaining us today and

8   making the time for us today.

9                You've read all the papers.  I actually

10  think that this case has been substantially briefed.

11  We've provided proposed findings of fact and conclusions

12  of law today.  This is an important case for MAACO.

13  This is an important day for MAACO.  We will have

14  witnesses testifying today as to the importance of the

15  case and the fact that in a case like this and under

16  circumstances like this, MAACO simply cannot afford from

17  a system maintenance point of view to allow a franchisee

18  to do the things that Mr. Augustin has done both within

19  and outside the litigation and to get away with it.

20               And if the systems -- the MAACO system is

21  watching today, and we hope that we put on the case that

22  is compelling and leads to the entry of the requested

23  relief.  We are, in fact, suffering irreparable harm,

24  and we believe that the merits are substantially tilted

25  in our favor.

1              Thank you, Your Honor.

2              THE COURT:  All right.  Do the defendants

3    wish to say anything?

4              MR. BUKOWSKI:  Nothing at this time, Your

5    Honor.

6              THE COURT:  All right.  We'll go right ahead

7    and turn to -- turn to the plaintiff.  Call your

8    witnesses.

9              MS. AMARANTE:  Your Honor, MAACO Franchising

10   calls Tom Monaghan to the stand.

11             THOMAS FRANCIS MONAGHAN, WITNESS, SWORN.

12             COURTROOM CLERK:  Please state your full

13   name, spell your last name for the record.

14             THE WITNESS:  Thomas Francis Monaghan, last

15   name Monaghan, M-O-N-A-G-H-A-N.

16             THE COURT:  Please sit down, Mr. Monaghan.

17                    DIRECT EXAMINATION

18   BY MS. AMARANTE:

19      Q.  Thank you, Mr. Monaghan.  Good afternoon.

20      A.  Good afternoon.

21      Q.  Where do you work, Mr. Monaghan?

22      A.  I work for MAACO Franchising, Incorporated, in

23   King of Prussia, Pennsylvania.

24      Q.  And can you tell me generally what is the

25   business of MAACO Franchising?

1    A.  We are the franchise corporate headquarters for

2  the entity known as MAACO Collision Repair and Auto

3  Painting franchises throughout the North America.

4    Q.  Okay.  And how long have you worked for MAACO?

5    A.  Eleven years, two months.

6    Q.  What is your current position with the company?

7    A.  Vice President of Operations.

8    Q.  Are you also familiar with a corporation named

9  MAACO Enterprises, Inc.?

10    A.  I am indeed.

11    Q.  What is the relationship between MAACO

12  Enterprises and MAACO Franchising?

13    A.  MAACO Enterprising was the company in which

14  existed until October of 2008 as the franchisor for

15  MAACO Collision Repair and Auto Painting and was sold in

16  October of eight and became MAACO Franchising.

17    Q.  Okay.  And when that transaction happened, did

18  the franchise agreements that were in MAACO

19  Enterprises's name become assigned to MAACO Franchising?

20    A.  Yes.  All the franchise agreements, trademark,

21  operating systems, and everything wherein MAACO

22  Enterprising owned were transferred into MAACO

23  Franchising, yes.

24    Q.  Okay.

25         MS. AMARANTE:  And, Your Honor, I'd like to

1    mark an exhibit Plaintiff's 1, and I'm handing a copy to

2    defendants's counsel right now.

3                    (Whereupon, Plaintiff's Exhibit No. 1 was

4                    marked for identification.)

5                    MR. BUKOWSKI:  Thank you.

6                    (Pause in proceedings.)

7                    MR. FOURNARIS:  Your Honor, may I proceed?

8                    THE COURT:  Yes.  Are we going to find out

9    whether there still is a MAACO Enterprising?

10                   MS. AMARANTE:  Well, I can ask that

11   question, Your Honor, yes.

12   BY MS. AMARANTE:

13      Q.  Mr. Monaghan, is there still a MAACO Enterprises,

14   Inc.?

15      A.  There is not.  All of its assets were sold and

16   are now under the -- under the company name of MAACO

17   Franchising.

18      Q.  Okay.  And is this document that's been marked --

19   do you have a copy?

20      A.  I do not have a copy.  Sorry.

21      Q.  The document that I've offered as Plaintiff's

22   Exhibit 1 is entitled, "Assignment and Assumption of

23   Franchise Agreements."  Do you see that, Mr. Monaghan?

24      A.  I do.

25      Q.  Okay.  And is this the document through which

1   MAACO Enterprises assigned franchise agreements to make

2   MAACO Franchising?

3       A.   It is indeed.

4            MS. AMARANTE:   I would offer the document

5   absent objection.

6            MR. BUKOWSKI:   No objection, Your Honor.

7            THE COURT:   Good.   All right.   It's been

8   admitted.

9            (Whereupon, Plaintiff's Exhibit No. 1 was

10           admitted into evidence.)

11  BY MS. AMARANTE:

12      Q.   Mr. Monaghan, how long has the MAACO brand

13  existed?

14      A.   The MAACO brand was founded in 1972, so we're in

15  our 38th year of operation.

16      Q.   And how many MAACO centers are there today?

17      A.   There are currently 474 operating locations

18  without -- throughout North America.

19      Q.   Are those locations all owned and operated by

20  franchisees?

21      A.   All but six are owned and operated by us as a

22  company.   The remaining are all individually owned and

23  operated by franchisees.

24      Q.   And over the course of that 38 years, has MAACO

25  developed a specific operating system?

1    A.  We certainly have.

2    Q.  Can you describe that operating system in broad

3    strokes to the Court, please?

4    A.  In a nutshell of what the operating system

5    consist it is of, it consists of the specific location

6    with specific equipment with a specific operating layout

7    in terms of both production and the sales said.  It's

8    the operating trademarks of MAACO.  It's a selling

9    system.  It's a marketing system.  It's a production

10   system.  It's a training system.  It's everything

11   essentially from when you open the doors in the morning

12   to when you close the doors at night have been developed

13   during that 38 years to operate the business day to day.

14   Q.  Okay.  And is the MAACO operating system the same

15   as that used by others in the automobile painting and

16   body repair industry?

17   A.  It is not.  It is extremely proprietary and the

18   way we do things is unlike any other industry, any other

19   body shop or collision repair/auto painting business in

20   the industry.

21   Q.  Has MAACO developed any trade secrets that

22   accompany this unique operating system?

23   A.  Clearly as a result of being unique and the way

24   we do things and how we do things and the way we sell

25   and the way we produce and our relationships with our

1    vendors, all of that is secret and proprietary, yes.

2        Q.  Does MAACO own any registered trademarks?

3        A.  We do.  Everything related to MAACO Collision,

4    MAACO Auto Painting, MAACO Collision Repair and Auto

5    Painting, MAACO Auto Painting and Body Works, all the

6    related trademarks since they incorporate those names

7    and those services.

8        Q.  How long did it take MAACO to develop the

9    operating system that it uses today?

10       A.  Again, thirty-eight years of evolution.  The

11   business started thirty-eight years ago.  We had a

12   specific operating system that has evolved and grown

13   year after year to be more complex and even more

14   proprietary as we evolve our systems and our services

15   for our franchisees.

16       Q.  And does MAACO divulge its trade secrets and

17   operating systems to just anyone?

18       A.  No.  We only divulge that to our franchisees they

19   have completed our franchise training program and use

20   them as a conduit of which they're the only ones that

21   have exposure to it.

22       Q.  Okay.

23            MS. AMARANTE:  I'm now going to offer as

24   Plaintiff's Exhibit 2 a MAACO Franchise Agreement dated

25   October 4th, 2006 --

```
 1                    THE COURT:  Okay.

 2                    MS. AMARANTE:  -- that the Augustins have

 3     signed.  I'm handing a copy to defense counsel and to

 4     the Court and to the witness.  And absent objection --

 5                    MS. AMARANTE:  Excuse me.

 6                    THE COURT:  Do you by any chance have two

 7     copy of your exhibits so that Mr. Ramios (ph.) can have

 8     one?

 9                    MS. AMARANTE:  Absolutely, Your Honor.  I

10     do.

11                    (Pause in proceedings.)

12                    MR. RAMIOS:  Thank you.

13                    MS. AMARANTE:  You're very welcome.  Absent

14     objection from defense counsel, I'd offer that as a full

15     exhibit.

16                    MR. BUKOWSKI:  No objection, Your Honor.

17                    THE COURT:  Okay.

18                    (Whereupon, Plaintiff's Exhibit No. 2 was

19                    admitted into evidence.)

20     BY MS. AMARANTE:

21        Q.  Okay.  Mr. Monaghan, are you familiar with this

22     document?

23        A.  I am indeed.

24        Q.  And what is it?

25        A.  This is the Augustins's franchise agreement that
```

1  they executed on October 4th of 2002 between themselves

2  and MAACO Enterprises.

3     Q.  Okay.  And did MAACO Enterprises assign this

4  franchise agreement to MAACO Franchising pursuant to the

5  document that we've marked as Plaintiff's Exhibit 1?

6     A.  It was a deed assigned based on the assignments

7  and assumption of the franchise agreements of

8  October 21st, 2008.

9     Q.  Now, I'm going to refer to you to the first two

10 whereas clauses of the franchise agreement.  Do you see

11 those two clauses?

12    A.  I do.

13    Q.  And just quickly just to read them into the

14 record, they say, "Whereas, MAACO has accumulated

15 extensive knowledge of and experience in the automobile

16 painting and body repair business and has developed and

17 owns a unique system, 'the System', relating to the

18 establishment, development, and operation of centers

19 specializing in automobile painting and body repair

20 which may be changed, improved, and further developed by

21 MAACO from time to time."

22           Did I read that provision accurately, Mr.

23 Monaghan?

24    A.  Yes.

25    Q.  Okay.  And then the second whereas

1    continues, "That whereas MAACO is the owner of the trade

2    name, trademark, and service mark, quote, 'MAACO Auto

3    Painting and Body Works,' end quotes, and such other

4    trade names, service names, and trademarks as are now

5    designated and may hereinafter be designated by MAACO as

6    part of the System called the proprietary marks.  And

7    MAACO continues to develop, use, and control just

8    proprietary marks for the benefit and exclusive use of

9    itself and its franchisees in order to identify for the

10   public the source of services and products marketed

11   thereunder and to represent the System's high standards

12   of quality and service."

13          Did I read that accurately, Mr. Monaghan.

14      A.  Yes, you did.

15      Q.  Okay.  And does those clauses accurately describe

16   the confidential system that MAACO reveals only to its

17   franchisees?

18      A.  It does indeed in broad strokes.

19      Q.  Let's turn, if you will, Mr. Monaghan, to

20   paragraph 8 of the franchise agreement which is on page

21   3 and that's entitled, "Proprietary marks."  Do you see

22   that?

23      A.  I do.

24      Q.  And why are -- I'll spare everyone my reading it

25   into the record, but can you just explain in broad

1  strokes why this provision, section 8, is included in

2  the franchise agreement?

3      A.   In short, it's recognizing the fact the

4  franchisee has the right to use our marks while he is a

5  franchisees and that he will not share or trade or have

6  others utilize or represent themselves as a MAACO in any

7  form or fashion subsequent to this franchise agreement.

8      Q.   Okay.  And let's turn the page and look at

9  paragraph 10, which is entitled, "Confidential

10  Information."  Do you see that?

11      A.   I do.

12      Q.   And why is this provision in the franchise

13  agreement, Mr. Monaghan?

14      A.   As we stated earlier, we have developed over

15  38 years a proprietary and secret way of doing business

16  that we only expose our franchisees to.  Therefore, it

17  is implicit in our relationship with our franchisees

18  that our -- our operating secrets, our systems, our

19  knowledge, our proprietary information systems are not

20  shared with others outside the system by -- and

21  therefore, potentially putting our system in jeopardy.

22      Q.   Thank you.  And if you look right above section

23  10, there's 9.  Paragraph 9, is "Confidential Operating

24  Manual."  Do you see that, Mr. Monaghan?

25      A.   I do.

1    Q.   And just to draw your attention to subset B,

2    capital B, which says, "Franchisees shall at all times

3    treat the manual, any other manuals created, for or

4    approved for in the use of the operation of the

5    franchise business and the information contained therein

6    as confidential, and shall use all reasonable efforts to

7    maintain such information as secret and confidential.

8    Franchisees shall not, at any time, without MAACO's

9    prior written consent copy, duplicate, record, or

10   otherwise reproduce the foregoing materials in whole or

11   in part nor otherwise make the same available to any

12   unauthorized person."

13        Did I read that accurately.

14   A.   Yes.

15   Q.   Okay.  And why are -- is there a specific

16   provision about the confidentiality of the operating

17   manual, Mr. Monaghan?

18   A.   Again, there are eleven specific manuals related

19   to each segment of our business.  They're extremely

20   proprietary.  And the last thing we'd want them to do is

21   to fall into the hands of competition or those that

22   compete with us in any form or fashion.  So we go out of

23   our way to very clearly explain that the confidential

24   matter of that, you know, is the property of MAACO and

25   is being loaned to the franchisee during the term of

1    their agreement with us.

2       Q.   Thank you.  I'm going to ask you to go backwards

3    in the agreement now to page 2.  There's section 6 is

4    entitled, "Duties of Franchisee."

5              And in particular, looking at subpart A, it

6    talks about -- well, it says, "Franchisee shall acquire,

7    or lease the location at franchisee's expense and shall

8    submit the lease, if any, prior to its execution to

9    MAACO for its approval," and that goes on.

10             Why is this provision regarding the

11   franchisee's lease in the franchise agreement?

12      A.   Just so there's no confusion as to the

13   responsibility of the franchisee to secure a lease on

14   their own, that they are bound to and is in no form or

15   fashion either represented, agreed upon, or that MAACO

16   Enterprises or MAACO Franchising has any responsibility

17   for that location for the responsibility of them as a

18   tenant.

19      Q.   Okay.  And is MAACO generally a party to the

20   lease that its franchisees sign with landlords?

21      A.   We are not.

22      Q.   Is it MAACO's responsibility to negotiate the

23   terms of a lease for a franchisee?

24      A.   It is not.

25      Q.   Who is supposed to negotiate the lease for the

1  franchisee?

2      A.   It is the duty of the franchisee.

3      Q.   Turning the page and still within section 6 of

4  the agreement, I'm going to draw your attention to

5  subpart J, which says, "Franchisee shall make all

6  payments required under this agreement in the manner and

7  at the time prescribed in this agreement."

8              Do you see that, Mr. Monaghan.

9      A.   I do.

10     Q.   And why is that provision in the franchise

11 agreement?

12     A.   Again, self evident in being that that location

13 can only exist as long as the franchisee upholds his

14 obligation to his landlord.  And consequently, if he's

15 unable to do so, puts that franchise at risk due to

16 being in default with his landlord on the lease

17 perspective.

18     Q.   Okay.  And subpart J also refers to payments

19 required under the agreement.  Would that also include

20 payments required to be made to MAACO?

21     A.   It is indeed.  It's related to his franchise fees

22 due on a weekly basis, his advertising commitment on a

23 weekly basis, and his product and supply accounts with

24 us on a monthly basis.

25     Q.   Okay.  And so let's turn to section 4, which is

1    entitled, "Fees."  And that's on page 2 of the franchise

2    agreement.

3        A.  Okay.

4        Q.  Does this provision accurately reflect the

5    various fees that a franchisee, or in this case the

6    Augustins's agreed to pay to MAACO during the course of

7    their franchise relationship?

8                THE COURT:  He's still reviewing.

9                THE WITNESS:  Yes, it is.

10   BY MS. AMARANTE:

11       Q.  And looking at subpart A, number 2, it refers to

12   a continuing weekly royalty fee during the term of this

13   agreement in an amount equal to nine percent of the

14   gross receipts of the center.  Do you see that.

15       A.  I do.

16       Q.  Okay.  And what is that royalty fee required for?

17       A.  That royalty fee is in exchange for the use of

18   our trademarks, our operating systems, our training, and

19   everything related to the MAACO brand and whereby the

20   franchisee then essentially pays us nine percent of all

21   collected monies from that location.

22       Q.  Okay.  And looking at subpart F under section 4,

23   there's a definition of gross receipts.  Do you see

24   that, Mr. Monaghan?

25       A.  I do.

1       Q.   And it says, "Gross receipt as used herein shall

2    mean the amount of all cash collected or other

3    consideration received for all sales of merchandise and

4    services of any nature at or from or as a result of the

5    center, including but not limited to, sublet labor and

6    new and used replacement parts, less sales, or

7    equivalent taxes."

8          Did I read that accurately?

9       A.   You did.

10      Q.   Okay.  And why is there a reference in here to

11   sublet labor being included as the gross receipts?

12      A.   Again, just an understanding that further

13   definition of what all sales and service and

14   merchandise, that there would be no exceptions to that

15   to such things as sublet labor or parts.

16      Q.   Moving forward to page 4 of the franchise

17   agreement, I'm going to draw your attention to section

18   11.  And in particular, subpart B, which talks about the

19   requirement for a weekly report that the franchisee

20   shall submit to MAACO indicating what the gross receipts

21   were during the proceeding week.

22          Do you see that Mr. Monaghan?

23      A.   I do.

24      Q.   And why is the weekly report of gross receipts

25   required?

1      A.   Again, our agreement calls for both the weekly

2   reporting and weekly payment of those fees.  So

3   consequently, it just lays out that obligation of the

4   franchisee to report essentially by Tuesday of week --

5   of each week, that we get it by Friday or it's

6   postmarked by Tuesday, and we get it by Friday, and it

7   includes for the payments due relative to the gross

8   receipts from the prior week.

9      Q.   Okay.  And without the weekly report, does MAACO

10   know what the gross receipts would be at a particular

11   MAACO center?

12      A.   We do not.  We do not directly tie into that

13   their operating system.  We leave it up to the

14   franchisees on the honor system to report to us using

15   our system on a weekly basis.

16      Q.   Thank you.  Only page 5, section 14 of the

17   franchise agreement talks about terminations by MAACO.

18   Do you see that, Mr. Monaghan?

19      A.   I do.

20      Q.   And does this provision summarize the grounds

21   under which MAACO can terminate the franchise agreement?

22      A.   It does.

23      Q.   Okay.  And looking at section 15, "Obligations

24   Upon Termination Or Expiration."  What are the

25   franchisee's obligation once the agreement has been

1    terminated?

2        A.   Again, it is our -- our expectation that he

3    immediately cyst -- cyst -- cease and stop doing

4    business of any collision repair or auto painting

5    business whatsoever for the term of one year or

6    ten miles for any other locations.

7        Q.   And I'm going to draw your attention in

8    particular to subpart B, subpart F, and subpart G.   I'm

9    going to try to speed this along and just --

10       A.   Uh-uh.

11       Q.   -- point those three out all together.

12            Why is it that MAACO requires terminated

13   franchisees to stop using the proprietary marks and

14   return the operating manuals?

15       A.   Again, I think this kind of goes to the crux of

16   the matter we have here.  In our operating system, in

17   our franchise agreement with all of our franchisees

18   would hang in the balance.  It allows someone to

19   essentially say I will no longer be a MAACO, and no

20   longer continue to pay your obligations but continue to

21   operate as an independent.  We'd have chaos.  We would

22   not have an agreement anymore.  That would be egregious.

23   The concept being is that upon termination you will then

24   cease operating at all per the agreement.

25            We also talk about that any monies outstanding

1    would then be fully brought current and that whatever

2    was owed to us, per paragraph F, would then be satisfied

3    as well in agreement with that termination.

4        Q.   Okay.  Thank you.  And does the franchise

5    agreement also contain a post termination covenant not

6    to compete?

7        A.   It does indeed.

8        Q.   Okay.  And let's take a look at section 17,

9    subpart C, which appears at the top of page 7.  Is that

10   the post termination covenant not to compete?

11       A.   It is.

12       Q.   Okay.  And why does MAACO include that provision

13   in the agreement?

14       A.   Again, I think this is where we get to the crux

15   of the matter here.  Is it is critical for our system

16   strength and that of our existing franchisees that

17   someone who has our proprietary operating system, has

18   our customer base, has our manuals, has our information

19   system, no longer utilize that for their own benefit

20   without having the obligations of the -- of the

21   financial obligations and the competing obligations to

22   other MAACO centers in their market or in their country.

23          So, yes, that's, you know, part of the covenant

24   and what our expectations are.

25       Q.   Okay.  To your knowledge, has MAACO ever entered

 1   into a franchise agreement without a covenant not to

 2   compete?

 3       A.   Absolutely not.

 4       Q.   And why is the covenant to important to MAACO?

 5       A.   It's important to MAACO and all franchise

 6   organizations.  Here, I think we're talking about a

 7   precedent setting situation.

 8           This is a covenant that allows franchisors and

 9   franchisees to understand that what they have learned is

10   proprietary and the expectation.  And when that

11   relationship is over, you can no longer benefit from the

12   knowledge, the information, the training, the trademark,

13   that was given to you during the term of your franchise

14   agreement.

15           If you chose to do so, you have franchise chaos.

16   Guys would grab the system, learn from it, and in a week

17   or seven years later -- in this case -- say I'm just

18   going to stop paying you and go use everything you've

19   learned on your own and be in competition with you.  We

20   would no longer have a franchise without that covenant.

21       Q.   And the covenant contains a radius of ten miles

22   around the franchisee's MAACO center or any other MAACO

23   center.  Can you tell me what is that ten-mile radius

24   based upon?

25       A.   Again, over years of research, we have done pin

 1    studies and other research that shows us that a location

 2    can draw customers, both retail and trade customers,

 3    from up to ten miles away.  Therefore, we still give

 4    this guy an opportunity to go beyond ten miles, but we

 5    don't want him competing within that ten-mile circle of

 6    an existing MAACO or any proposed MAACO location that

 7    may, in turn, jeopardize that location or the brand

 8    again in that marketplace.

 9        Q.   Okay.  And in coming up with the ten miles, has

10    MAACO conducted studies regarding the radius from which

11    a center will draw customers?

12        A.   We have.

13        Q.   Okay.  The covenant also applies for a period of

14    one year.  Can you explain how that term of the covenant

15    was decided upon?

16        A.   I can't say specifically.  I believe that what

17    we've done there is do what's reasonable and not try to

18    prevent a ex-franchisee from every being a part to the

19    business, but at least give the brand and the existing

20    franchisees enough time to get up and running and gain

21    any of the customer base back within the system rather

22    than have it compete up to that time period for one

23    year.

24        Q.   Okay.

25             MS. AMARANTE:  I'm now going to offer as

1    Plaintiff's Exhibit 3 a MAACO-Polaris 2000 software

2    license agreement.  And I have two copies for the Court

3    and the witness.

4                 (Pause in proceedings.)

5    BY MS. AMARANTE:

6         Q.  Is this document familiar to you?

7         A.  It is.

8         Q.  Okay.  What is it?

9         A.  It is our proprietary software hereby called

10   "Polaris" in which we agree to loan the use of that

11   software to a franchisee for the term of its franchise

12   agreement.

13        Q.  Okay.  And is this the software license agreement

14   that Mr. and Mrs. Augustin signed with MAACO?

15        A.  It is indeed.  This agreement specifically was

16   dated October 4th, 2002, by the Augustins.

17        Q.  Okay.  And was this agreement also assigned by

18   MAACO Enterprises, Inc. to MAACO Franchising, Inc., when

19   the transaction happened in 2008?

20        A.  Yes, it was.

21        Q.  What kind of information is generated and

22   contained in Polaris?

23        A.  Again, this is a proprietary secret software in

24   which it is the way we interface with our customers, and

25   the software that they receive and the invoices and

 1    repair orders that a customer would receive.  So our

 2    selling system is built into the software, our

 3    information system in terms of how we look at profit and

 4    loss of our business and all of that, the production in

 5    the way we produce our work in the back of the shop in

 6    terms of prioritizing which work over it.  It

 7    essentially is our operating system memorialized in a

 8    software program that's licensed to each of our

 9    franchisees.

10        Q.  Okay.  And turning to section 7 of the Polaris

11    agreement --

12        A.  Uh-uh.

13        Q.  -- again entitled, "Confidential Information."

14            Why is it important to have this separate

15    agreement indicating that Polaris is also confidential

16    to the MAACO system?

17        A.  Again, it's part and parcel to our operating

18    system, the way we do business, which is significantly

19    different than the industry.  It needs to be outlined

20    again that this should not be shared and is only to be

21    used by the franchisee or his agents while representing

22    themselves as a MAACO franchise.

23        Q.  Okay.  Mr. Monaghan, are you personally familiar

24    with the Augustins and their former MAACO center?

25        A.  I am.

1    Q.   When the Augustins's signed their franchise

2    agreement in October 2002, did MAACO provide them with

3    any training?

4    A.   We did indeed.

5         MS. AMARANTE:   And I'm going to offer as

6    Plaintiff's 4 some training -- a document entitled,

7    "Training Class Memo."   And I'm handing it to defense

8    counsel right now.

9         (Pause in proceedings.)

10        MS. AMARANTE:   Absent objection, Your Honor,

11   I'm beginning to move both Plaintiff's Exhibit 3 and

12   Plaintiff's Exhibit 4 as full exhibits at this time.

13        MR. BUKOWSKI:   No objection.

14        THE COURT:   Good.   It will be admitted.

15        (Whereupon, Plaintiff's Exhibit Nos. 3 and 4

16        were admitted into evidence.)

17   BY MS. AMARANTE:

18   Q.   Mr. Monaghan, are you familiar with this document

19   marked as Plaintiff's 4?

20   A.   I am.

21   Q.   And are these documents kept as part of MAACO's

22   business records?

23   A.   They are indeed.

24   Q.   What does this document show?

25   A.   This is documentation that in September of 2002,

1   specifically from September 16th until October 8th of

2   2002, that Philippe Augustin was flown to King of

3   Prussia, Pennsylvania, to complete in our franchise

4   training program for the three and a half weeks at our

5   corporate office.

6       Q.   Okay.  And what kinds of topics are covered

7   during that initial training?

8       A.   Again, it's essentially your -- I'll call it your

9   MAACO MBA.  It is the exposure to our operating system

10  and all the proprietary systems and procedures therein,

11  from how the store's laid out again, to how to sell at

12  our business, to our advertising, to our production, to

13  our Polaris training, to our information system.  It is

14  the exposure to essentially behind the curtain of MAACO

15  and our operating system.

16      Q.   Okay.  And does the training include information

17  about how to properly calculate the royalties that are

18  due to MAACO?

19      A.   It does indeed.

20      Q.   Okay.  Did Mr. Augustin receive access to MAACO's

21  unique operating system during this initial training?

22      A.   Yes.  He would have had exposure to it and would

23  have walked away at the end of the class with all of the

24  manuals that he was exposed to there, and consequently,

25  walks away with a Polaris software disc and all the

1    manuals relating to our operating system upon the

2    completion of this said training program.

3        Q.   Okay.

4             MS. AMARANTE:   I'm not going to offer as

5    Plaintiff's Exhibit 5 a document called, "Manual

6    Receipt."   And I'm handing a copy to defense counsel.

7             (Pause in proceedings.)

8             MS. AMARANTE:   Absent objection, I'd like to

9    offer that as a full exhibit, Plaintiff's Exhibit 5.

10            MR. BUKOWSKI:   No objection.

11            THE COURT:   All right.

12            (Whereupon, Plaintiff's Exhibit No. 5 was

13            admitted into evidence.)

14   BY MS. AMARANTE:

15       Q.   Mr. Monaghan, is this document familiar to you?

16       A.   It is indeed.

17       Q.   Okay.   And what is it?

18       A.   It is a signed manual receipt by Philippe that on

19   October 1st of two thousand and second, that he received

20   eleven of our confidential operating manuals and would

21   understand that this is extremely important information

22   and that the -- that this information is owned by MAACO,

23   forbidden to be shared by anyone else and have every

24   expectation that it be returned to us undamaged at the

25   end, and that any loss or anything that would incur to

1  us is to us monumental towards our franchise agreement

2  and implied in the -- the -- the value of these manuals.

3      Q.  Okay.  And at the bottom of the document, do you

4  recognize the signature on the page?

5      A.  Again, without being a handwriting expert, it

6  certainly is consistent with the handwriting of Mr.

7  Augustin both on our franchise agreement, on the Polaris

8  software agreement, that was priorly introduced.

9      Q.  Okay.  And in the first sentence of the -- the

10  first paragraph of the manual receipt, it talks about

11  the manuals being on loan to Mr. Augustin.  Why is it

12  phrased that way?

13      A.  Again, these operating manuals, in our opinion,

14  are extremely important to our system and, therefore,

15  are on loan to our franchisees while they operate as a

16  MAACO under our agreement and would need to be returned

17  upon that termination or other agreement with us.

18      Q.  Okay.  And the last part of the second paragraph

19  of text starting with, "Their loss will cause

20  substantial damage to MAACO" --

21      A.  Uh-uh.

22      Q.  -- "although the amount of such a loss would be

23  incalculable with any degree of certainty."

24          Why is that language included on the manual

25  receipt?

1    A.   Again, to recognize the seriousness of this

2    information.  In the hands, it could be extremely

3    dangerous to us as a company to allow our manuals, our

4    way of doing business, to become common knowledge and

5    common practice.  It is what differentiates us from the

6    industry.  And consequently, if it became public domain

7    information, it would put us at serious risk.

8    Q.   Why are there eleven separate manuals that are

9    given to the franchisees in the MAACO system?

10   A.   Because it would be one gigantic manual if we put

11   it into one.  This is, you know, a volume of

12   information, you know, that probably stands eleven

13   binders and three feet in girth in terms of all the

14   information.

15   Q.   Okay.

16        MS. AMARANTE:  I'm now going to offer as

17   Plaintiff's Exhibit 6 a document that starts at the top,

18   "Maintenance Manual."

19        THE WITNESS:  Okay.

20        MS. AMARANTE:  And I'm handing that to

21   defense counsel.

22        (Pause in proceedings.)

23   BY MS. AMARANTE:

24   Q.   Mr. Monaghan, do you recognize this document?

25   A.   I do indeed.

1    Q.   Okay.  And what is it?

2    A.   It is a portion of a manual that was given to our

3    franchisees related to this specific piece, or at least

4    the beginning of it is related to the maintenance of the

5    equipment and the location in order to be successful and

6    to maintain good working equipment.

7    Q.   And looking through, does this document include a

8    table of contents for each of the eleven manual that the

9    Augustins received?

10    A.   It does indeed.

11         If you to through, we see the first part is the

12    maintenance manual.  As we go through that, it's the

13    health and safety piece, our management information

14    piece.  What you're looking at here is, you know, the

15    sales and marketing piece.

16         This is the introduction to each of the manuals

17    in which Philippe would have received upon the

18    completion of his class that he dated he received on

19    October 1st of 2002.

20              MS. AMARANTE:  Absent objection, I'd like to

21    offer this as a full exhibit, Plaintiff's Exhibit 6.

22              THE COURT:  Any objection?

23              MR. BUKOWSKI:  No, Your Honor.

24              THE COURT:  Good.  All right.

25              (Whereupon, Plaintiff's Exhibit No. 6 was

```
 1              admitted into evidence.)
 2  BY MS. AMARANTE:
 3      Q.   Mr. Monaghan, do any of these manuals include
 4  information or forms regarding the calculation of
 5  royalties due to MAACO?
 6      A.   Yes, they do.  If you were to turn -- and I'm not
 7  quite sure which page it would be.  It's about 15,
 8  20 pages in.  It says, "Management Information System."
 9          If you look at the table of contents there, it
10  clearly outlines what the Friday night weekly close
11  would look like and the sequential MIS track and all of
12  the exhibits and forms there -- thereto on page 2 of
13  that.  It would need to be completed in order to
14  calculate accurately your royalties due each week.
15      Q.   Okay.  So, for example, does the manual include
16  information on how a franchisee might receive a royalty
17  credit if a customer obtained an estimate but didn't
18  return for the actual work on their vehicle?
19      A.   I'm sorry.  I don't understand the question.
20      Q.   Does this Management Information System Manual
21  and the forms attached include information about whether
22  or not MAACO would calculate royalties on an estimate
23  where the customer didn't actually return and pay for
24  the work?
25      A.   Indeed it would.  Under the exhibits and forms,
```

1    you know, it goes through each of them explaining by

2    definition.  Under Exhibit Number 11, number 2 is the

3    repair order.  It would have outlined in that chapter

4    what the repair order is and your obligations.

5          Further down you look at Cash Receipts, in

6    Exhibit Number 8 there.  And its definition being that

7    that's what the royalties would be calculated from and

8    how that's generated is all outlined in this manual.

9    Q.   Okay.  And does the manual also include

10   information regarding the calculation of royalties due

11   on sublet work?

12   A.   Indeed it would.  Again, by the definition under

13   the cash receipts and that under the franchise agreement

14   it's -- it's -- its royalties are subject to all revenue

15   generated on the location without exception.

16   Q.   Okay.  Can you explain in simple terms what

17   sublet work means?  Why would a MAACO center be doing

18   sublet work?

19   A.   Certainly, that would -- an example may mean the

20   replacement or the outsourcing of labor in which you are

21   unable to do in-house.  An example of that may be a

22   windshield repair that you would bring in a glass

23   specialist to replace that windshield on a customer's

24   car for them, and then consequently pay that -- that

25   windshield repair supplier directly and charge the

1   customer to have -- to pay for it.  Rather than allowing

2   those two to act together, we would act as intermediary

3   between the two.  And in most cases, marking up the

4   sales in order to make some profit on that and then

5   passing it onto the customer.

6       Q.   Okay.  And under the franchise agreement and as

7   detailed in the operations manuals, the franchisee is

8   required to pay MAACO a royalty fee on that sublet work,

9   correct?

10      A.   Without a doubt.

11      Q.   Once Mr. Augustin completed the initial three and

12  a half week training and received his eleven operating

13  manuals, did MAACO provide him with any additional

14  support?

15      A.   A significant amount of additional report.

16  During that first year of operation, there were six-man

17  weeks.  We're talking about 42 days of people in his

18  location to train him and his staff on our operating

19  system.  And then subsequently each year there was

20  additional incenter training, regional marketing

21  meetings training, incenter inspections, national

22  conventions, on and on and on.

23          So yes, there was a significant amount of

24  resources to go into the support of specifically their

25  locations.

1    Q.   Okay.  And when you say "man weeks" --

2    A.   Uh-uh.

3    Q.   -- can you explain what that means?  Did MAACO

4    actually send a person?

5    A.   It would literally mean that one of our

6    representatives would fly in either on Sunday night or

7    Monday morning and would remain at that location through

8    the duration of the week:  Monday, Tuesday, Wednesday,

9    Thursday, Friday.  So a man week would mean that we had

10   an employee of MAACO's operations department, a person

11   that would have report to me, in that location for an

12   entire week of business for training purposes.

13        So during that time period there were, you know,

14   weeks and weeks and weeks of incenter support given to

15   this location.

16   Q.   And I think you said that the Augustins's

17   received six-man weeks of support?

18   A.   Just during the first six months of operation,

19   yes.

20   Q.   And is that amount of support typical for a new

21   franchisee in the system?

22   A.   I would say it's a little on the high side.

23   We -- in our agreement with our franchisees is typically

24   they will get up to four weeks during that time period.

25   However, if we run into a situation where we have a

1    franchisee struggling to get the system and struggling

2    to understand our operating system, we will continue to

3    invest more support in that location to help them try to

4    get it.

5        Q.  And after the fist year of the Augustins's

6    operation, did MAACO continue to provide support and

7    training to the Augustins?

8        A.  Indeed.  Right up until the proverbial bitter

9    end.  It then was clearly not as intensive where we

10   would have people in there for weeks and weeks.  It

11   would typically be someone coming in for a half a day or

12   a full day of training.  It may also include for a

13   meeting within the marketplace where the franchisee or

14   salespeople or production manager would come to do a

15   meeting with one of our people for a training exercises

16   in the evening.

17           There are both regional conferences every other

18   spring and there's national conferences each year.

19   They're all available for Philippe to continue to

20   operate and to learn more about our system from a

21   support standpoint.

22       Q.  Does MAACO also provide its franchisees with any

23   publications?

24       A.  We do.  There are numerous publications.  On a

25   weekly basis our franchisees receive which is a

1    proprietary called our paint line.  That is a -- a -- a

2    list of every single franchisee in the system and their

3    reported revenues and cars and leads and a lot of

4    proprietary information on all of the systems on both a

5    regional and national basis that share every week with

6    each of the franchisee so that they can measure

7    themselves up against their peers within the marketplace

8    or within the region on the within the country.

9         In addition to that, we have monthly newsletters

10   called the Quick Connect that give them continuing

11   education on what's going on in the business and updates

12   on all the things going on in MAACO on a national basis.

13   We have an intranet site with a site only accessible to

14   our franchisees called the MAACO Forum, and franchisees

15   were encouraged to go on there at their -- at their own

16   time to continue to update themselves and the library of

17   information that would be available to them to operate

18   the business.

19   Q.  And what kind of information is available on that

20   library on the intranet?

21   A.  That is a significant amount.  It is again almost

22   like -- it is representative.  It's a list of all of our

23   national accounts.  It's a list of every manual on that

24   you've -- we've shown here.  There's an electronic

25   version in which a franchisee can grab pieces and update

 1   when necessary when there's changes to what they might

 2   have received in training.  There are any of our new

 3   related procedures or systems or advertising campaigns

 4   or initiatives relating to the company.  It is all

 5   things MAACO.

 6      Q.  Okay.  And during the time that they operated

 7   their MAACO center, did the Augustins have access to all

 8   of these publications and the intranet that MAACO hosts

 9   for its franchisees?

10      A.  Indeed they did.

11      Q.  Can franchisees also e-mail or call MAACO

12   headquarters if they have a question or need additional

13   training and support?

14      A.  Absolutely.

15      Q.  To your knowledge, did the Augustins ever contact

16   MAACO to say they needed more training or support?

17      A.  Again, they would have been assigned a regional

18   operations director, and I think you've going to speak

19   to him shortly, Mr. Doug Engle, who's here with us.  He

20   would have been their direct conduit to those.

21          I personally was never called and asked for any

22   additional support or anything of that nature by them.

23      Q.  Did you personally ever visit the Augustins's

24   former MAACO center?

25      A.  I did indeed.

1    Q.   When did that occur?

2    A.   Gosh.   I apologize for not knowing the exact

3    date.   It was a few years ago in the spring.   We were

4    doing a spring meeting in the marketplace and myself and

5    a prior employee visited all the MAACOs in the

6    marketplace to get a sense of how the business was being

7    run before we went in and did a weekend-long training

8    exercise with all the franchisees and their key

9    employees.

10    Q.   And when you visited the Augustins's former MAACO

11    center, what did you observe during that visit?

12    A.   What we observed is a significant disconnect from

13    our operating system in a lot of ways.   We saw things

14    that were not being done properly from how we were

15    selling to your customers, to how the work was being

16    produced, to the quality standards of the work that was

17    being produced.

18    Q.   Did the Augustins's MAACO center receive any

19    customer complaints that you're aware of?

20    A.   An excessive amount.

21    Q.   Do you remember anything specific about those

22    complaints?

23    A.   We do.   Again, we have standards of both customer

24    service inquiries.   All of our customers are asked to

25    fill out a warranty card that registers their

1   satisfaction with that experience.  They're also given a

2   receipt at the end of that job that if they're unable or

3   un -- un -- if they're unsatisfied to call into our

4   customer complaint department that we -- that we man at

5   our King of Prussia office.

6        Specifically, to this location during the time

7   period you were talking about approximately one customer

8   for every forty-some customers would call in complaining

9   about their experiences being a negative experience

10  either due to the service or the quality rendered at

11  that location.

12              MS. AMARANTE:  I'm now going to mark as

13  Plaintiff's 7 a document entitled, "Notice of

14  Termination of Franchise Agreement."  I'm going to offer

15  this as 7.

16              (Whereupon, Plaintiff's Exhibit No. 7 was

17              marked for identification.)

18  BY MS. AMARANTE:

19     Q.  Are you familiar with this document?

20     A.  Yes, I am.

21     Q.  Okay.  And what is this document?

22     A.  This is the notice of termination that was sent

23  to the Augustins on April 9th of 2009.

24     Q.  And what was the reason for the termination of

25  the franchise agreement?

     A.   The inability of our franchisee, in this case, to

cure the default that was given to them on December 3rd

of 2008.

     Q.   Okay.  And turning to the second page of

Plaintiff's Exhibit 7, you'll see that there are some

figures at the bottom.

     A.   Yes.

     Q.   Can you tell me according to the termination

notice, how much money did the Augustins owe MAACO at

that point in time?

     A.   Again, based on the information that was

submitted by them, and there were some missing reports

and other things so this is not in total.  But based on

what we knew, the Augustins owed us in excess of $93,000

at the time of this termination.

     Q.   Okay.  And when did the termination of the

franchise agreement take effect?

     A.   Well, we were asking for them to be terminated

effective immediately on October -- on April 9th of

2009.  But implicit in that is their compliance with our

post termination obligations.

     Q.   Are you aware of any issues that the Augustins

were having with their landlord at or about the time the

franchise agreement was terminated?

     A.   We were.  We had been notified a couple of times

1   throughout the seven years and up until this time

2   period.  The Augustins were also in default with their

3   landlord in terms of that you are lease obligations.

4      Q.  Okay.

5           MS. AMARANTE:  And I'm going to at this time

6   offer, absent objection, the notice of termination,

7   Plaintiff's Exhibit 7 as a full exhibit.

8           MR. BUKOWSKI:  No objection.

9           (Whereupon, Plaintiff's Exhibit No. 7 was

10          admitted into evidence.)

11          MS. AMARANTE:  And I am also going to turn

12   to an exhibit that's entitled, "Final Judgment," and

13   offer that as Plaintiff's 8.

14          (Pause in proceedings.)

15   BY MS. AMARANTE:

16      Q.  Are you familiar with this document, Mr.

17   Monaghan?

18      A.  I am.

19      Q.  Okay.  And what is it?

20      A.  This is a judgment entered on behalf of the

21   landlord, Thomas David, against the Augustins in

22   reference to their default on their lease agreement with

23   the landlord.

24      Q.  And is this with respect to the landlord of the

25   former MAACO center at 804 Old Dixie Highway?

1    A.  It is indeed.

2    Q.  And in the first paragraph of that final

3  judgment, there's a reference to a stipulation for

4  payment dated March 10th, 2009.  Do you see that, Mr.

5  Monaghan?

6    A.  (No response.)

7    Q.  The second line of the --

8    A.  Yes, I do.

9    Q.  Okay.  March 10th, 2009, is that approximately a

10  month before the franchise agreement was terminated?

11    A.  Indeed, it was.  It was while we were still in

12  default with our franchisee, he had this judgment filed

13  against him for -- in the sum of excess of $43,000.

14    Q.  And when a franchisee fails to pay a landlord and

15  winds up getting sued for nonpayment, do those actions

16  have an impact on the MAACO brand?

17    A.  Clearly, they do in numerous ways.  The first and

18  foremost would be if he's unable to maintain his

19  occupancy of that location, our franchise agreement is

20  put in jeopardy and we would no longer have an operating

21  center at that location as a result of his inability to

22  pay his rent.

23        So, therefore, you know, our expectation of

24  receiving any future royalties and fees at that location

25  are clearly put in jeopardy.

```
 1              MS. AMARANTE:  Absent objection I'm going to
 2   move to admit Plaintiff's Exhibit 8 as a full exhibit at
 3   this time.
 4              MR. BUKOWSKI:  No objection, Your Honor.
 5              THE COURT:  Go ahead.
 6              (Whereupon, Plaintiff's Exhibit No. 8 was
 7              admitted into evidence.)
 8              MS. AMARANTE:  And as a bit of clean up, I'm
 9   told that I didn't do that with Exhibit 6 yet, either.
10   So absent objection, I'll also move to admit Plaintiff's
11   Exhibit 6 as a full exhibit.
12              MR. BUKOWSKI:  No objection.
13              THE COURT:  Exhibit 6 will be received.
14              MS. AMARANTE:  Thank you, Your Honor.
15              (Whereupon, Plaintiff's Exhibit No. 6 was
16              admitted into evidence.)
17   BY MS. AMARANTE:
18     Q.  When the Augustins's franchise agreement was
19   terminated in April 2009, did the Augustins stop
20   operating a painting and auto body repair shop?
21     A.  They have yet to stop operating an auto repair
22   and body shop of any means.  No, they did not.
23     Q.  Okay.  Did they continue to operate at the same
24   location as their former MAACO center for a period of
25   time?
```

1    A.   They did.   They continued to operate at that
2   specific location until the end of June.
3    Q.   Okay.
4    A.   And then moved a mere 900 feet away to another
5   location and continued to operate in perpetuity since
6   then.
7    Q.   Okay.   When the franchise agreement terminated,
8   did the Augustins return the operations manuals or any
9   other materials that they received over the course of
10   their franchise relationship?
11    A.   They returned nothing.
12    Q.   Did they return the Polaris software to MAACO?
13    A.   No.
14    Q.   And did they stop using the MAACO name and
15   operating system when the franchise agreement was
16   terminated?
17    A.   No.   They continued to represent themselves as
18   MAACO.
19            THE COURT:   Can you say a little more about
20   what you mean about continued to operate themselves
21   through MAACO?
22            THE WITNESS:   Well, in through -- they
23   continued to be in that specific Old Dixie Highway
24   location, Judge, until the end of June still with MAACO
25   signage, still with MAACO paperwork, still with

1    everything related to our operating system.

2             When they moved down the street, they still

3    represented themselves as formerly MAACO, and even

4    represented themselves to our vendors as MAACO to

5    benefit from our national contacts in order to buy

6    supplies and products and parts at the discounted rate

7    that we've negotiated as a result of our economics of

8    470 locations.  So they've always represented themselves

9    as MAACO or formerly as MAACO up until very recently.

10            MS. AMARANTE:  I am going to offer as

11   Plaintiff's 9 a document that's an invoice that has

12   "LKQ" at the top.

13            (Pause in proceedings.)

14            MS. AMARANTE:  Okay.  So this is being

15   offered as Plaintiff's 9.

16   BY MS. AMARANTE:

17      Q.  Mr. Monaghan, do you recognize this document?

18      A.  I do.

19      Q.  And what is it?

20      A.  This is an invoice from one of our vendors called

21   LKQ who is the reseller of automobile body parts to our

22   franchisees and others in the industry.

23      Q.  Okay.  And does MAACO have an agreement with LKQ?

24      A.  We do.  We have a national agreement with them in

25   terms of a part discount that they supply to all of our

 1     franchisees that is considerably better than one would

 2     receive if they were in business without the MAACO

 3     brand.

 4         Q.   Okay.  And do you see or the left side in the

 5     "sold to" box --

 6         A.   I do.

 7         Q.   -- it says, "MAACO of Lake Park with a 1009

 8     Newman Road address; do you see that?

 9         A.   I do.

10         Q.   Has there every been a MAACO center located at

11     1009 Newman Road in Lake Park?

12         A.   Well, that's a mess -- it's kind of an issue of

13     dispute.  It's clearly not a licensed location, but it's

14     one in which the Augustins continued to operate and

15     represent themselves as MAACO at the location that's a

16     mere, you know, thousand feet away from the MAACO that

17     they abandoned on Old Dixie Highway.

18         Q.   Okay.  And looking down at the "received" line

19     toward the bottom of the invoice?

20         A.   Uh-uh.

21         Q.   Can you make out who's signature is on the

22     document?

23         A.   Again, it's -- it seems to be completely

24     consistent with every other signature I've seen for

25     defendant, Philippe Augustin.

1    Q.   And going up to the right hand side of the
2    invoice there's shipping date and date ordered; do you
3    see those dates?
4    A.   I do indeed.
5    Q.   And the date is September 25th, 2009; is that
6    correct?
7    A.   It is.
8    Q.   Okay.
9         THE COURT:   I'm sorry.   What was the date?
10        MS. AMARANTE:   September 25th, 2009, Your
11   Honor.
12   BY MS. AMARANTE:
13   Q.   And just to repeat, when was the Augustins's
14   franchise agreement terminated?
15   A.   Again, the agreement was terminated in April of
16   2009.
17   Q.   So that would be five months before Mr. Augustin
18   placed this order with LKQ using the MAACO name?
19   A.   Five plus months, yes.
20   Q.   And did the Augustins receive any benefit from
21   using the MAACO name on this order form?
22   A.   They certainly would have received our associated
23   MAACO discount consequently saving them money or making
24   them more money on that part as a result of using their
25   name as MAACO in purchasing of this part and delivering

1    it to their said location.

2              MS. AMARANTE:  Your Honor, I move for

3    Plaintiff's Exhibit 9 to be a full exhibit at this time

4    absent no objection.

5              THE COURT:  All right.

6              MR. BUKOWSKI:  No objection, Your Honor.

7              (Whereupon, Plaintiff's Exhibit No. 9 was

8              admitted into evidence.)

9              MS. AMARANTE:  And I'm now going to mark an

10   exhibit, Plaintiff's Exhibit 10, which has a Palm Beach

11   Auto business card at the top.

12             (Whereupon, Plaintiff's Exhibit No. 10 was

13             marked for identification.)

14   BY MS. AMARANTE:

15     Q.  Have you seen this document before?

16     A.  I have.

17     Q.  Okay.  And turning to the second page of the

18   document, do you recognize this form?

19     A.  I do indeed.  This is a proprietary repair order

20   for MAACO Collision Repair and Auto Painting.  For this

21   specific one, it was generated by the location, the Lake

22   Park on Old Dixie Highway on July 2nd of 2009.

23     Q.  Okay.  And is July 2nd, 2009, also after the

24   Augustins's franchise agreement was terminated?

25     A.  It is both after their franchise agreement was

```
1   terminated and after their fact of vacating the premises
2   at that address.
3              THE COURT:  I'm sorry.  Where in -- where
4   down are we?  What page are we on?
5              MS. AMARANTE:  The second page of
6   Plaintiff's Exhibit 10, Your Honor, at the bottom, the
7   very last line, it says, "Date, 7/02/2009."
8              THE WITNESS:  That's right there in your
9   hand, Your Honor.  Nope.  The one in your left hand.
10              MS. AMARANTE:  It's the second page of the
11   exhibit.
12              THE WITNESS:  That.  To the very bottom of
13   that.  You'll see the date.
14              THE COURT:  7/02/2009.
15              THE WITNESS:  And then if you look at --
16              MS. AMARANTE:  Yes.
17              THE WITNESS:  And to the top left is the
18   address.
19              THE COURT:  Thank you.
20   BY MS. AMARANTE:
21      Q.  And, Mr. Monaghan, you testified that this form
22   is created from the Polaris software --
23      A.  Yeah.  The only way --
24      Q.  -- and it's proprietary to --
25      A.  -- this or anything like this would be generated
```

1  is by our proprietary management information software

2  system called Polaris.

3     Q.  And in turning to the first page of the document

4  at the top there's a Palm Beach Painting and Auto

5  Collision card; is that correct?

6     A.  There is.

7     Q.  Okay.  And it looks as though the fax is being

8  sent to an insurance company; is that correct?

9     A.  It is without a doubt a fax being sent from Palm

10 Beach Auto Painting by a Jerome Dear to State Farm

11 Insurance representing this specific repair being done

12 by them and authorization for payment and around that.

13    Q.  And based on those documents, does it appear to

14 you as though Palm Beach Auto is affiliated somehow with

15 MAACO?

16    A.  It is directly affiliated.  It's usually in our

17 repair order with our customer and representing

18 themselves as such to an insurance company, which is

19 extremely dangerous from our prospective to allow,

20 again, someone to continue to operate and represent

21 themselves as a MAACO to one of our major clients, being

22 a State Farm Insurance Company.

23         MS. AMARANTE:  I'd like to move for

24 Plaintiff's Exhibit 10 to be a full exhibit, Your Honor,

25 absent objection.

```
 1              MR. BUKOWSKI:  No objection, Your Honor.
 2              THE COURT:  Fine.
 3              (Whereupon, Plaintiff's Exhibit No. 10 was
 4              admitted into evidence.)
 5   BY MS. AMARANTE:
 6      Q.  Mr. Monaghan, I'll also asked, on Plaintiff's
 7   Exhibit 10, when did you first see these documents?
 8      A.  A day or two before last week while we were
 9   preparing for this.
10      Q.  And do you know why it is that you didn't see
11   documents like this before last week?
12      A.  Clearly, they were being utilized by the
13   Augustins behind -- they wouldn't want us to see that
14   they're representing themselves as a MAACO, utilizing
15   our name for the purposes of gaining customers,
16   utilizing our names in the purpose of gaining the
17   benefit of national account buying supplies and national
18   account vendor relationships and national account
19   customer relationships.
20              You know, this is a smoking gun as far as I'm
21   concerned.  So why I've never seen it is because it was
22   clearly not being shared with us.  It was being done and
23   utilized behind our backs.
24              MS. AMARANTE:  I'm now going to offer as
25   Plaintiff's 11 a copy of the defendants's joint answer
```

 1   and counter claim dated February 24th, 2010.

 2   BY MS. AMARANTE:

 3       Q.   Turning to paragraph 41 -- well, actually, I'm

 4   sorry.  I'll give you a page number.  It is on page 22

 5   of the document numbered paragraph 41.

 6            (Pause in proceedings.)

 7   BY MS. AMARANTE:

 8       Q.   And there's an allegation here in paragraph 41

 9   that MAACO failed to purchase the assets of the center

10   from the Augustins in order to obtain an assignments of

11   the Augustins's lease as required by paragraph 16(a) of

12   the franchise agreement.  Does paragraph 16(a) of the

13   franchise agreement require MAACO to purchase the assets

14   of the Augustins's center after termination of the

15   agreement?

16            MR. BUKOWSKI:  Objection; calls for a legal

17   conclusion.

18            THE COURT:  Sustained.

19   BY MS. AMARANTE:

20       Q.   Mr. Monaghan, I'm going to ask you to look at

21   Plaintiff's Exhibit 2, which is the franchise agreement.

22       A.   (Witness complies.)

23       Q.   And --

24            THE COURT:  Hold on a moment.  I'm making my

25   way through the exhibits.

```
 1                  MS. AMARANTE:  I'm sorry.

 2                  (Pause in proceedings.)

 3                  THE COURT:  You've given so much exciting

 4      reading material.  It's hard to stop.  Very good.

 5      Exhibit 2.

 6      BY MS. AMARANTE:

 7         Q.  Exhibit 2, and I'll ask you to look at paragraph

 8      16(a), Mr. Monaghan.  And I'll actually read it for you.

 9       "Upon termination on expiration of this agreement,

10      MAACO shall have the right for a period of 60 days

11      commencing on the date of termination or expiration to

12      purchase from franchisee the assets of the center and

13      obtain an assignment of franchisee's lease for the

14      premises of the center."

15              Do you see that?

16         A.  I do.

17         Q.  Okay.  And in your experience during your time

18      with MAACO, has MAACO always purchased a franchisee's

19      assets and obtained -- when obtaining an assignment of a

20      lease?

21         A.  No, we have not.  Again, that's our definition of

22      an option or a right, not a requirement.

23         Q.  And turning back to page 2 of that document --

24      excuse me.

25                  THE COURT:  Which document?  Two or --
```

 1          MS. AMARANTE:  Plaintiff's 2, yes.  Excuse

 2   me.  I'm sorry, Your Honor.

 3          THE COURT:  It's all right.

 4          MS. AMARANTE:  We're still in Plaintiff's

 5   Exhibit 2, and I'm asking the witness to turn to page 2

 6   looking at section 6A(4), which talks about the leasing.

 7          THE COURT:  Okay.

 8   BY MS. AMARANTE:

 9    Q.  Are you there, Mr. Monaghan?

10    A.  I am.

11    Q.  And I'll read that.  "MAACO shall have the right,

12   at MAACO's election, to receive an assignment of the

13   leasehold interest upon termination or expiration of

14   this agreement."

15          Do you see that?

16    A.  I do.

17    Q.  And that provision doesn't require MAACO to

18   purchase any assets in order to receive that assignment

19   of the leasehold interest, correct?

20    A.  Again, we shall have the right at our election,

21   not required to do so.

22    Q.  Was MAACO able to place a new franchisee at the

23   Augustins's former location?

24    A.  We were.

25    Q.  Who is that franchisee?

```
 1      A.   David Stefan.

 2      Q.   And do you know, when did he open for business?

 3      A.   He opened in late July of 2009.

 4            (Pause in proceedings.)

 5            MS. AMARANTE:   I now have a document that

 6   I'm going to offer as Plaintiff's Exhibit 12.

 7            (Pause in proceedings.)

 8   BY MS. AMARANTE:

 9      Q.   Is this document familiar to you, Mr. Monaghan?

10      A.   It is.

11      Q.   Okay.  What is it?

12      A.   It is a map profile of the locations within the

13   DMA area of Lake Park, Florida.

14      Q.   Okay.

15      A.   Each of the X's represents a MAACO location in

16   that market.

17      Q.   Okay.  And who created this map?

18      A.   This was created by the MAACO -- our real estate

19   department.  By us.

20      Q.   And I'm going to ask you to look --

21            MS. AMARANTE:   Well, first of all, absent

22   objection, I'm going to move to admit Plaintiff's

23   Exhibit 12 as a full exhibit.

24            MR. BUKOWSKI:   I don't have an objection.

25            (Whereupon, Plaintiff's Exhibit No. 12 was
```

```
 1                  admitted into evidence.)
 2   BY MS. AMARANTE:
 3      Q.   So I'm going to now ask you to look at Lake Park,
 4   which is approximately in the middle of the map, Mr.
 5   Monaghan?
 6      A.   Uh-uh.  I see it.
 7      Q.   And you see Lake Park, Old Dixie Highway.  Is
 8   that the Augustins's former MAACO center?
 9      A.   The Lake Park, Old Dixie Highway, yes, indeed is.
10      Q.   And that's where David Stefan --
11      A.   David Stefan operates currently.
12      Q.   All right.  And the X that's right next to it --
13   well, really on top of it, has an address of 1009 Newman
14   Road.  Do you see that?
15      A.   I do.
16      Q.   Okay.  And what is that location?
17      A.   That was the location the Augustins continued to
18   operate both formerly as a MAACO location.
19      Q.   And off to the side to the right in the Atlantic
20   Ocean over here, there's a box that says 1913.6 feet.
21   Do you see that?
22      A.   Indeed, it measures the distance from that Old
23   Dixie Highway location to the 1009 Newman Road location
24   designating that the two locations are nineteen hundred
25   and thirteen and a half feet apart from one another.
```

1      Q.   Okay.  So would you agree then that the

2  Augustins's new location is less than a half mile away

3  from the former MAACO center?

4      A.   I'm not quite sure of my math on a half a mile,

5  but I'll certainly say it's -- it's less than 2,000 feet

6  away, yes.

7      Q.   Okay.  Thank you.  Is the Augustins's continued

8  operation of a competing automobile painting and repair

9  shop at that Newman Road location harmful to the new

10  franchisee, David Stefan?

11      A.   It -- it's harmful beyond the implications --

12           MR. BUKOWSKI:  Objection.  Calls for

13  speculation; lack of foundation.

14           THE COURT:  It's appropriate.  You better

15  find out if the witness is in a position or not to know

16  what's happened to Mr. Stefan.

17  BY MS. AMARANTE:

18      Q.   Mr. Monaghan, have you had any communications

19  with Mr. Stefan?

20      A.   Yes.

21      Q.   And have you had communications with him

22  regarding his operation of the new MAACO center in Lake

23  Park?

24      A.   We have, indeed.

25      Q.   Okay.  Have any of those communications with

 1   Mr. Stefan concerned the Augustins's continued operation

 2   of an automobile painting and repair shop at Newman Road

 3   in Lake Park?

 4       A.   I occupies almost every one of our conversations

 5   exclusively.

 6       Q.   And in your experience, in your years of

 7   experience as -- in the operations of MAACO, do you have

 8   experience with whether or not a competing center very

 9   close to an existing location would harm a franchisee?

10       A.   It clearly would.  Even if you would use this map

11   as our --

12            MR. BUKOWSKI:  Objection.  Objection, Your

13   Honor.  It lacks foundation.

14            THE COURT:  Well, I think --

15            MR. BUKOWSKI:  To the extent she's asking

16   about this franchisee, you know, she -- it certainly

17   calls for hearsay.

18            MS. AMARANTE:  Well, I actually -- Your

19   Honor, the witness has over ten years experience in the

20   MAACO system, and I asked if in his experience he has

21   seen that it's harmful to an existing franchisee when

22   there's competition.

23            THE COURT:  I think the witness can answer

24   that kind of generalized question.  He can't tell us

25   about the damage that Stefan without more.

1          MS. AMARANTE:  Okay.  Thank you, Your Honor.

2          THE WITNESS:  To continue, clearly we would

3    never place a MAACO center 2,000 feet away from an

4    existing MAACO center.  And in this case, essentially

5    you have a MAACO franchisee representing him as a MAACO

6    franchisee, using our operating system, using our

7    information system, using our national accounts, using

8    our vendor relationships to operate 2,000 feet away from

9    another MAACO.  By our own map, we don't have a shop

10   within six miles of one another in this market.

11          We certainly wouldn't put 2,000 feet away

12   because clearly all of the information and all of the

13   training we provided to the Augustins would put him --

14   put David Stefan's operation in harm's way to allow that

15   to continue to operate.

16   BY MS. AMARANTE:

17   Q.  Okay.  I'm going to ask you to please turn back

18   to Plaintiff's Exhibit 2 now, which is that franchise

19   agreement.  And we're going to look at section 17C,

20   which is the covenant not to compete.

21   A.  (Witness complies.)

22   Q.  Okay.  And just reading the language of 17C, it

23   says that, "Franchisee covenants that for a period of

24   one year after the expiration or termination of this

25   agreement regardless of the cause of termination or the

1   date upon which franchisee ceases to operate the

2   business franchised hereunder following termination or

3   expiration of this agreement, whichever is later,

4   franchisee shall not either directly or indirectly for

5   himself or through on behalf of or in conjunction with

6   any other person, persons, partnership, or corporation,"

7   and then it goes onto talk about the things that are

8   prohibited.

9         Based on this language, in your experience with

10  over ten years in operations with the MAACO system, has

11  the one year time period for the covenant started to run

12  yet for the Augustins?

13    A.   It has yet to begin.  Not only based on what's

14  stated here in the franchise agreement, what was also

15  stated in his termination letter that we had a

16  reasonable expectation and his compliance with our post

17  termination obligations and noncompete covenants which

18  have never begun.

19        So, therefore, you know, this one year time

20  period clearly hasn't even begun yet because he

21  continues to own and operate and participate in a

22  competing collision and repair and auto painting shop

23  and still represents himself and still holds all of our

24  manuals, still has our information system -- I mean,

25  this is a travesty to think it started.  It's clearly

1   not started yes.

2       Q.   Okay.

3            MS. AMARANTE:   Your Honor, I just need one

4   moment.

5            (Pause in proceedings.)

6            MS. AMARANTE:   I'm now going to offer as

7   Plaintiff's Exhibit 13 a document entitled, "Security

8   Agreement."

9            (Pause in proceedings.)

10  BY MS. AMARANTE:

11      Q.   Have you seen this document before?

12      A.   I did last week.

13      Q.   Is last week the first time you saw it?

14      A.   It was indeed.   In the prior courtroom last week

15  was the first time that it was presented to me.

16      Q.   And what is your understanding of what this

17  document is?

18      A.   Without being politically correct, it's another

19  straw transaction on behalf of the defendant to

20  represent that he no longer is participating in the

21  ownership or operation of Palm Beach Auto Painting and

22  Body Works, formerly MAACO.

23      Q.   And does this sale of the -- strike that.

24           Does Mr. Augustin's sale of his stock in Palm

25  Beach Auto to Mr. Samson mean that he's no longer

```
 1  engaged in a competitive business?
 2              MR. BUKOWSKI:  Objection; calls for a legal
 3  conclusion.
 4              THE COURT:  Sustained.
 5              MS. AMARANTE:  Okay.
 6  BY MS. AMARANTE:
 7     Q.  Based on your understanding of this document,
 8  does Mr. Augustin retain a security interest in the Palm
 9  Beach Auto business?
10     A.  He does.  He continues to hold the debt for this
11  business and, therefore, has an interest in this
12  business, so consequently, has not completely separated
13  from it.
14     Q.  And is having -- well, strike that.
15         Would having a security interest in the business
16  qualify as an indirect participation in a competing
17  business in your mind?
18     A.  I think it's -- it's --
19              MR. BUKOWSKI:  Objection; calls for a legal
20  conclusion.
21              THE COURT:  Sustained.
22              MS. AMARANTE:  All right.  Withdrawn.
23  BY MS. AMARANTE:
24     Q.  Has MAACO been harmed by the Augustins's refusal
25  to comply with the covenant not to compete in their
```

1   franchise agreement?

2      A.   Without a doubt.  It's a monumental harm.  Again,

3   I think it was stated in the opening remarks, not only

4   the entire MAACO chain and our franchise users are

5   watching this, quite honestly, the entire franchise

6   community is watching this as a precedent case.

7          You have a franchisee that for years not only

8   paid his -- did not pay his obligations to us, didn't

9   pay his obligations to his landlord, continues to

10  then try to separate himself from the brand by -- by not

11  really doing so and enjoys all of the benefits of the

12  MAACO brand in operating his current business, to allow

13  him compete and operate in such is causing us

14  irreparable harm.  It could mean chaos for our system

15  and any other franchisor that would allow for franchisee

16  to simply say, that agreement to not compete doesn't

17  apply to me.

18         So, yes, it's irreparable harm that could cause

19  our entire franchise system to collapse on itself if we

20  had 470 franchisees that are watching this decide to do

21  the same thing.

22     Q.   And is there any way to place a number on the

23  harm that MAACO is suffering today?

24     A.   Other than the value of the entire company, so I

25  can't imagine it would be -- it's incomprehensible of

1    what that number would be.

2        Q.   Okay.   What relief is MAACO looking for from the

3    Court today?

4        A.   Again, we are looking for two specific things:

5    We are looking for the cease and desist of Palm Beach

6    Auto in Lake Park on that specific address where it was

7    operating, and we're looking for the repayment of all

8    the outstanding monies.

9            But first and foremost, our most important thing

10   is to have Palm Beach Collision Repair and Auto Painting

11   closed immediately.

12               (Pause in proceedings.)

13               MS. AMARANTE:   I'm now going to offer as

14   Plaintiff's Exhibit 14 a letter dated July 28th, 2009.

15               (Pause in proceedings.)

16   BY MS. AMARANTE:

17       Q.   Are you familiar with this document, Mr.

18   Monaghan?

19       A.   I am.

20       Q.   And what is it?

21       A.   It is a letter written from our general counsel,

22   Ted Pearce, to a attorney representing the Augustins in

23   reference to the fact that we have been working with

24   them since July of -- even prior to that -- April to

25   work with them to recognize that they are owning and

1   operating and involved in a competing business and that

2   we are doing everything we possibly can to get him to

3   live up to our expectations of the covenant and the

4   terms of his termination.

5       Q.   Okay.  And looking at the second page of the

6   document, can you testify to what the amount was that

7   the Augustins owed to MAACO as of July 28th, 2009?

8       A.   $108,599.03.

9       Q.   And looking at the next page after the letter,

10  there's a MAACO statement account; do you see that?

11      A.   Uh-uh.  I do.

12      Q.   What does this document show?

13      A.   This is a statement representing how that

14  $108,599.03 was calculated due to the combination of

15  outstanding royalties that would be to us, outstanding

16  advertising expenditures that were due to us, and his

17  paint and supply count due to us.  The sum of those

18  three line items.

19          MS. AMARANTE:  Absent objection, I would

20  move to admit Plaintiff's Exhibit 13 and 14 as full

21  exhibits at this time.

22          THE COURT:  Any objection?

23          MR. BUKOWSKI:  No objection to 13.

24          As to 14, to the extent it's being offered

25  not for the truth of the matter, the matters stated

 1   therein, I would have no objection.  Otherwise, it would
 2   be -- those statements contained in the letter would be
 3   hearsay.
 4                THE COURT:  Well, I take it you're not
 5   offering it for the truth; are you?
 6                MS. AMARANTE:  Well, Your Honor, I believe
 7   it can be offered for the truth because this is a
 8   document that MAACO retains in its general business
 9   records and that would be a hearsay exception.
10                THE COURT:  It can be offered for the truth.
11   Can it be admitted for the truth?  I'll tell you, I
12   don't think so.
13                MS. AMARANTE:  Okay.
14                THE COURT:  Now, I mean, I'll be glad to
15   admit it not for the truth of what's recited there.
16                MS. AMARANTE:  Okay.  Thank you.
17                (Whereupon, Plaintiff's Exhibit Nos. 13 and
18                14 were admitted into evidence.)
19                MS. AMARANTE:  I'm now going to offer
20   Plaintiff's Exhibit 15, which is a Notice of Default
21   dated December 3rd, 2008.
22   BY MS. AMARANTE:
23      Q.  Are you familiar with this document?
24      A.  I am.
25      Q.  And is this a document that MAACO keeps in its

1  regular business records?

2      A.   It is.

3      Q.   Okay.  And what does this document show with

4  respect to how much the Augustins owed MAACO at the time

5  of the initial default?

6      A.   Again, this -- it showed a $59,948.46 that was

7  due to us as of December 2nd.  And consequently, this

8  notice of default is also referred to then in our

9  franchise termination on April 9th.

10     Q.   And by the time of termination, the amount of

11 money due and owing to MAACO had grown, correct?

12     A.   Absolutely.  Again, our expectations, when we

13 have a notice of default to a franchisee as it's written

14 here, we have the expectation the franchisee will make

15 every effort then to report and pay current on a weekly

16 basis not to get any further behind in his obligations

17 to us.  Consequently, we -- you know, we flash forward

18 here four months later into April, and that $59,000 has

19 escalated to $93,000.  You flash forward a couple months

20 later and now it's $108,000.

21          So despite them being in default, they made no

22 effort or attempt to try and cure that default or even

23 begin to at least stay current so that they didn't get

24 any further in the hole or behind with us.  It only

25 escalated and got worse and worse as each week

1    progressed.

2              THE COURT:  Counsel, how much longer do you

3    expect the direct examination to take?

4              MS. AMARANTE:  Your Honor, I'm just about

5    finished.  If I can have a moment to confer with

6    counsel?

7              THE COURT:  Okay.

8              (Pause in proceedings.)

9    BY MS. AMARANTE:

10   Q.  Mr. Monaghan, in your experience with ten years

11   in operations with MAACO, when a franchisee's amount due

12   and owing to MAACO are increasing that rapidly, what

13   does that tell you?

14   A.  Clearly, we have someone who is not working in

15   earnest to resolve this situation.  They are not

16   reporting what's going on, not trying to make an effort

17   to cure the situation, not communicating as in a way

18   that would put us in a position to want to continue to

19   work with that franchisee and resolve this in a long

20   term.  So we're left at no choice than to termination

21   after what is a reasonable time period to try to work

22   this out.

23   Q.  Thank you, Mr. Monaghan.

24             MS. AMARANTE:  I have no further question,

25   Your Honor.

```
 1              THE COURT:  All right.  I think we've been
 2   going now for an hour and a half.  It seems to me we
 3   ought to have a brief recess.  I'm concerned though
 4   about our timing.  When we last met, I was surprised by
 5   plaintiff's counsel with it would take about four hours
 6   on plaintiff's case.  We're still not finished with
 7   plaintiff's first witness, and I'd like to know what
 8   your -- what you think will happen in terms of what kind
 9   of schedule you expect to conclude on.  Can we complete
10   it at 6 o'clock or 6:30?
11              MS. AMARANTE:  I'm hopeful that we can, Your
12   Honor.  And the other witnesses that MAACO will offer
13   today will have significantly shorter testimony.  But a
14   lot of that will depend on defense counsel's
15   examinations as well.  So I'm --
16              THE COURT:  Well, the other witnesses better
17   be an awful lot briefer if we want to get anywhere.
18              And do you have an idea how long your
19   cross-examination of Mr. Monaghan will take?
20              MR. BUKOWSKI:  Forty-five minutes.
21              THE COURT:  Forty-five minutes?
22              MR. BUKOWSKI:  I will cut it down as much as
23   I can, Your Honor.  It may -- I'd hate to tell you less
24   and then run over.  I -- I --
25              THE COURT:  All right.  All right.  We'll
```

```
 1   take a five minutes recess.

 2              COURTROOM CLERK:  All rise.

 3              (Brief recess.)

 4              THE COURT:  All right.  Proceed with the

 5   cross-examination.

 6              MR. BUKOWSKI:  Your Honor, in light of the

 7   timing concerns, I've cut down any cross-examination

 8   considerably --

 9              THE COURT:  Good.

10              MR. BUKOWSKI:  -- and we'll take that --

11              THE COURT:  Excellent.

12              MR. BUKOWSKI:  -- take that approach.

13                       CROSS-EXAMINATION

14   BY MR. BUKOWSKI:

15     Q.  Mr. Monaghan, please tell the Court what

16   specifically MAACO does different from its competitors

17   in its industry.

18         You've described these alleged trade secrets.

19   What are the trade secrets that MAACO's claiming?

20     A.  A little bit of an oxymoron if you're asking me

21   to disclose the trade secrets, if you will, publically

22   for the record.  I guess I feel obligated to do so as

23   asked.

24         It begins with a very fundamental premise of our

25   business in order for us, first the fact at how we
```

1    advertise.  No one advertises the way we advertise.  And

2    part of our operating system, we use a price leader TV

3    advertising.  No one else in our industry does that.

4         We use a merchandising --

5    Q.   Let's stop right there.

6    A.   Okay.

7    Q.   But the fact that you do it is not a secret.

8    A.   Well, but then what we do with the way we handle

9    a customer with our merchandising system, our selling

10   system, our production system, our equipment

11   configuration, the materials in which we use, those are

12   all proprietary.  So I was starting at an A, if you

13   will.

14   Q.   All right.  Well, let's start with a price leader

15   advertising.  The fact that MAACO uses that, it may be

16   the only one to do it.  I don't know.  But you're not

17   suggesting that that fact in and of itself is a secret,

18   are you?

19   A.   No.

20   Q.   Okay.

21   A.   It's what we then do to merchandise or sell to

22   those customers once we convert.  They listen to it and

23   then either call the store.  And the way we handle the

24   phone, the way we then sell to the customers, the

25   merchandising words that we use --

1    Q.   Okay.   Take me through that process and describe

2  how it's different.

3    A.   How it's different?

4    Q.   Or what's secret about what MAACO does.

5    A.   Again, what's secret about it or what is the

6  accumulation of all the elements of our operating

7  system, it's like a domino.   It's the way we advertise,

8  the way we sell, the way we use the information

9  internally to -- for the operating system, the way we

10  produce the work in the back of the shops.

11    Q.   All right.   What about the --

12    A.   The materials we use.

13    Q.   What about the way you sell is proprietary or

14  secret?

15    A.   Again, the -- the -- the way we sell is using a

16  merchandising ladder in order to walk customers through

17  a value equation to what -- to find out what's best for

18  them.   In any other body shop in the country, you'll

19  walk into a shop, get an estimate written only one way

20  with little or no options for the customer to decide

21  whether they want to use certain materials or not do

22  certain work.   There's one way to write the estimate.

23  In our system, it is not.

24        Part of the secret is giving the customer options

25  that would not get elsewhere.   And so, consequently,

1    it's not the way any one else does business out there

2    other than us.

3         Q.  But apart from the fact that MAACO may be the

4    only person giving the customer choices --

5         A.  Uh-uh.

6         Q.  -- you're not contending that that is a secret

7    that MAACO does it?

8         A.  It's part and parcel to our operating system,

9    which, again, is proprietary.

10        Q.  What do you mean by proprietary?  I don't

11   understand what that means in the context of what MAACO

12   does.

13        A.  I don't understand what you don't understand.

14   Sorry.

15        Q.  You know, I want you to explain to the Court --

16             THE COURT:  I think the -- I think the

17   question is when you use the adjective "proprietary."

18             THE WITNESS:  Uh-uh.

19             THE COURT:  What do you have in mind?

20             THE WITNESS:  The expectation that the way

21   we do things and the way we train our franchisees to do

22   things is completely different than anyone else in the

23   industry.  There is no other industry training you can

24   go to, to learn to do the things the way we do them.

25   We're the only ones who train to -- to handle our

1   customers this way, to handle the cars the way we handle

2   them, to use the materials that we use, to use the

3   processes and even in the back of the shop of sort of an

4   assembly line environment where we have specialized

5   employees doing only specialized work, unskilled labor

6   doing unskilled work that we train them to do a very

7   specific way to the MAACO operating system that's not

8   done any other way like that in any other body shop.  So

9   without exposure to our operating system, you would have

10  no knowledge of how to do that.

11          THE COURT:  It seems to me a little

12  puzzling.  I will accept it because you say so, but none

13  of your competitors do the -- go through that elaborate

14  processes of marketing and training and selling that you

15  do.

16          But I guess something of a puzzle is to know

17  what it is within any of those elements that's secret.

18  I suppose anybody who's gone to one of your franchises

19  and to a competitor at one time or another knows that

20  she gets options suggested to her.  I can understand

21  that that would be very attractive, but that's no longer

22  a secret.

23          THE WITNESS:  Well, and then in the way in

24  which we deliver that to the customer is again part of

25  that, right?  It's no different than, you know, Kentucky

1   Fried Chicken saying they've got a secret recipe and yet

2   everyone whoever worked at the KFC probably knows that

3   recipe because they make it all day long.

4           It's -- it is in inherent fact that the way

5   we produce the work, the materials we use, the processes

6   that we use that are proprietary to us, that are unique

7   only to MAACO.

8           THE COURT:  All right.

9   BY MR. BUKOWSKI:

10   Q.  You talked about the confidential operating

11   manuals.  Do you know today where the operating manuals

12   that were provided to Mr. Augustin are located?

13   A.  I do not.  They have never been returned to us.

14   That's all I know.

15   Q.  Okay.  Did you have hear the name of Inderia

16   Bellino?

17   A.  No.

18   Q.  Okay.  Do you have still have the exhibits up

19   there?

20   A.  I do.

21   Q.  Would you turn to Plaintiff's Exhibit 2, the

22   franchise agreement.

23   A.  I have it.

24   Q.  Okay.  And section 4, Fees, on the top of page 2.

25   The franchisee pays an initial franchise fee of $30,000;

1    is that right?

2        A.   That's what it says, yes.

3        Q.   Okay.  And did Mr. and Ms. Augustin do that in

4    this case?

5        A.   They were obligated to do so.

6        Q.   Okay.  So they did?  That's fine.

7             THE COURT:  Excuse me.  Which paragraph are

8    we looking at?

9             MR. BUKOWSKI:  Section 4, subsection A, on

10   the top of page 2, Your Honor.

11            THE COURT:  I see.  All right.

12   BY MR. BUKOWSKI:

13       Q.   So they did pay?

14       A.   I have no -- I did not receive that fee

15   personally, so I can't tell you whether they did or did

16   not.

17       Q.   Well, there's a lot of things you didn't receive

18   personally that you testified to in court about; isn't

19   that true?

20       A.   Again, this would have been as it says here, "Due

21   and payable upon the signing of the agreement."  It's

22   all of the subsequent fees that I would have been

23   responsible for and party to their collection

24   thereafter, not the franchise fee.

25       Q.   Okay.  As you sit here today, you have no reason

1   to believe they didn't pay the fee?

2       A.   Correct.

3       Q.   Okay.

4       A.   Yes.

5       Q.   And then each week, the franchisee is required to

6   pay MAACO an amount equal to nine percent of the gross

7   receipts of the center.

8       A.   That is correct.

9       Q.   Okay.   And that's -- gross receipts is as broad

10  as you can get.   Any dollar in the door of the

11  franchisee goes into that calculation?

12      A.   Minus sales tax, yes.

13      Q.   Okay.   And there's an initial software license

14  fee of $5,000 for the --

15      A.   Yes.

16      Q.   -- for the Polaris software, right?

17      A.   Yes.

18      Q.   Okay.   And then working capital deposit of

19  $10,000.

20      A.   Yes.

21      Q.   Okay.   And then the weekly royalty fees and

22  continued -- what are the advertising contributions?

23      A.   The advertising contribution is on behalf of each

24  franchisee, he is obligated to make an investment in the

25  media and advertising that's done on behalf of his

1   center in his market area, and that can range from $850

2   to $1,100 per week.

3      Q.   And in this agreement, section 5 also on page 2,

4   it talks about the initial advertising contribution

5   being $7,500; is that right?

6      A.   That's what it states, yes.

7      Q.   Okay.  And then I think you were right.  In

8   section 5B the amount -- the weekly advertising

9   contribution is $850?

10      A.   Or greater.

11      Q.   Right.

12      A.   Whatever is bearing in the marketplace.

13      Q.   Okay.  A minimum of $850?

14      A.   Correct.

15      Q.   Okay.  Now, if Mr. Augustin continued to operate

16   a competing business in -- within the restricted

17   territory as you contend, couldn't MAACO just measure

18   nine percent of whatever money he earned and say that's

19   what MAACO should be -- should receive?

20      A.   That's one small element there, right.  I mean,

21   the ability then to have a franchisee who no longer

22   operates and walked away from his obligation to -- to --

23   to not to compete, how do I put a number figure on that?

24   I mean, that's -- that's putting our whole franchise at

25   risk.

1    Q.   I guess let me ask you, the question specifically

2  was if you knew what he took in --

3    A.   Uh-uh.

4    Q.   -- at his allegedly competing center, you could

5  calculate nine percent of that, correct?

6            THE COURT:  At his allegedly preceding

7  center?

8            MR. BUKOWSKI:  Competing.  It went --

9            THE COURT:  Allegedly competing center.

10            THE WITNESS:  I don't know what that means.

11  I mean, we certainly can compete -- could calculate nine

12  percent of whatever revenues he generated, right?  I

13  mean --

14  BY MR. BUKOWSKI:

15    Q.   Yes.

16    A.   -- I don't -- that certainly wouldn't fulfill his

17  obligation under his termination.

18    Q.   I understand.  And you said he walked away.  He

19  didn't walk away from his franchise.  You terminated the

20  franchise; isn't that right?

21    A.   Yes, we did.

22    Q.   Okay.  Let's make sure we get that right.

23            Now, under the agreement, MAACO has a right to

24  audit its franchisee; isn't that right?

25    A.   It is.

1    Q.   When was the last audit conducted of the

2    Augustins's franchise?

3    A.   I'm unable to give a specific date on that.  He

4    was audited twice during his tenure.  I don't know the

5    specific dates.

6    Q.   Would June or July of 2006 surprise you?

7    A.   I'm sure if you had an audit letter there that

8    would recollect my mind or memory or an audit finding

9    report that would tell me the timeframe, that sounds

10   about right.  But I can't be sure.

11   Q.   Okay.  Tell me about what the -- how the Polaris

12   system, how does that work that's proprietary or secret

13   to use your terminology?

14   A.   Again, it holds all of our -- all the customer

15   information, all that was done for each of those

16   customers and at what price, in terms of who did it, how

17   it was sold.  And, consequently, you know, it is our

18   customer list, for lack of a better word, let alone our

19   management information system.  The way we measure all

20   of the benchmarks to the relative success of that

21   business are measured in Polaris.

22   Q.   And don't you need an access code or a password

23   to get onto that system?

24   A.   Only when initially installed.

25   Q.   So I could go on?  Get on that system right now

1   without a password?

2      A.   You could go on if the Augustins have a version

3   of Polaris currently, you could indeed go onto that

4   system.  Again, you would only need a password to get

5   into the management piece.  You could certainly use it

6   as a salesperson.  It is then password protected beyond

7   that to the administrative -- administrative level where

8   you have salary information, pricing file information.

9   You would be able to use it essentially as a POS system,

10  a point of sale system.

11      The management information piece is password

12  protected and only the owner would know that password if

13  it doesn't expire.

14      Q.   And would MAACO be able to determine whether

15  that's been accessed?

16      A.   I can't answer that question.  I can't.

17      Q.   Okay.  Do you know how long Mr. Augustin was in

18  the body shop/collision repair business prior to signing

19  his franchise agreement in October 2002?

20      A.   I've seen copies of his resume that he submitted

21  when he did his franchise application back in 2002, yes.

22      Q.   And how long?

23      A.   He had, I believe, 11 or 12 years of controller

24  experience per his resume, which not necessarily meant

25  that he was in the day-to-day operations, that he did

1    the books for the business.

2        Q.   Okay.  But you don't know what he did day to day?

3        A.   I'm just going by what his resume says --

4        Q.   Okay.

5        A.   -- that that's what he did.

6        Q.   Okay.  So you don't know what he did day to day?

7        A.   No.

8        Q.   Who are MAACO's competitors in terms of

9    franchises or body shops?

10       A.   There is -- there are no other national franchise

11   competitors.  Our competitors are typically the

12   collision repair and auto body shops that exist within a

13   marketplace either independent or dealership operated

14   franchise, you know, car dealership, Ford dealership

15   body shop.

16       Q.   Sure.  Do you know how many of those other body

17   shops or collision repair centers are located within ten

18   miles of the MAACO franchise that Mr. Stefan operates?

19       A.   I do not.  MAACO's or others?

20       Q.   Others.

21       A.   I do not.

22       Q.   How many --

23       A.   I know of one.

24       Q.   How many MAACOs are within ten miles?

25       A.   There would be one other within ten miles.

1    Q.   Referring to your -- MAACO's termination letter,

2    that's the letter that was marked as Exhibit 7; do you

3    have that?

4    A.   I do.

5    Q.   The effective date of that termination letter is

6    April 9th, 2009; isn't that right?

7    A.   That is correct.

8    Q.   Okay.   Now, turning to the LKQ invoice,

9    Exhibit 9.   Let me know when you have that.

10   A.   Got it.

11   Q.   Okay.   MAACO doesn't have an exclusive

12   arrangement with LKQ; is that right?

13   A.   We have an exclusive discounting arrangement;

14   however, we're clearly not their only customer.

15   Q.   Okay.   Thank you.   That's more accurate.   That's

16   what I was asking.   That body shops and other companies

17   other than MAACO buy products from LKQ?

18   A.   Yes.

19   Q.   Okay.   Can you show me on Exhibit 9 where the

20   MAACO discount appears?

21   A.   I cannot based on this piece of -- this piece of

22   paper, no.

23   Q.   Okay.   And Exhibit 10, I guess you were referring

24   to page 2 of that.

25   A.   I'm sorry.   Exhibit 10 by title is which one?

1      Q.   I guess the first page is the fax sheet.

2      A.   Got it.

3      Q.   Okay.  The second page of Exhibit 10, I think you

4   described as a proprietary MAACO invoice?

5      A.   Repair order.

6      Q.   Repair order, okay.

7      A.   Yup.

8               THE COURT:  I'm sorry.  Which is --

9               MR. BUKOWSKI:  Page 2 of Exhibit 10, Your

10  Honor.

11              THE COURT:  Which is 10?  Okay.  Page 3?

12              MR. BUKOWSKI:  Page 2, Your Honor.

13              THE COURT:  Page 2.

14  BY MR. BUKOWSKI:

15     Q.   And looking at the bottom right hand corner of

16  page 2, there's some numbers -- letters and numbers.

17  They're PA-001357; do you know what that is?

18     A.   I do not.

19              MR. BUKOWSKI:  I'll represent to the Court

20  that those were numbers and letters put on it by Mr.

21  Augustin's counsel that we call -- attorneys call Bates

22  numbers when we produce documents.

23              THE WITNESS:  Okay.

24  BY MR. BUKOWSKI:

25     Q.   Were you aware that this document was produced in

1    this case by Mr. Augustin through his counsel?

2        A.   Okay.

3        Q.   Did you know that?

4        A.   I did not.

5        Q.   Okay.  Now, getting to the repair order itself,

6    what is proprietary or secret about this repair order?

7        A.   Again, there couldn't be much more proprietary --

8    the name used in the top left is, "MAACO Collision

9    Repair and Auto Centers."  Is there much more

10   proprietary than our name?

11       Q.   Well, that's a trademark.  I understand that.

12       A.   Okay.

13       Q.   I'm talking about, you know, you're using the

14   term "trade secret" and "proprietary information" in the

15   complaint --

16       A.   Uh-uh.

17       Q.   -- and I want to know if there's anything on --

18       A.   Again --

19       Q.   -- on this.

20       A.   -- from a proprietary standpoint, the design of

21   this form, the way in which it is laid out is -- is

22   nothing like if you look two pages later, three pages

23   later by your own counsel's admission, this is what a

24   repair order would look like, and he's got a copy of it

25   here, that's done by everybody else.  You can see the

 1   difference in how much more customer friendly usable --

 2   user it is than compared to what you see.

 3                  THE COURT:  What page?

 4                  THE WITNESS:  So if you move to page --

 5   BY MR. BUKOWSKI:

 6      Q.  Show --

 7                  THE COURT:  What page?

 8                  THE WITNESS:  Page 4.

 9   BY MR. BUKOWSKI:

10      Q.  Tell the Court what page you were referring to.

11      A.  Page 4 here.  You have your PA-001360 on the

12   bottom right.

13      Q.  Right.

14      A.  That is a repair order used by the industry

15   outside MAACO.

16      Q.  Okay.  And to whom is the MAACO repair order

17   given?

18      A.  To the customer or the third party paying for the

19   repair.

20      Q.  So once a customer has it, they can give it to

21   whoever they want and any body shop could copy this if

22   they so chose?

23      A.  They could, but then we would then be fighting

24   them for using our forms.

25      Q.  Okay.  Do you know if that form is copyrighted?

```
 1              MR. BUKOWSKI:  Go ahead, Your Honor.
 2              THE COURT:  I don't know whether the witness
 3    is in a position to tell me this, but the two documents
 4    -- the document on page -- the second page of the -- it
 5    says (indiscernible) here up at top --
 6              THE WITNESS:  Correct.
 7              THE COURT:  -- the document that
 8    says "Phil's Auto Body."
 9              THE WITNESS:  Uh-uh.
10              THE COURT:  On the basis of quickly skimming
11    them, have a notion that these are referring to the same
12    transaction.
13              THE WITNESS:  It is referring to the same
14    customer and the same car, so being a MAACO customer
15    that Palm Beach continues to try to collect additional
16    work and additional revenue from.
17              THE COURT:  Well, it's not only the same
18    car, it's the same repair or addition; is it not?  A
19    high note horn for $65.81?
20              THE WITNESS:  Correct.  And that work that
21    you see there is in addition to the work listed on the
22    prior pages.  It's a -- in our business, it would be
23    called a supplement.  It's a asking for additional
24    monies to perform additional procedures on top of what
25    they had already done.
```

1           THE COURT:  Now, the document -- the second

2    of these documents, the document with Bates number

3    1360 --

4           THE WITNESS:  Yes, sir.

5           THE COURT:  -- it says "Phil's Auto Body" up

6    at the top.

7           THE WITNESS:  It does.

8           THE COURT:  This is not a document which

9    falls within your range of proprietary materials?

10           THE WITNESS:  That's correct.

11           THE COURT:  So Phil's Auto Body was at least

12   doing something that was not a trespass on your

13   proprietary interests when it generated this document on

14   July 2nd, 2009?

15           THE WITNESS:  Well, other than they are

16   overtly willing to do business with a obvious MAACO

17   customer that they represented.  So they're still -- you

18   know, part of our covenant not to compete is they will

19   not seek to gain any business from our customers of that

20   location.

21           Clearly here, they are seeking -- continue

22   to do business with a customer of that MAACO location.

23           THE COURT:  All right.  I --

24           THE WITNESS:  So they're diverting business,

25   if you will, from the existing -- the new MAACO that

1    opened up by doing so.

2    BY MR. BUKOWSKI:

3        Q.   And when was it that the new MAACO opened up?

4        A.   Late July of '09.  I believe, July twenty -- the

5    week of July 24th.

6        Q.   And when did MAACO first learn of the existence

7    of David Stefan who has since become the new MAACO

8    franchisee?

9        A.   I can't give you an exact date, but I can tell

10   you it was certainly in the winter and the early spring

11   of 2009.

12       Q.   And how did that -- how did MAACO become aware of

13   Mr. Stefan then?

14       A.   One of my operations directors was interviewing

15   sales people, candidates for another MAACO location as

16   an employee.  Upon that interview, we felt that

17   Mr. Stefan would potentially qualify to become a

18   franchisee, and he stated he had interest in potentially

19   becoming a franchisee.  So that's how it all began.

20       Q.   And did you discuss with Mr. Stefan the

21   possibility of him becoming a franchisee in the winter

22   of 2008, 2009?

23       A.   Well, at that point, we had asked him to have

24   actually direct conversations with Mr. Augustin to the

25   potential purchase of his location.

1      Q.   And why was that?

2      A.   Because at that point, Philippe was in default.

3  We were giving him an opportunity to try and sell his

4  center and felt it would be in everyone's best interest

5  to give him someone that we felt might be a qualified

6  lead in order to try to sell that center.

7      Q.   Did Mr. Augustin ever ask you or anybody else at

8  MAACO to help him reduce the amount of rent he was

9  paying?

10     A.   He did not ask me personally.

11     Q.   Are you aware of him asking somebody else?

12     A.   Well, I know when he was in default with his

13  landlord, he -- part of his defense was that his rent

14  was simply too high.  So, therefore, would you imply

15  that he thought his rent was too high because he wasn't

16  paying any of it?  I guess that can be made.

17     Q.   Let me --

18          (Pause in proceedings.)

19             MR. BUKOWSKI:   Let me mark as Defendants's

20  Exhibit 1 --

21             (Whereupon, Defendants's Exhibit No. 1 was

22             marked for identification.)

23             (Pause in proceedings.)

24  BY MR. BUKOWSKI:

25     Q.   Mr. Monaghan, you have what's been marked as

1   Defendants's Exhibit 1 in front of you.

2       A.  Uh-uh.

3       Q.  Okay.  And that's a series of e-mails.  As you

4   can see, beginning on the second page, the earliest

5   e-mail is from Diana Dieciedue.  And who is she?

6       A.  She is the vice president of licensing, the

7   former vice president of licensing for MAACO Franchising

8   and Enterprises.

9       Q.  Okay.  And is she here today?

10      A.  She is.

11      Q.  Okay.  She's sitting in the courtroom; is that

12  right?

13      A.  She is.

14          MR. BUKOWSKI:  Let the record reflect that

15  Ms. Dieciedue has raised her hand in the first row

16  there.

17          MR. FOURNARIS:  She's not happy about your

18  pronunciation there.

19          MR. BUKOWSKI:  Well, I apologize.  Maybe Mr.

20  Monaghan can correct me.

21  BY MR. BUKOWSKI:

22      Q.  How do you pronounce that.

23      A.  We were just having this conversation in the

24  hallway, but go by Dieciedue.

25      Q.  Okay.

```
 1              MR. BUKOWSKI:  I apologize.
 2              MS. DIECIEDUE:  It wasn't bad.
 3   BY MR. BUKOWSKI:
 4     Q.  And it appears that you are a recipient of that
 5   first e-mail and then several other e-mails on --
 6     A.  Yup.
 7     Q.  -- this.  Okay.  And on the first e-mail, Ms.
 8   Dieciedue is discussing sending Philippe -- referring to
 9   Mr. Augustin, I assume; is that right?
10     A.  Yes.
11     Q.  A supplemental notice of default and is asking --
12   and asks, "Do you agree that I should hold off on
13   sending the notice as it looks like the landlord is
14   moving forward to evict."  And then in parenthesis, per
15   Frank, eviction should not take more than seven days.
16   Once Philippe loses possession to the premises, it will
17   be grounds for immediate termination of the franchise
18   agreement.  If the eviction does take place, I would
19   assume that since there are so many vehicles at the
20   location, operations will probably have to assist with
21   the customers and their vehicles getting them to another
22   MAACO center, etcetera."
23          Do you recall receiving this e-mail?
24     A.  Now that I read it, yes.
25     Q.  Okay.  And isn't it true that in February of 2009
```

1   you and others at MAACO were discussing the termination

2   of Mr. Augustin's franchise through the fact that he

3   looked like he was about to be evicted from the

4   premises; isn't that right?

5       A.   Yes.

6       Q.   Okay.  And then if you go to the first page of

7   Exhibit 10 --

8       A.   Uh-uh.

9       Q.   -- Ms. Dieciedue said -- Dieciedue, excuse me --

10  sends an e-mail to Frank Costello.  And who is that?

11      A.   He is our vice president of real estate.

12      Q.   Okay.  And she forwards that e-mail.  Then it

13  looks like she's forwarding an e-mail from Bill Bass.

14  And who's Bill Bass?

15      A.   Bill Bass was a former regional operations

16  director.

17      Q.   Okay.  And he's sending an e-mail to Ms.

18  Dieciedue with a copy to Doug Engle --

19      A.   Yup.

20      Q.   -- dated February 18th, 2009, 5:29 p.m.  And

21  who's Mr. Engle?

22      A.   Our assistant vice president of operations.

23      Q.   Okay.  And then Mr. Bass is also saying, "I've

24  also spoken with the landlord and feel he will be

25  willing to reduce the rent.  Although he did not say so

1    directly, he did ask to speak with me again about it

2    after I told him we would not be willing to put another

3    franchise in there at the current rent.  I asked him to

4    consider around $8,000 a month.  I will speak with him

5    on Thursday."

6          Were you aware that Mr. Bass had spoken to the

7    landlord?

8       A.  I was not cc' d on this, but I was aware the

9    conversation took place.

10      Q.  Okay.  And in that conversation of February,

11   someone at MAACO is talking to Mr. Augustin's landlord

12   about reducing the rent; isn't that right?

13      A.  It appears to be -- that was the conversation

14   based on this e-mail, yes.

15      Q.  And the reduced rent was going to be around

16   $8,000 a month; is that right?

17      A.  It was a consideration, not a guarantee there.

18      Q.  What was the current rent that Mr. Augustin was

19   paying?

20      A.  I can't answer that question.  I don't know.

21      Q.  Is $11,000 a month sound about right?

22      A.  If you say so.  I can't tell you.  I don't know.

23            MR. BUKOWSKI:  Okay.  Let's mark

24   Defendants's Exhibit 2.

25            (Whereupon, Defendants's Exhibit No. 2 was

1           marked for identification.)

2   BY MR. BUKOWSKI:

3       Q.   All right.  Do you have Defendants's Exhibit 2?

4       A.   I do.

5       Q.   And that's another e-mail series including an

6   e-mail at the top of the first page Bates numbered MFI.

7       A.   That's a continuation of the ones from the prior

8   day.

9       Q.   Okay.  So that's Thursday, February 19th --

10      A.   Uh-uh.

11      Q.   -- 2009 from Ms. Dieciedue to Doug Engle, Bill

12  Bass, and yourself; is that right?

13      A.   Among others, yes.

14      Q.   Okay.  And the bottom of the first page of

15  Exhibit 2 is the e-mail that I -- from which I read

16  talking about holding off on sending the notice?

17      A.   Correct.

18      Q.   Okay.  And above that Bill Bass sends an e-mail

19  back to Ms. Dieciedue copying Doug Engle saying that

20  Mr. Bass spoke with Phil's attorney this morning.  He

21  has had no success in getting a rent reduction from the

22  landlord.  The landlord is moving forward with the

23  eviction process.  And then that e-mail looks like it

24  gets forwarded to you by Ms. Dieciedue in a subsequent

25  e-mail at the top of the page one; is that right?

1    A.   Yes.

2    Q.   And so you knew at the time, February 19th, that

3  Mr. Augustin was trying to get a rent reduction from the

4  landlord; isn't that right?

5    A.   Okay.  That -- yes.  I guess it was inferred that

6  that's what he was trying to do, right.  But he was also

7  at that time still in default, wasn't even working

8  through the default.

9    Q.   And at the same time MAACO has Mr. Bass talking

10  to the landlord saying, "Well, we'll get the next

11  franchisee in here.  You know, we'll consider that if

12  you can reduce the rent."  Isn't that what was going on?

13    A.   He made a comment that he talked to the landlord

14  about putting potential -- another franchisee in there.

15  At this point I would believe that David Stefan was in

16  the picture because Bill Bass was the one who had

17  interviewed Mr. Stefan and had recommend him as the

18  potential buyer for the Augustins's location.

19    Q.   And Mr. Stefan never did buy Mr. Augustin's

20  franchise from him, did he?

21    A.   He did not.

22         MR. BUKOWSKI:  Let me mark Defendants's

23  Exhibits 3 and 4.

24         (Whereupon, Defendants's Exhibit Nos. 3 and 4

25         were marked for identification.)

```
 1                    MR. FOURNARIS:  This is a legal form on the
 2      letter of franchise.
 3                    MR. BUKOWSKI:  I know it is.
 4                    MR. FOURNARIS:  Well, how is it possibly
 5      relevant to this case?  He's not a lawyer.
 6                    MR. BUKOWSKI:  You can object then.
 7                    MR. FOURNARIS:  I object.
 8                    MS. AMARANTE:  Your Honor --
 9                    THE WITNESS:  I only have two pages here,
10      sir.  More to it?  3 and 4.  I'm sorry.  Are you
11      introducing two?
12                    MR. BUKOWSKI:  Three.  What do you have for
13      exhibit --
14                    THE WITNESS:  That one says three and four
15      on the bottom.
16                    MR. BUKOWSKI:  Yeah.  That's it.  I got you
17      that was on there previously.
18                    THE WITNESS:  Okay.
19                    MR. FOURNARIS:  I'm sorry.  Now, I've
20      confused.  Is four four or is four three?
21                    MR. BUKOWSKI:  Plaintiff's -- well, it's
22      marked as Plaintiff's Exhibit 4.  It was filed in
23      another case in this district as Plaintiff's Exhibit 4
24      to a complaint.
25                    MR. FOURNARIS:  I think we should find out
```

1    where this came from.

2              MR. BUKOWSKI:  These are --

3              MS. AMARANTE:  Your Honor, MAACO is

4    objecting to these documents both based on foundation

5    and relevance.  It's not clear where they came from, and

6    it's not how -- clear how they're relevant to the matter

7    before Your Honor so.

8              THE COURT:  Well, I suppose on the basis of

9    it that would look to be the case unless this witness

10   has foundation or information on that.

11             MR. BUKOWSKI:  What I plan to do, Your

12   Honor, since this witness testified at length about the

13   MAACO franchise agreement, I was going to show him

14   certain provisions of these other agreements and ask him

15   whether the MAACO agreement has anything similar.

16             MS. AMARANTE:  Your Honor, I don't see how

17   the witness has any foundation to talk about other

18   systems's franchise agreements.  And I plainly don't see

19   the relevance of having him compare other franchise

20   agreements to the MAACO franchise agreement.  The

21   document speaks for itself.

22             THE COURT:  Well, I don't think the witness

23   can be helpful on this basis.

24             MR. BUKOWSKI:  Well, I wasn't going to ask

25   him to testify about this franchise agreement.  I was

1    going to simply ask him if a certain clause in this

2    agreement is in the franchise agreement between MAACO

3    and Mr. Augustin.

4            THE COURT:  Well, I think you'll have to --

5    I'm not sure that it's very complicated if it's just a

6    matter of saying is this crows like that crows.  I'm not

7    sure that Mr. Monaghan is particularly the best vehicle

8    for doing that.

9            MR. BUKOWSKI:  Sure.

10           THE COURT:  I suppose you could --

11           MR. BUKOWSKI:  I will use that with another

12   witness or later in argument, Your Honor.  I'll -- I'm

13   not going to ask Mr. Monaghan about it.

14           MS. AMARANTE:  Your Honor, MAACO objects to

15   them being admitting as exhibits even for purposes of

16   argument because no foundation has been laid, and they

17   clearly aren't relevant to the matter.

18           MR. BUKOWSKI:  We didn't move for their

19   admission, Your Honor.

20           MS. AMARANTE:  Okay.  I'm just stating that

21   for the record.

22           THE COURT:  You're concerned now?  We've

23   deferred, I mean, consideration of these exhibits.

24           MS. AMARANTE:  Well, counsel made a

25   reference to using them in argument, and I'm just

```
 1   stating for the record that MAACO objects to that
 2   because there's been no foundation laid for them so.
 3                THE COURT:  That's what I understood him in
 4   saying it might be introduced later through another
 5   witness.  If it's introduced in argument, then you could
 6   certain quarrel with it at that time.  Let's not try to
 7   deal with issues prematurely.
 8                MR. BUKOWSKI:  Your Honor, we do move for
 9   admissions of Defendants's exhibits 1 and 2 at this
10   time.
11                THE COURT:  I don't hear any objection to.
12                MS. AMARANTE:  No objection, Your Honor.
13                (Whereupon, Defendants's Exhibit Nos. 1 and 2
14                were admitted into evidence.)
15                MR. BUKOWSKI:  And with this, we conclude
16   our cross-examination of Mr. Monaghan.
17                THE COURT:  All right.  Any redirect?
18                MS. AMARANTE:  No, Your Honor.
19                THE COURT:  Mr. Monaghan, you have released.
20                THE WITNESS:  According to protocol, do I
21   take all this paperwork with me or do I leave this here?
22                MS. AMARANTE:  No, Mr. Monaghan, please
23   leave it.
24                THE WITNESS:  Okay.  Thank you, Your Honor.
25                (Witness excused.)
```

```
 1              MS. AMARANTE:  Your Honor, MAACO Franchising
 2    calls Dianna Dieciedue to the stand.
 3              DIANNA DIECIEDUE, WITNESS, SWORN.
 4              COURTROOM CLERK:  Please state your full
 5    name and spell your last name for the record.
 6              THE WITNESS:  Dianna Dieciedue.
 7              COURTROOM CLERK:  Please spell your last
 8    name.
 9              THE WITNESS:  D-I-E-C-I-E-D-U-E.
10              THE COURT:  You have more wonderful vowels
11    in your name.
12              THE WITNESS:  Yes, you can sing it.
13                        DIRECT EXAMINATION
14    BY MS. AMARANTE:
15       Q.  Good afternoon, Ms. Dieciedue.  Where do you work
16    currently?
17       A.  I work for American Drive Lines, Amoco
18    Transmissions.
19       Q.  Okay.  And where did you work before that?
20       A.  MAACO Franchising.
21       Q.  How many years did you work for MAACO?
22       A.  Approximately 27 years.
23       Q.  And what was your last position with the company?
24       A.  I was its vice president of licensing.
25       Q.  How many years did you hold that title?
```

1    A.   About 13.

2    Q.   And what were your job responsibilities generally

3  as vice president of licensing?

4    A.   I over saw the credit and collections department,

5  statistical department, auditing, and I handled

6  compliance under the franchise agreement with the

7  franchisees, noncompliance matters.

8    Q.   And when did you stop working for MAACO?

9    A.   July 1st of 2009.

10    Q.   And what was the reason that you stopped working

11  for MAACO at that time?

12    A.   The company had been purchased and the synergies

13  that existed, my position was eliminated.

14    Q.   Okay.  In your role as vice president of

15  licensing, did you have any interactions with Mr.

16  Augustin?

17    A.   Yes.

18    Q.   And did MAACO ever audit the Augustins's MAACO

19  center?

20    A.   Yes.

21    Q.   What is the purpose of an audit in the MAACO

22  system?

23    A.   To ensure that a franchisee is accurately

24  reporting its business figures to MAACO.

25    Q.   Okay.

1            MS. AMARANTE:  I'm going to offer as

2    Plaintiff's Exhibit 16 a document, which is a letter

3    from Ms. Dieciedue, which is dated August 10th, 2004.

4            (Pause in proceedings.)

5    BY MS. AMARANTE:

6        Q.  Is this document familiar to you?

7        A.  Yes.

8        Q.  Okay.  And what is it?

9        A.  It's a letter forwarding the detailed audit

10   summary prepared by our auditor to the Augustins.

11       Q.  Okay.  And to the best of your knowledge, is the

12   information contained in the audit summary true and

13   accurate?

14       A.  Yes.

15       Q.  Okay.  And what were the results of this audit

16   shown in Plaintiff's Exhibit 16?

17           MR. BUKOWSKI:  Your Honor, I object to the

18   hearsay nature of the testimony and this document.

19           THE COURT:  Perhaps the (indiscernible) was

20   how it was developed, materials like this arise.

21           MS. AMARANTE:  Okay.

22   BY MS. AMARANTE:

23       Q.  Ms. Dieciedue, who created this document which is

24   the audit summary, Plaintiff's 16?

25       A.  MAACO's auditor.

1    Q.   Okay.  And who is MAACO's auditor?

2    A.   I'd have to see.  I'd have to see at this point

3    who it was.  I think this one was prepared by, I

4    believe, Kevin Williamson, I believe.

5    Q.   And is Mr. Williamson an employee of MAACO at the

6    time that he created this document?

7    A.   Yes.

8    Q.   And is conducting audits and creating audit

9    summaries part of Mr. Williamson's job responsibilities

10   for MAACO?

11   A.   Yes.

12   Q.   And are these figures and documents things that

13   MAACO keeps in the ordinary course of business?

14   A.   Yes.

15   Q.   And does the cover letter of Plaintiff's

16   Exhibit 16, is that your signature on the document?

17   A.   Yes.

18   Q.   Okay.  And does the cover letter summarize what

19   Mr. Williamson's findings were with respect to the audit

20   of the Augustins's MAACO center?

21   A.   Yes.

22   Q.   And does that cover letter make a conclusion that

23   past due royalties are owed?

24   A.   Yes.

25        MS. AMARANTE:  I'm now going to offer as

1    Plaintiff's Exhibit 17, a letter from Ms. Dieciedue

2    dated August 17th, 2006.

3              MR. BUKOWSKI:  Your Honor, I don't know that

4    Exhibit 16 was resolved.

5              THE COURT:  What happened to 16?

6              MS. AMARANTE:  Well, 17 is similar, and I

7    was going to go through them together and then offer

8    them both as exhibits.  I can do 16 now, if you'd like,

9    Your Honor.

10              THE COURT:  All right.

11              MS. AMARANTE:  I'd offer it as a full

12   exhibit based on the witness's testimony that the

13   information --

14              THE COURT:  All right.  Go ahead and do it

15   your way.  I just wanted to make sure we didn't overlook

16   16.

17              MS. AMARANTE:  Okay.

18              (Pause in proceedings.)

19   BY MS. AMARANTE:

20       Q.  Is this document familiar to you?

21       A.  Yes.

22       Q.  Okay.  And what is it?

23       A.  It's a letter from me dated August 17th, 2006, to

24   the Augustins regarding the results of another audit

25   that was done at the center.

1     Q.   And was this audit also conducted by a MAACO

2  Franchising employee?

3     A.   Yes.

4     Q.   And does your cover letter to the Augustins

5  indicate that royalties are due according to the

6  auditor's findings?

7     A.   Yes.

8     Q.   And are these audit documents business records

9  that MAACO keeps in the ordinary course of its business?

10     A.   Yes.

11          MS. AMARANTE:   Your Honor, I would offer

12  Plaintiff's Exhibits 16 and 17 as full exhibits.

13          MR. BUKOWSKI:   Your Honor, again, we object

14  to the hearsay nature of these.   They're hearsay within

15  hearsay.   To the extent the audit reports themselves are

16  being offered for the truth of the matter asserted, the

17  auditor is not subject to cross-examination and the

18  letters basically, as the witness has testified, restate

19  the conclusion presumably for the truth of the matter

20  asserted which, getting to my last objection, is the

21  relevance of these documents to the extent at which

22  they're not relevant, to the extent they're not the

23  basis for the termination at issue in this lawsuit.

24          THE COURT:   Well, I think they are

25  admissible as entries in the regular course of business,

1    and I'll admit them.  But the truth of what they report.

2                    (Whereupon, Plaintiff's Exhibit Nos. 16 and

3                    17 were admitted into evidence.)

4    BY MS. AMARANTE:

5        Q.  Ms. Dieciedue, I'll asking you to look at

6    Plaintiff's Exhibit 15 which has already been marked.

7    It's the December 3rd, 2008, notice of default addressed

8    to the Augustins, and it should be in the pile of papers

9    there.

10       A.  (Witness complies.)

11       Q.  Is this document familiar to you?

12       A.  Yes.

13       Q.  And on the second page, is that your signature on

14   the letter?

15       A.  Yes.

16       Q.  Why did you send this notice of default to the

17   Augustins?

18       A.  Because the Augustins had failed to pay royalty

19   fees and advertising contributions as they're required

20   to do so under the franchise agreement.

21       Q.  Under the calculation of the amount due, there's

22   a paragraph that talks about the Augustins's failure to

23   submit weekly gross receipt reports for various weeks.

24   Do you see that?

25       A.  Yes.

1    Q.   Approximately how many weeks worth of weekly

2    reports had the Augustins failed to submit according to

3    this notice of default?

4    A.   Ten reports.

5    Q.   Okay.  And under the franchise agreement, are the

6    weekly reports -- how often -- strike that.

7         Under the franchise agreement, how often are the

8    weekly reports supposed to be submitted?

9    A.   The reports are due on Friday following the

10   preceding week's business.

11   Q.   Okay.  In the notice of default, the total amount

12   due is calculated at approximately $59,000; is that

13   correct?

14   A.   Correct.

15   Q.   Would the gross receipts that the Augustins

16   received for those ten weeks of weekly reports that were

17   missing have been included in those royalty calculations

18   of $59,000?

19   A.   No.

20   Q.   And why is that?

21   A.   Because those figures were only known by the

22   Augustins.

23   Q.   Okay.  So if the Augustins had submitted those

24   ten weeks worth of weekly reports of their gross

25   receipt, would the amount due under this notice of

1    default have been different?

2       A.  Yes.  If they didn't pay those fees that they

3    reported, yes.

4       Q.  Okay.  And how would it have been different?

5    Would it have been higher?

6       A.  Higher.

7            MS. AMARANTE:  I'm going to offer as

8    Plaintiff's Exhibit 18, a response to notice of default

9    dated December 16th, 2008.

10   BY MS. AMARANTE:

11      Q.  Do you recognize this document?

12      A.  Yes.

13      Q.  Okay.  And did you receive it on or about

14   December 16th, 2008?

15      A.  Yes.

16      Q.  And is it -- who sent you this letter?

17      A.  Philippe Augustin.

18      Q.  In the second paragraph, can you please read into

19   the record the first two sentences of that paragraph

20   starting with, "I agree that I owe."

21      A.  "I agree that I owe $7,749.84 in advertising

22   expenditures and paint and supplies totalling $1,135.96.

23   I am also acknowledging that these figures may have

24   increased since December 3rd and am willing to pay what

25   is owed pertaining to these two categories."

Q.  So was Mr. Augustin disputing that he owed MAACO anything at all or was it just the amount what was due that was disputed?

A.  I'm sorry.  Can you ask me that again?

Q.  I'm sorry.  Let me rephrase.

So when you received this letter, did you understand that Mr. Augustin was disputing the fact that he owed anything to MAACO at all?

A.  I was aware of the fact that he acknowledged all the monies for advertising, all the monies for paint and supplies.  He had some concerns about the franchise fees.

Q.  Did you have any discussions with Mr. Augustin following this letter regarding his concern about the franchise royalty fees?

A.  As I recall, we had a telephone conversation.

Q.  What do you recall about that conversation?

A.  He talked about his center not being certified. He talked about concerns with regard to the audit.  I believe, if I'm not mistaken, the auditor may have even explained to him that you had to pay franchise fees on sublet work as well.

Q.  Okay.  Did you ever tell Mr. Augustin not to worry about the notice of default?

A.  No.

1    Q.   What did you tell him about the actions that he

2    should take in response to the December 3rd notice of

3    default?

4    A.   As the notice stated, he had 15 days to cure by

5    either paying all the amounts or enter into satisfactory

6    payment arrangement.  And if he failed to do that, MAACO

7    could, if it elected to, terminate his franchise

8    agreement.

9    Q.   Okay.

10             MS. AMARANTE:  Absent objection, I'm going

11   to move for admission of Plaintiff's Exhibit 18 as a

12   full exhibit.

13             MR. BUKOWSKI:  No objection, Your Honor.

14             (Whereupon, Plaintiff's Exhibit No. 18 was

15             admitted into evidence.)

16             MS. AMARANTE:  Okay.  I'm now going to mark

17   Plaintiff's Exhibit 19, which is a supplemental notice

18   of default dated March 4th.

19             (Whereupon, Plaintiff's Exhibit No. 19 was

20             marked for identification.)

21   BY MS. AMARANTE:

22   Q.   Are you familiar with this document?

23   A.   Yes.

24   Q.   And on the second page, is that your signature

25   sending this letter to the Augustins?

1    A.   Yes.

2    Q.   Can you please read the text of the second

3  paragraph into the record, please, starting with, "After

4  you receive the notice."

5    A.   "After you received the notice, I advised

6  Philippe that you were required to submit your weekly

7  gross receipts reports, royalty fees, and advertising

8  contributions on a current basis as a first step to

9  curing your defaults under the franchise agreement."

10    Q.   Okay.  And according to the supplemental notice

11  of default, had the Augustins complied with that request

12  to maintain current and submit the weekly reports as

13  required?

14    A.   No.

15    Q.   Okay.  And what had happened to the total amount

16  due and owing since the December 3rd notice of default?

17  Had the number increased?

18    A.   It had increased to -- by over $15,000.

19    Q.   Okay.  Making --

20    A.   Plus -- I'm sorry.  $15,000 plus there were more

21  missing reports, so I wasn't aware of what was owed on

22  those reports.

23    Q.   Okay.  And as you'll see in the last paragraph of

24  the first page, how many weekly reports are missing from

25  the Augustins at this point according to this

1   supplemental notice of default?

2       A.   Twelve.

3       Q.   Okay.  Did you have any conversations with Mr.

4   Augustin following this supplemental notice of default?

5       A.   I -- I vaguely recall one conversation because I

6   believe that was the conversation where I informed

7   Philippe how serious the notice of default was and that

8   he had to be concerned about, and he had to cure it or

9   again we could elect to terminate his franchise

10  agreement.

11          MS. AMARANTE:  Your Honor, I'd move for

12  admission of Plaintiff's Exhibit 19 as a full exhibit.

13          MR. BUKOWSKI:  No objection, Your Honor.

14          THE COURT:  All right.  We'll put it in.

15          (Whereupon, Plaintiff's Exhibit No. 19 was

16          admitted into evidence.)

17  BY MS. AMARANTE:

18      Q.   Okay.  And the notice of termination which is

19  dated April 9th, 2009, is already marked as Plaintiff's

20  Exhibit 7.  You should have it in the stack up there.

21  Can you turn to that now?

22      A.   I have it.

23      Q.   Okay.  Did you also send this letter to the

24  Augustins?

25      A.   Yes.

1    Q.  Okay.  And looking at the amount due on page 2,

2    had those amounts again increased since the supplemental

3    notice of default?

4    A.  Yes.

5    Q.  And the last paragraph of page 2, according to

6    the notice of termination, had the Augustins come

7    current on their weekly gross receipts reports?

8    A.  No.

9    Q.  Did your letter remind the Augustins of the post

10   termination covenants in the franchise agreement?

11   A.  Yes.

12   Q.  And why did it do that?

13   A.  Because the termination was effective April 9th,

14   and I wanted to ensure that he was aware of what he had

15   to comply with immediately.

16   Q.  Did you ever tell Mr. Augustin that he didn't

17   need to worry about the notices of default?

18   A.  Absolutely not.

19   Q.  What did you tell him about the notices of

20   default?

21   A.  That they were serious, that he -- if he didn't

22   cure satisfactorily, MAACO could terminate his franchise

23   agreement.

24   Q.  Okay.  And based on your 27 years of experience

25   with MAACO, what harm does MAACO suffer if after

1    termination a franchisee does not comply with the post

2    termination covenants?

3       A.   Well, first of all, it's not fair to any other

4    MAACOs in his market if he continues to operate a MAACO

5    without being authorized to do so.  They pay fees to

6    operate as a MAACO.  He didn't.

7          It also would lessen that value of that covenant

8    not to compete if we just let people continue to compete

9    in that market when they were terminated.  They also,

10   when they came to us, knew that we would require that

11   when we negotiated to enter into a franchise agreement

12   with them.

13              MS. AMARANTE:  Thank you.  No further

14   questions.

15              (Pause in proceedings.)

16              THE COURT:  I'm sorry.  Were you waiting for

17   me?

18              MR. BUKOWSKI:  I was.

19              THE COURT:  I beg your pardon.

20              MR. BUKOWSKI:  No problem.  I just didn't

21   want to start if you were making notes, Your Honor.  I

22   apologize for the delay.

23                        CROSS-EXAMINATION

24   BY MR. BUKOWSKI:

25      Q.   Ms. Diecidue, Exhibit 18 is the letter that Mr.

1    Augustin sent to you in response to your initial notice

2    of default, right?

3        A.  Yes.

4        Q.  Okay.  Do you have that in front of you?

5        A.  Yes.

6        Q.  Okay.  Can you turn to the last -- the second

7    page of that letter.

8        A.  (Witness complies.)

9        Q.  In the second paragraph from the bottom Mr.

10   Augustin states, "On behalf of MAACO Enterprises, you're

11   pursuing me for money that you feel that I owe, but what

12   about monies that MAACO Enterprises owes me and its

13   breached contractual obligations?  When I moved from

14   Boston to West Palm Beach because MAACO failed to find

15   me a location at the Boston area, I was told by Bill

16   Chafey (ph.) that I will be reimbursed for moving

17   expenses.  I was never compensated.  That remains

18   outstanding.  Also MAACO Enterprises has an old

19   compressor in my shop for years and owes me for storage.

20   I've been trying to get certified by a MAACO and the

21   person that was scheduled to certify me quit his job and

22   MAACO Enterprises did not send anybody else out to

23   certify me.  Doug Engle is aware of this.  Because I'm

24   not MAACO certified, I missed out on quite a few jobs.

25   In addition, I was told I would get a MAACO sign that

1    which lights up.  I'm still waiting for such."  Did I

2    read that paragraph correctly?

3       A.  Yes.

4       Q.  The next paragraph states, "Overall, I do not

5    feel that I've been treated very well by MAACO

6    Enterprises.  I have to fight to get MAACO Enterprises

7    to honor certain obligations.  The only individuals at

8    MAACO Enterprises that I had good conversations with is

9    the late Tony Martino, Grace and Jane in finance.  I

10   want to work with representatives of MAACO Enterprises

11   to build a better business relationship and get the New

12   Year off to a good start.  Please have the person with

13   whom I need to negotiate payment arrangements contact me

14   at (561) 845-2228 to work out a payment plan for monies

15   owed.  I would greatly appreciate your addressing in

16   writing my concerns as identified above.  Specifically,

17   about the known royalty fees and MAACO's failed

18   obligations to me.  Thank you for your time and

19   consideration.  Happy holidays."

20       Did I read that paragraph correctly?

21       A.  Yes.

22       Q.  Now, Exhibit 19 is here marked forth supplemental

23   notice of default; is that right?

24       A.  I don't know what number it is, but --

25       Q.  Nineteen?  Okay.  That's how I have it marked.

```
 1     A.   Okay.  I believe you.

 2     Q.   Do you have the March 4th --

 3               THE COURT:  Do you have the letter of

 4  March 4th?

 5               THE WITNESS:  I have the March 4th letter.

 6               MR. BUKOWSKI:  Okay.

 7  BY MR. BUKOWSKI:

 8     Q.   Nowhere in your March 4th, 2009, letter do you

 9  address any of the concerns that I just read from Mr.

10  Augustins's December 16th, 2008, response to your first

11  notice of default; isn't that true?

12     A.   Yes.

13     Q.   Now, was there an economic downturn in 2008

14  or 2009?  Would you agree with me that the economy went

15  south in 2008 and 2009?

16     A.   We had economic problems, yes.

17     Q.   And it wouldn't surprise you to realize that a

18  franchisee might have trouble paying its weekly

19  advertising commitment, its weekly royalty payments,

20  etcetera, would it?

21     A.   No.

22     Q.   And here Mr. Augustin in his letter is asking for

23  someone at MAACO to contact him to build a better

24  business relationship and negotiate payment

25  arrangements, right?
```

```
 1      A.   Yes, and I contacted him.

 2      Q.   You didn't negotiate payment arrangements, did

 3  you?

 4      A.   Well, I attempted to, yes.

 5      Q.   Okay.

 6      A.   Yes.

 7      Q.   It doesn't say anything about payment

 8  arrangements in your March 4th supplemental notice of

 9  default, does it?

10      A.   No.  No, because --

11      Q.   No.  That answered my question.

12      A.   No.

13      Q.   Thank you.

14      A.   No.

15      Q.   How do you have exhibit -- Defendants's Exhibits

16  1 and 2?  I said what it is.  They're the e-mails -- the

17  February 18th and 19th e-mails.

18              MR. BUKOWSKI:  Is there an exhibit sticker

19  on those?  May I approach, Your Honor?

20              THE COURT:  Please.  Go ahead.

21              MR. BUKOWSKI:  That's them.

22              THE WITNESS:  These one?

23              MR. BUKOWSKI:  Let me just make sure.  Okay.

24  That's 1 and 2.  Okay.

25  BY MR. BUKOWSKI:
```

1    Q.  Now, in the e-mails that are marked Defendants's

2    Exhibit 1 and 2, those are dated February 18th and

3    February 19th, 2009; is that right?

4    A.  Yes.

5    Q.  So I'd say after Mr. Augustin sent his response

6    to your initial notice of default, right?

7    A.  Yes.

8    Q.  And it's before your March 4th supplemental

9    notice of default?

10    A.  Yes.

11    Q.  And in those e-mails you're talking about the

12    landlord evicting Mr. Augustin, right?

13    A.  I'm talking about an operations person advising

14    me that the landlord might evict him.

15    Q.  Okay.  So someone in MAACO's operations

16    department advised you that the landlord was ready to

17    evict Mr. Augustin for not paying his rent; is that

18    right?

19    A.  Yes.

20    Q.  And you're asking whether you should hold off on

21    sending the supplemental notice of default, marked as

22    Plaintiff's Exhibit 19, right?

23    A.  Yes.

24    Q.  And the reason you're asking is because in your

25    mind if the landlord evicts him, you don't need a

```
 1   supplemental notice of default.  He'll be terminated as

 2   a result of being evicted from the premise, right?

 3      A.   That's was the way I chose to do any job, yes.

 4      Q.   Okay.

 5            MR. BUKOWSKI:  Nothing further, Your Honor.

 6            MS. AMARANTE:  I have just a few questions

 7   of redirect.

 8            THE COURT:  Go ahead.  Go ahead.

 9                   REDIRECT EXAMINATION

10   BY MS. AMARANTE:

11      Q.   Ms. Dieciedue, you were starting to explain how

12   you did go about trying to set up a payment arrangement

13   for Mr. Augustin after his December 16th, 2008, letter.

14   Can you further explain that?

15      A.   As I would tell any franchisee that was in

16   default, the first step that you had to take was to pay

17   current, submit all your missing reports, and start to

18   submit your reports on a current basis with the fees due

19   on them and to pay your other obligations, advertising

20   contributions, paint supplies that you purchased, on a

21   current basis going forward so that debt would not grow.

22            Each time he got a default, that was my

23   conversation.  He never -- he never paid current.  It

24   just kept growing.  Then I would tell him that after he

25   paid current for awhile, we would address something
```

1    structured, enter into a note, something, that I would

2    propose on his behalf to the board for approval once he

3    paid current.

4        Q.   And did Mr. Augustin ever start submitting the

5    weekly reports on a timely basis and current -- paying

6    his current royalties?

7        A.   No.

8        Q.   With the economic downturn that we all

9    experienced at the end of 2008 and 2009 excuse Mr.

10   Augustin's failure to submit the weekly --

11       A.   No.

12       Q.   -- reports on a timely basis?

13       A.   No.

14       Q.   Did you have a conversation after the

15   December 16th, 2008, letter in which you tried to

16   address Mr. Augustin's concerns about his alleged unfair

17   treatment from MAACO?

18       A.   Did I have a conversation?

19       Q.   Yes.

20       A.   Yes.

21       Q.   And did you take any action to investigate his

22   claims by talking to anyone else within MAACO?

23       A.   I believe that I talked about certification, his

24   concerns with operations.  We talked about the audit.

25   We talked about sublet.  We talked about the main reason

1    that he owed MAACO franchise fees from the audit was

2    that he reported work and when our auditor went to his

3    center, he never reported that he got paid for it.  That

4    was the majority of the reason he owed so much money

5    under his audits.

6        Q.  Let's look at Defendants's Exhibit 2, which is an

7    e-mail chain.  There's an e-mail from you at the top,

8    Thursday, February 19th, 2009.  Do you see that?

9        A.  Yes.

10       Q.  Let's look at the second -- the bottom of the

11   second page of that e-mail chain.  You'll see an e-mail

12   from Frank Costello to you dated Wednesday,

13   February 18th, 2009, at 3:21 p.m.  Do you see that?

14       A.  Yes.

15       Q.  And who is Frank Costello?

16       A.  He was our vice president -- he is our vice

17   president of real estate.

18       Q.  Okay.  And Frank Costello was reporting to you

19   about conversations he had had with the Augustins's

20   landlord?

21       A.  Yes.

22       Q.  And do you see in the first bullet point it

23   says "LL," I assume that means landlord --

24       A.  Yes.

25       Q.  -- informed me that he was there today and that

1    there were 26 cars on the lot without invoices per

2    landlord and there are no signs of economic downturn in

3    this business as the franchisee is claiming to the

4    landlord."  Do you see that?

5        A.   Yes.

6        Q.   Okay.

7                MS. AMARANTE:  I have no further questions.

8                THE COURT:  I take it no recross?

9                MR. BUKOWSKI:  No recross, Your Honor.

10               THE COURT:  Thank you very much.

11               (Witness excused.)

12               MS. AMARANTE:  Your Honor, MAACO Franchising

13   calls Sheik Hyatt to the stand.

14               THE COURT:  Okay.  Good afternoon, sir.

15               SHEIK HYATT, WITNESS, SWORN.

16               COURTROOM CLERK:  Please state your full

17   name, spell your last name for the record.

18               THE WITNESS:  Sheik Hyatt.  Last name

19   H-Y-A-T-T.

20               COURTROOM CLERK:  Could you also spell your

21   first name, sir.

22               THE WITNESS:  S-H-E-I-K.

23                        DIRECT EXAMINATION

24   BY MS. AMARANTE:

25       Q.   Good afternoon, Mr. Hyatt.

1        A.   Good afternoon.

2        Q.   Mr. Hyatt, are you aware that you're a defendant

3    in this case?

4        A.   Yes.

5        Q.   And do you have a lawyer representing you here?

6        A.   No.

7        Q.   Do you currently have employment?

8        A.   No.

9        Q.   When were you last employed?

10       A.   I was last employed in January.

11       Q.   And where did you work at that time?

12       A.   I worked at Palm Beach Auto Paint and Collision.

13       Q.   Before working at Palm Beach Auto, where did you

14   work?

15       A.   I work at the MAACO center on 0804 Old Dixie

16   Highway.

17       Q.   And is that Mr. Augustin's former MAACO center?

18       A.   Yes, it is.

19       Q.   And when you worked at Mr. Augustin's former

20   MAACO center, what were your job responsibilities there?

21       A.   I was a painter, and I oversee a couple workers

22   in the back of the shop.

23       Q.   Did you have any role in keeping the books or

24   records of that business?

25       A.   Never.

1     Q.  And did you have any role in managing the

2  day-to-day operations of the office at --

3     A.  No, nothing in the office; strictly in the back

4  of the shop.

5          MS. AMARANTE:  I'm going to mark as

6  Plaintiff's Exhibit 20 a declaration of Sheik Hyatt that

7  was filed with this Court on March 9th, 2010.

8          (Whereupon, Plaintiff's Exhibit No. 20 was

9           marked for identification.)

10  BY MS. AMARANTE:

11     Q.  Mr. Hyatt, is this document familiar to you?

12     A.  Yes, it is.

13     Q.  Okay.  And turning to page 8 of the declaration,

14  is that your signature at the top of page 8?

15     A.  Yes, it is.

16     Q.  Did you review this document before you signed

17  it?

18     A.  No, I did not.  Oh, this document?

19     Q.  Yes.

20     A.  Yes.  Yes.

21     Q.  Okay.  Let me ask that again:  Did you review

22  this declaration, Mr. Hyatt --

23     A.  Yes.

24     Q.  -- before you signed it?

25     A.  Yes, I did.  I'm sorry.

1    Q.   And is everything in the declaration true and

2  accurate to the best of your knowledge?

3    A.   To the best of my knowledge, yes.

4    Q.   I'm going to asking you to turn to page 2.

5         MR. BUKOWSKI:  Your Honor, before we get

6  into the substance of it, you know, we object to any

7  statements in this document coming into evidence as

8  hearsay.  You know, this is clearly a prior out of

9  course statement by this witness who is here to testify

10 as to whatever counsel is asking him.

11        THE COURT:  Well, since we have the witness

12 on the stand, I assume you could pursue directly by a

13 declaration of whatever may be pertinent recitals.

14        MS. AMARANTE:  Again, Your Honor, I thought

15 it would be more efficient to do it this way.  But, I

16 mean, the witness is here and subject to

17 cross-examination, so I thought working through the

18 declaration would be the most efficient way to get the

19 testimony.

20        THE COURT:  Well --

21        MS. AMARANTE:  If you'll prefer that I ask

22 him questions, I will.

23 BY MS. AMARANTE:

24   Q.   Mr. Hyatt, at some point did you sign papers to

25 incorporate an entity known as Palm Beach Auto Painting

1   and Collision?

2       A.   Yes, I did.

3       Q.   Why did you sign those papers?

4       A.   I signed those papers because Mr. Augustin asked

5   me to sign them.

6       Q.   Okay.  Who prepared the documents in order to

7   incorporate Palm Beach Auto?

8       A.   I do not know who.  I never seen who prepared the

9   documents.  I was given to them by Mr. Philippe.

10      Q.   Okay.  And did Mr. Augustin tell you why he

11  wanted you to sign the documents to incorporate Palm

12  Beach Auto?

13      A.   Because he wanted me to put the business in my

14  name.

15      Q.   And did he tell you why the business needed to be

16  in your name as opposed to Mr. Augustin's name?

17      A.   Well, he said that he was having some problems

18  with MAACO.  I don't know at the time, but -- and he --

19  before -- the economy is very bad and before my

20  coworkers, we lose our job, it's -- he wants me to put

21  the business in his name -- in my name, I'm sorry, for

22  some reason.

23           And I asked him at the time if it was illegal

24  because I do not want myself involved with any problems,

25  and he told -- he quite assured me it was -- it wasn't

1    illegal or nothing I'm doing.

2       Q.   Okay.   When Mr. Augustin asked you to incorporate

3    Palm Beach Auto, was it your understanding that you

4    would actually own and operate that business?

5       A.   No.   It was my understanding that I would just

6    be -- just my name would be used.   He is still the owner

7    of the business.

8       Q.   Did you make any cash or capital investments into

9    Palm Beach Auto?

10      A.   No, I did not.

11      Q.   And did you manage the day-to-day business of

12   Palm Beach Auto?

13      A.   No, I did not.

14      Q.   Who did?

15      A.   Mr. Augustin did.

16              (Pause in proceedings.)

17      Q.   Mr. Hyatt, have you heard the name Alan Zangen?

18      A.   Not before today.

19      Q.   Do you know who Mr. Zangen is?

20      A.   He's a lawyer representing Mr. Philippe, I think

21   it is --

22      Q.   Okay.

23      A.   -- in Palm Beach.   I'm sorry.   I don't know

24   what -- I know he's a liar.   That's all I know actually.

25      Q.   Okay.

```
 1              MS. AMARANTE:  And I'm going to ask if the
 2   witness could please turn to Plaintiff's Exhibit 20,
 3   which is the declaration.  There's a document attached
 4   that I wanted to ask him about, which I don't have in
 5   the single form.
 6              Is it appropriate, Your Honor, to ask him
 7   about the exhibits to the declaration?
 8              THE COURT:  Sure.
 9              MS. AMARANTE:  Thank you, Your Honor.
10   BY MS. AMARANTE:
11     Q.  So if you turn --
12              MR. BUKOWSKI:  Your Honor -- I'm sorry.  I
13   think she was about to identify the exhibit.
14              MS. AMARANTE:  I am.
15              MR. BUKOWSKI:  Okay.
16   BY MS. AMARANTE:
17     Q.  On page 12 of 58, which appears at the top of the
18   document -- well, actually, excuse me.
19              It starts on page 10 of 58.  It says, "Exhibit A"
20   and then there's some documents behind that tab.
21     A.  Yeah.
22     Q.  Okay.  And if you look at the top right corner,
23   Mr. Hyatt, there's page numbers.  If you go to page 14
24   of 58.
25     A.  Yes.
```

1       Q.   Is that your signature on the articles of

2    incorporation of Palm Beach Auto?

3       A.   That's my signature.

4       Q.   Okay.  And going back two pages to page 12 of 58.

5       A.   Yes.

6       Q.   Do you see that there's a letter from Attorney

7    Zangen in transmitting those papers to the Florida

8    Secretary of State?

9       A.   Yes, I see that.

10      Q.   And did you ask Attorney Zangen to prepare these

11   papers to incorporate Palm Beach Auto in your name?

12      A.   No, I did not.

13      Q.   Have you ever met Attorney Zangen?

14      A.   No, I never met him.

15      Q.   And have you ever spoken with Attorney Zangen?

16      A.   No, I never spoken to him.

17      Q.   After you signed these papers, did you receive

18   any stock certificates showing your ownership of Palm

19   Beach Auto?

20      A.   No, I did not.

21      Q.   And did you ever receive any paperwork regarding

22   that corporation?

23      A.   No, I did not.

24             MS. AMARANTE:  I'm going to offer

25   Plaintiff's Exhibit 21, which is a commercial lease

1   agreement.

2   BY MS. AMARANTE:

3      Q.   Do you recognize this, Mr. Hyatt?

4      A.   Yes, I do.

5      Q.   And turning to the last page of the document, is

6   that your signature on the line for lessee?

7      A.   Yes, it is.

8      Q.   Did you find this location for Palm Beach Auto to

9   open business?

10     A.   No, I did not.

11     Q.   Did you negotiate the lease with the landlord?

12     A.   No, I did not.

13     Q.   Did you pay the $5,000 security deposit to the

14   landlord?

15     A.   No, I did not.

16     Q.   And do you know who it is that found the

17   location, negotiated the lease, and paid the security

18   deposit?

19     A.   Mr. Augustin.

20     Q.   Did you pay any role in this lease agreement

21   other than signing it?

22     A.   No, I did not.

23     Q.   Looking at the front of the lease agreement, it's

24   dated June 24th, 2009; is that correct?

25     A.   Yes, it is.

1    Q.  And on that date, were you still working at Mr.

2  Augustin's former MAACO center located on Old Dixie

3  Highway?

4    A.  Yes, I was.

5    Q.  And if you recall, when did the business move

6  from the former MAACO location to this Newman Road

7  location?

8    A.  I think it was towards the end of June, first of

9  July.

10    Q.  Did you ever work in the office of Palm Beach

11  Auto?

12    A.  No, I did not.

13    Q.  Did you have access to the books and records of

14  Palm Beach Auto?

15    A.  No, I did not.

16    Q.  Who kept the books and records of Palm Beach

17  Auto?

18    A.  Mr. Augustin.

19    Q.  Who ran the day-to-day operations of Palm Beach

20  Auto?

21    A.  Mr. Augustin.

22    Q.  And what was your role in the business?

23    A.  My role?  I was a painter, and I would see Mr.

24  Augustin in the morning.  He would tell me what to do,

25  and I would tell the guys in the back what to do.

1   That's it.  And I paint the cars.

2      Q.  Okay.

3      A.  I do some things sometimes, different jobs.

4      Q.  And did you receive payment for your services as

5   an employee of Palm Beach Auto?

6      A.  Yes, I did.

7      Q.  From your prospective, did Palm Beach Auto

8   operate any differently than the Augustins's former

9   MAACO center?

10     A.  No, it did not.

11     Q.  When Mr. Augustin moved the business to Newman

12  Road, did he bring any of the equipment or supplies from

13  the former MAACO center to the new location?

14     A.  He brought some painting stuff and a frame

15  machine and a hoist that he used for work.

16     Q.  Did Palm Beach Auto have computers in the office?

17     A.  Yes, they did.

18     Q.  And were those -- where did those computers come

19  from?

20     A.  They came from MAACO also.

21     Q.  When did you first learn that MAACO had sued the

22  Augustins over their involvement with Palm Beach Auto?

23     A.  I think it was in the middle of January or

24  towards the end of December.  I'm not too sure of the

25  date on that.

1    Q.   All right.   Do you recall how you learned that

2  fact?

3    A.   Yes.   My wife opened the mail and it was for me.

4  It was a FedEx envelope or something, and she was at the

5  shop and she opened the mail, and there was one for me

6  and one for Mr. Augustin.   And she opened mine, and that

7  was what -- that was when I learned about what was going

8  on.

9    Q.   Okay.   And if you'll look at your declaration,

10  which was marked for identification as Plaintiff's

11  Exhibit 20, in the top right corner it'll say "page 44

12  of 58."   There's a January 12th, 2010, letter to you.

13  Let me know when you're there.

14    A.   Yes.

15    Q.   Okay.   Is this the letter that you received that

16  first alerted you to the situation with --

17    A.   Yes, this was it.

18    Q.   Okay.   And prior to receiving this letter, did

19  you have any understanding of whether there was

20  litigation between MAACO and Mr. Augustin?

21    A.   My thought was Mr. Augustin was suing MAACO;

22  that's what I understand on all this.

23    Q.   And who told you that?

24    A.   Mr. Augustin told me he was going to sue MAACO

25  also.

1    Q.  And when you learned that MAACO had sued the

2  Augustins, did you take any action?

3    A.  Yes.  I asked Mr. Augustin about it, and he told

4  me don't worry, that his lawyer will take care of the

5  papers.  MAACO is just trying to intimidate me.  That's

6  -- that was the word that he used.

7    Q.  Did you do anything with respect to your

8  employment --

9    A.  Yes.

10   Q.  -- and ownership at Palm Beach Auto?

11   A.  Yeah.  I give him my two weeks's notice.

12   Q.  And why did you do that?

13   A.  Because I didn't want to be doing something

14  that's against the law or something that would get

15  myself involved in trouble.  I was never involved with

16  the law in the first place.

17   Q.  Okay.  And in the declaration that's been marked

18  for identification as Plaintiff's 20, if you'll turn to

19  Exhibit D, which is page 48 of 58.

20   A.  Yeah.

21   Q.  Do you recognize these documents that appear on

22  these pages?

23   A.  No.

24   Q.  Okay.  Let me ask you to look at page 50 of 58.

25   A.  Yes.

1    Q.   Is that your signature on this document?

2    A.   Yes, that's -- that's my signature.

3    Q.   Why did you resign from Palm Beach Auto at this

4    time?

5    A.   As I say, I didn't want nothing -- no trouble

6    with the law, so I -- I wanted to come clean with Palm

7    Beach Auto.  I didn't want nothing to do with it anymore

8    once I learned the true fact of the -- some of it

9    anyways.

10   Q.   And let's look in that same document at page 55

11   of 58, which is a Wachovia signature card.

12   A.   Yes.

13   Q.   Do you recognize that document?

14   A.   Yes, I do.

15   Q.   And how did this document get to be signed by

16   both you and Mr. Augustin?

17   A.   When I left, I left on a Friday.  Mr. Augustin

18   told me he wanted me to sign over the account.  I said,

19   "Don't worry.  I am not going to take nothing from you.

20   I believe in a higher authority."  That was my exact

21   word to him.

22        "I will be back on Monday and I will sign all the

23   paper."  I did go back on Monday.  I signed -- and I

24   signed the paper.  I went to the bank with him

25   personally, and I signed the account over.

1    Q.   Okay.  And prior to this, when the account was in

2    your name, did you have the -- did you have the

3    supervision of how the money was spent for Palm Beach

4    Auto?

5    A.   I did not have any supervision.  I've got -- all

6    I did was sign the checks.

7    Q.   And who would ask you to sign the checks?

8    A.   Mr. Augustin would ask me to sign five, six

9    checks at a time.

10   Q.   And when you were signing them, did you always

11   know what the checks were for?

12   A.   No, I did not always know what the checks were.

13   Q.   Did you also contact MAACO's counsel in January

14   of 2010?

15   A.   Yes.  Because I was -- I wanted to know what

16   situation I was in, and so I called Mr. Dean and spoke

17   with him briefly.

18   Q.   Okay.  And why did you call MAACO's counsel at

19   that time?

20   A.   Because I wanted to do the right thing.  I don't

21   want to be in trouble for something that -- you know, I

22   didn't want to be in any trouble.

23   Q.   Okay.

24   A.   I want to do the right thing.

25   Q.   Mr. Hyatt, do you know a man named Frank Samson?

1    A.  I don't know him personally, but I don't know

2    he's Mr. Augustin's friend.  He's always at the shop

3    with him.

4    Q.  And to your knowledge, does Mr. Samson have any

5    experience in the automotive industry?

6    A.  No, he does not.

7    Q.  How do you know that?

8    A.  Because I always -- I was the one that fixes his

9    car, and he said that a lot of times he don't know

10   nothing about cars.

11   Q.  Did you know that Mr. Augustin signed an

12   agreement last week to sell his stock in Palm Beach Auto

13   to Mr. Samson?

14   A.  No, because after I left, I did not talk to Mr.

15   Augustin anymore.  That was it.  I think I called him

16   once and that was it.  I didn't speak to him.

17        MS. AMARANTE:  I'm looking to offer

18   Plaintiff's Exhibit 22, which is a motion filed in this

19   case.

20   BY MS. AMARANTE:

21   Q.  Mr. Hyatt, are you familiar with this document?

22   A.  Yes, I am.

23   Q.  Okay.  And did you sign this document?

24   A.  Yes, I did.

25   Q.  And did you read it before you signed it?

1   A.  Yes, I did.

2   Q.  And you understand that in this motion, you're

3   agreeing to have a judgment and an injunction entered

4   against you in this case?

5   A.  Yes.

6   Q.  And why did you agree to that consent judgment

7   and injunction?

8   A.  Because it was the right thing to do.

9   Q.  Based on your involvement with Palm Beach Auto,

10  have you also had the possibility of suffering some tax

11  consequences?

12  A.  I do not know that at this time because Mr.

13  Augustin, I asked him about the taxes, and he never give

14  me no papers or he never gave me nothing.  He tell

15  me, "Don't worry.  Don't worry."  That's all.  So I

16  don't know what's threatening on me right now.

17  Q.  Okay.  Do you know a man named Jerome Dear?

18  A.  Yes, I do.

19  Q.  Did Mr. Dear work with you at Palm Beach Auto?

20          THE COURT:  Named what?  I'm sorry.

21          MS. AMARANTE:  Jerome Dear, D-E-A-R.

22          THE WITNESS:  Yes, he did.

23  BY MS. AMARANTE:

24  Q.  And what was his position at Palm Beach Auto?

25  A.  He used to order parts and do a couple --

1   write -- print out estimates.

2      Q.  Did Mr. Dear also work with you at Mr. Augustin's

3   former MAACO center?

4      A.  Yes, he did.

5      Q.  Okay.  And based on your work experience with

6   Mr. Dear, do you believe that Mr. Dear's qualified to

7   operate Palm Beach Auto without assistance from Mr.

8   Augustin?

9              MR. BUKOWSKI:  Objection.

10             THE WITNESS:  Honestly, no.

11             MR. BUKOWSKI:  Objection.  Calls for

12   opinion; move to strike; lacks foundation.

13             THE COURT:  A lot of foundation.  No, I'll

14   allow it.

15   BY MS. AMARANTE:

16     Q.  So I think you said, no, he's not.  And why not?

17     A.  He doesn't know nothing about a business.

18     Q.  Mr. Hyatt, why did you come here to testify

19   today?

20     A.  Because I want to stay out of trouble, and I

21   believe in keeping a straight path, and that's what I'm

22   on.  I don't want to lead in no misdirection with the

23   law or with any, you know, do any injustice to anybody.

24     Q.  And how did you get here from Florida to testify?

25     A.  I drove.

1      Q.   Who's paying for your travel expenses for that

2   trip?

3      A.   MAACO has offered to pay, but I pay -- right now

4   I paid everything.

5      Q.   Aside from reimbursing some expenses, has MAACO

6   paid you for your testimony here today?

7      A.   Not a penny.

8      Q.   And has everything in your testimony here today

9   been the truth?

10     A.   Honestly true.

11          MS. AMARANTE:   Thank you.   No further

12   questions.

13                   CROSS-EXAMINATION

14   BY MR. BUKOWSKI:

15     Q.   Good afternoon, Mr. Hyatt.

16     A.   Good afternoon.

17     Q.   The motion for a stipulated consent judgment that

18   you signed, I think that was marked at Exhibit 22; do

19   you have that?

20     A.   Yeah.

21     Q.   Okay.   As part of that consent judgment, if the

22   Court approves that, you would not have to pay MAACO any

23   money; isn't that right?

24     A.   Yes.

25     Q.   And that was part of the agreement you reached

1   with MAACO to get out of this lawsuit, correct?

2     A.  I never gained anything from Palm Beach Auto

3   Painting, so -- and I -- I just want to distance myself

4   from that.  That's all it is.

5     Q.  I understand.  But my question is:  As part of

6   the agreement you made with MAACO, they would let you

7   out of the lawsuit and you wouldn't have to pay MAACO

8   any money; isn't that right?

9     A.  Basically, that's what it's saying.

10     Q.  Okay.  Now, how long had you known Mr. Augustin?

11     A.  Maybe about nine years, eight, nine years.

12     Q.  And when did you first meet him?

13     A.  When I went to get a job with him.  I think it

14   was in 2003.

15     Q.  Okay.  And was he operating the MAACO franchise?

16     A.  Yes, he was.

17     Q.  Okay.  And he employed you at that time?

18     A.  Yes.

19     Q.  As a painter?

20     A.  Yes.

21     Q.  Okay.  And you didn't work in the office at the

22   MAACO franchise; is that right?

23     A.  No, I didn't work in the office.

24     Q.  Okay.  And at some point, did your wife become

25   employed by Mr. Augustin?

```
 1     A.   No.

 2     Q.   She never did?

 3     A.   No, she didn't.

 4     Q.   Ever?

 5     A.   No.   She was never employed.   She came and help

 6  him sometimes because I was there.

 7     Q.   Okay.   What did she do for him?

 8     A.   She would order parts and stuff like that.

 9     Q.   Okay.   Do you currently have a business in Ocala,

10  Florida?

11     A.   Yes, sir.

12     Q.   What is that business?

13     A.   Auto service.

14     Q.   And what do you do there?

15     A.   I couldn't find a job, so I opened a little shop.

16     Q.   And what do you do at that shop?

17     A.   I do mechanical repairs.

18     Q.   Okay.   And do you do painting?

19     A.   I don't have a spray boot as -- as -- in that

20  place right now so.

21     Q.   Okay.   Are you trained to do mechanical repairs?

22     A.   Yes, I do.

23     Q.   And did you obtain that training prior to ever

24  meeting Mr. Augustin?

25     A.   What?
```

1    Q.   When did you become trained to do auto mechanical

2    repairs?

3    A.   I used to do a while for Mr. Augustin.

4    Q.   Okay.  Did you know how to do it before you met

5    Mr. Augustin?

6    A.   Yes, I did.

7    Q.   Okay.  That's what I was asking.

8    A.   Yeah.

9    Q.   Okay.  When did you first learn how to do that?

10   A.   That, in Guyana, South America.

11   Q.   Okay.  At what age?

12   A.   Maybe since I was 12.

13   Q.   Okay.  And how old are you today?

14   A.   Forty-six.

15   Q.   Okay.  And you said you contacted MAACO's counsel

16   after finding out about the lawsuit; is that right?

17   A.   Yeah.

18   Q.   You didn't call me or Mr. Read, my associate, who

19   were representing Mr. Augustin; is that right?

20   A.   Yeah.

21   Q.   You did not?

22   A.   I did not.

23   Q.   Okay.  Why not?

24   A.   Because of the simple fact that I had no

25   paperwork with your name or nobody's name on it.  I only

1    had the MAACO paper that I got.

2       Q.  Okay.  And did you ever consult with your own

3    attorney?

4       A.  No, I never did.

5       Q.  Okay.

6       A.  Because I never thought I did nothing wrong.

7       Q.  Okay.  But, I mean, after you were going to

8    contact MAACO, you didn't have you own attorney?

9       A.  No, I didn't get attorney.

10      Q.  Okay.  Now, I believe you testified that you did

11   not work in the office at the MAACO franchise, right?

12      A.  Yeah.

13      Q.  And you also did not work in the office at Palm

14   Beach Auto, right?

15      A.  Yeah.

16      Q.  But you said there were computers in the office

17   at --

18      A.  Uh-uh.

19      Q.  -- Palm Beach Auto that were from MAACO?

20      A.  Yeah.  The office you could walk by and see

21   everything.  I mean, it's not -- you don't have to be a

22   scientist to know a computer.

23          And we help bring all the stuff over from Palm

24   Beach after -- from MAACO to Palm Beach Auto.  I put it

25   in my van if you want to be exactly.

1    Q.   And how much from your travel here today, how

2    much of expenses have you incurred?

3    A.   I did not calculated it yet.   I have some bills.

4    That's it.   I did not calculate how much I spent at the

5    time.

6    Q.   When did you leave Florida?

7    A.   Monday.

8    Q.   Okay.   And you stayed in hotels along the way?

9    A.   Yeah.

10   Q.   Okay.   Did you have meetings with MAACO's

11   attorneys?

12   A.   Not -- no, not since I left Palm Beach.   Not

13   since I was in Palm Beach, I didn't.   All I did was

14   spoke to them over the phone until today.

15   Q.   Okay.   You didn't meet with them in person in

16   Florida?

17   A.   No.

18   Q.   You spoke to them on the phone?

19   A.   Yeah.

20   Q.   And then the first time you met them in person

21   was here today?

22   A.   Here today.

23   Q.   Okay.   And who did you speak with on the

24   telephone?

25   A.   Mr. Dean.

1      Q.   Okay.

2      A.   And I believe Erika was there, too.

3      Q.   Okay.  And how many phone calls did you have?

4      A.   Maybe about three.

5      Q.   And the declaration that she had showed you, did

6    they prepare all that paperwork and the consent judgment

7    for you to sign?

8      A.   Yes, they did.

9           MR. BUKOWSKI:  Okay.  I have nothing

10    further, Your Honor.

11           THE COURT:  All right.

12           MS. AMARANTE:  Your Honor, I have one --

13           THE COURT:  Any redirect?

14           MS. AMARANTE:  I have one question of

15    redirect.

16           THE COURT:  All right.

17                 REDIRECT EXAMINATION

18    BY MS. AMARANTE:

19      Q.   Mr. Hyatt, during the month of October, November,

20    December of 2009, did Mr. Bukowski or Mr. Read ever call

21    you to interview you and find out if you were the actual

22    owner and operator of Palm Beach Auto?

23      A.   No, nobody did.

24           MS. AMARANTE:  No further --

25           THE WITNESS:  That's why I knew I didn't

 1  know of them.

 2              MS. AMARANTE:  No further questions.

 3              THE COURT:  All right.  Thank you, sir.  You

 4  may step down.  Thank you very much for coming --

 5              THE WITNESS:  Thank you.

 6              THE COURT:  -- this long way to testify.

 7              (Witness excused.)

 8              THE COURT:  All right.  I'd like to

 9  interrupt for about 30 seconds before we move to the

10  next witness to find out what I think is simply a

11  clerical discrepancy, but so that the record will not be

12  overly confused by it.

13              The articles of incorporation, pages 13 to

14  15 of 58, part of the materials attached to Mr. Hyatt's

15  declaration.  The articles of incorporation, which he

16  signed on June 2nd, 2009, seems superficially not to fit

17  chronologically with Mr. Zangen's letter to the Florida

18  Secretary of State filing copies of the articles of

19  incorporation.  If you look at that letter, which is

20  page 12 of 58, you'll see it bears the date June 2,

21  2008.  I can only conclude that that letter was

22  typographically erroneous.

23              It'd be noted that the stamp of receipt by

24  the Secretary of State was June 4th, 2009, and of

25  course, fits with the signing of the articles of

```
 1   incorporation, and every other date that's been

 2   mentioned as far as I can tell is all addressed to June

 3   of 2009.

 4             I simply want to make clear that my

 5   interpretation of the record leads me to conclude that

 6   I'm sure the parties have no difficulty with us, I take

 7   it.  Leads me to the conclusion that Mr. Zangen did not

 8   get the right date on his later.

 9             MS. AMARANTE:  Thank you, Your Honor.  Yes,

10   we would be in agreement with that.  It appears to be a

11   typographical error.

12             MR. BUKOWSKI:  We would, too, Your Honor.

13             THE COURT:  Good.  Well, if you can agree on

14   that, maybe you're halfway to settlement.

15             MR. FOURNARIS:  We've tried that, Your

16   Honor.

17             THE COURT:  All right.

18             MS. AMARANTE:  Are you ready for another

19   witness, Your Honor?

20             THE COURT:  Yes, indeed.

21             MS. AMARANTE:  Plaintiff calls --

22             THE COURT:  Eager.

23             MS. AMARANTE:  Yes.  Plaintiff calls

24   Shereena Hyatt to the stand.

25             SHEREENA HYATT, WITNESS, SWORN.
```

1          COURTROOM CLERK:  Please state your full

2    name, spell your last name, and spell your first name,

3    too, for the record.

4          THE WITNESS:  Shereena Hyatt, last name

5    H-Y-A-T-T, first name, S-H-E-R-E-E-N-A.

6                    DIRECT EXAMINATION

7    BY MS. AMARANTE:

8        Q.  Thank you, Ms. Hyatt.  I would first --

9            (Pause in proceedings.)

10            THE COURT:  Go ahead.

11            MS. AMARANTE:  Thank you, Your Honor.  I'm

12    first going to mark as Plaintiff's Exhibit 23 a

13    declaration of the Shereena Hyatt.

14            (Whereupon, Plaintiff's Exhibit No. 23 was

15            marked for identification.)

16    BY MS. AMARANTE:

17        Q.  Ms. Hyatt --

18            (Pause in proceedings.)

19    BY MS. AMARANTE:

20        Q.  Ms. Hyatt, is this document familiar to you?

21        A.  Yes, it is.

22        Q.  And on the last page, on page 4, is that your

23    signature attesting to the document?

24        A.  Yes, it is.

25        Q.  Did you review this declaration before signing

1    it?

2        A.   Yes, I did.

3        Q.   And is everything in the declaration true and

4    accurate to the best of your knowledge?

5        A.   Yes, it is.

6        Q.   Have you ever been an employee of Palm Beach

7    Auto?

8        A.   Officially, no.

9        Q.   Did you have any role in that business?

10       A.   Well, my husband was there.  I had a lot of free

11   time and I would go over.  And Philippe would ask me,

12   you know, to help him do certain tasks, but in at least

13   September of 2009, I became more frequent there.

14       Q.   And why did you start going to Palm Beach Auto

15   early in September of 2009?

16       A.   Because I was warned by Charles Agee (ph) and

17   Jerome Dear that I should be careful with Philippe

18   because he was going to ruin Sheik's name and everything

19   along with it.

20       Q.   When you assisted -- did you occasional help out

21   in the office of Palm Beach Auto?

22       A.   Yes.

23       Q.   And when you assisted in the office, who asked

24   you to provide services?

25       A.   Philippe did.

1    Q.  What kinds of work would you do for Palm Beach

2    Auto in the office?

3    A.  Well, I answered the phone, call -- call around

4    people to tell them that, you know, where we're located,

5    and if they want to consider us as their body shop of

6    choice.

7    Q.  Okay.

8    A.  Shredding of paperwork, things like that.

9    Q.  Okay.  And you mentioned making phone calls to

10   potential customers.  Where did you find names and

11   addresses or phone numbers of people to call for that

12   task?

13   A.  He provided me a list of names that -- paperwork

14   that he got from the city and also from customer from

15   the Polaris.

16           THE COURT:  Customer for what?

17           THE WITNESS:  From the Polaris.

18           THE COURT:  Right.

19           THE WITNESS:  The thing that MAACO uses.

20           THE COURT:  Yes.

21   BY MS. AMARANTE:

22   Q.  So were there computers operating in the office

23   of Palm Beach Auto?

24   A.  Yes.

25   Q.  And was MAACO's Polaris software operating on

1    those computers?

2       A.   When you say operating, you mean to print

3    invoices and things like that or --

4       Q.   Well, was it accessible on the computers of Palm

5    Beach Auto?

6       A.   Yes.

7       Q.   Okay.  And did Mr. Augustin give you customer

8    lists from Polaris and ask you to call those customers?

9       A.   Yes.

10      Q.   What did you say to the former MAACO customers

11   when you were making these phone calls?

12      A.   That we're no longer part of MAACO, that we have

13   moved and our new address is 1009 Newman Road, and our

14   phone number.  And if they wish to use us to give us a

15   call.

16      Q.   Okay.  And who directed you to make those phone

17   calls?

18      A.   Philippe.

19      Q.   And did you tell customers that Palm Beach Auto

20   was formerly MAACO?

21      A.   Yes.

22      Q.   Did you also write letters to former MAACO

23   customers with that same information?

24      A.   Yes.

25      Q.   Can you estimate, sitting here today, how many

1    former MAACO customers you contacted either via letter

2    or telephone?

3        A.  Well, we went through them alphabetically, and we

4    did A through Z.  How many, I can't say.

5        Q.  Okay.  Did you call every former MAACO customers

6    that was in the Polaris database?

7        A.  Yes.  Some of them answered, some of them phone

8    numbers disconnected.

9        Q.  Okay.  You also mentioned as part of your tasks

10   for Palm Beach Auto, shredding documents.  What kinds of

11   documents did you shred?

12       A.  Invoices from MAACO customer, letters, bank

13   statements, whatever was there.

14       Q.  Okay.  And who asked you to shred those

15   documents?

16       A.  Philippe did.

17       Q.  Okay.  And approximately when did Mr. Augustin

18   make that request?

19       A.  I believe it was the second week in July.

20       Q.  And can you estimate the number of documents that

21   you shredded at Mr. Augustin's request?

22       A.  Well, I can't say by numbers, but they were in

23   little baskets, maybe 10 or 12 of them.  Those post

24   office baskets.

25       Q.  How long did it take you to shred all of those

1  documents?

2      A.  About a week and a half.

3              THE COURT:  A week and a half did you say?

4              THE WITNESS:  Yes.

5  BY MS. AMARANTE:

6      Q.  And can you describe the kinds of documents you

7  saw as you shredded them?

8      A.  Like I said, it was the invoices, MAACO letters,

9  bank statements, lawyers's letters, things of such.  I

10  mean, I didn't really read, but, you know, at a glance,

11  you can see what it is.

12     Q.  And did the documents that you were shredding

13  appear to be business records from the Augustins's

14  former MAACO center?

15     A.  They could.

16             MR. BUKOWSKI:  Objection, leading.

17             THE WITNESS:  It could be.

18             THE COURT:  Yes.

19  BY MS. AMARANTE:

20     Q.  Well, did you see the name "MAACO" on any of the

21  documents?

22     A.  Yes.

23     Q.  Did you see customer estimates?

24     A.  Yes.

25     Q.  With the MAACO name on them?

```
 1      A.  Yes.

 2      Q.  Do you recall seeing any bank statements in Mr.

 3  Augustin's name?

 4      A.  Yes.

 5      Q.  From what bank, if you recall?

 6      A.  Wachovia and Ameriprise.

 7      Q.  Do you recall --

 8              THE COURT:  Wachovia.  I'm sorry.  What was

 9  the second one?  Bank of America?

10              THE WITNESS:  No.  It's America -- I'm

11  sorry.  Ameriprise Financial.

12  BY MS. AMARANTE:

13      Q.  Do you remember seeing what the approximate

14  balance was on the Ameriprise Financial bank statements?

15      A.  Yes.  That I did look at.  It was like $200,000

16  or something like that.

17      Q.  And did you know at that time that the Augustins

18  owed MAACO more than a hundred thousand dollars that

19  they were refusing to pay?

20      A.  No, I did not.

21      Q.  How did you get here from Florida to testify

22  today?

23      A.  We drove.

24      Q.  Okay.  And I think your husband already testified

25  about some of those expenses.  But aside from
```

 1   reimbursing expenses, has MAACO paid you anything for

 2   your testimony here today?

 3       A.  No, nothing.

 4       Q.  Why are you here to testify today?

 5       A.  Well, because number one, I don't think that my

 6   husband did anything wrong.  Number two, we just want to

 7   do the right thing right now coming clear.  And, you

 8   know, just be free of all this.

 9       Q.  And has everything in your testimony here today

10   been the truth?

11       A.  Yes.

12       Q.  Thank you, Ms. Hyatt.

13            MS. AMARANTE:  I have no further questions.

14                   CROSS-EXAMINATION

15   BY MR. BUKOWSKI:

16       Q.  Ms. Hyatt, when did you first meet Mr. Augustin?

17       A.  2004, May or June, sometime.

18       Q.  2004.  Okay.  Was Mr. Hyatt employed by Mr.

19   Augustin's business at that time?

20       A.  Yes.

21       Q.  At some point, did your children become employees

22   of Mr. Augustin's business?

23       A.  My daughter worked at the front desk for Philippe

24   while she was in college.

25       Q.  Okay.  Is that it?

1      A.   Yes.

2      Q.   Okay.

3      A.   My son did odd jobs for him for about a couple of

4  weeks.

5      Q.   Okay.  I think you said Mr. Augustin handed you

6  the list of people to call, right?

7      A.   I don't believe that was the question.  I said

8  who -- did she not say who told me to call?

9      Q.   Who gave you the list?

10     A.   Well, Mr. Augustin gave me a list of people to

11  call and also instructed me to use the Polaris several

12  times to call.

13     Q.   Okay.  Did you ever appear on a television

14  promotion and represent yourself as an executive

15  assistant at Phil's Auto Body?

16     A.   Well, I didn't really represent myself.  I was

17  pushed into that because none of them wanted to go on TV

18  and say it, and Mr. Fonger (ph.) just, you know, at that

19  moment I was put on the spot and --

20     Q.   So the answer's yes?

21     A.   Yes.

22     Q.   Right?

23     A.   Yes.

24     Q.   Okay.

25          MR. BUKOWSKI:  I have nothing further.

```
 1                THE COURT:  All right.

 2                MS. AMARANTE:  I have no redirect, Your

 3   Honor.

 4                THE COURT:  Thank you, very much.

 5                THE WITNESS:  Thank you.

 6                THE COURT:  Thank you for coming.

 7                THE WITNESS:  You're very welcome.

 8                (Witness excused.)

 9                MS. AMARANTE:  Your Honor, MAACO Franchising

10   calls Doug Engle to the stand.  And this will be our

11   last witness, Your Honor.

12                THE COURT:  All right.  Mr. Engle, welcome.

13                MR. ENGLE:  Thank you.

14                DOUG ENGLE, WITNESS, SWORN.

15                COURTROOM CLERK:  Please state your full

16   name, spell your last name for the record.

17                THE WITNESS:  Douglas Engle, E-N-G-L-E.

18                COURTROOM CLERK:  Plead be seated.

19                MR. FOURNARIS:  Your Honor, pardon me.

20   There seems to be some confusion with the Hyatts as to

21   whether they can leave or whether they must stay.

22                THE COURT:  Okay.

23                MR. FOURNARIS:  And since they've traveled

24   so far, do you mind if I just clarify?

25                THE COURT:  No, no.  Not at all.
```

1          MR. FOURNARIS:  Okay.  You are free to

2     leave.  The Court and the parties thank you for coming.

3     Please drive safely.

4          THE COURT:  Thank you very much for coming.

5          MS. HYATT:  You're very welcome.  Thank you.

6                    DIRECT EXAMINATION

7     BY MS. AMARANTE:

8     Q.   Good evening, Mr. Engle.  Where do you work?

9     A.   MAACO Franchising.

10    Q.   And when did you start working for MAACO?

11    A.   It started in February of 2005.

12    Q.   What was your position and title at that time?

13    A.   Regional director of operations for the southeast

14    region.

15    Q.   And in broad strokes, what were your job

16    responsibilities in that position?

17    A.   Supporting franchisees within an assigned

18    territories specially in the execution and

19    implementation of the operating system.

20    Q.   Okay.  Have you changed positions during your

21    employment with MAACO?

22    A.   I have.

23    Q.   What's your current position?

24    A.   Assistant vice president of operations.

25    Q.   And was that a promotion?

1 A. Yes.

2 Q. What are your responsibilities as assistant vice

3 president of operations?

4 A. Well, primarily growing the chain in terms of

5 store sales, but working in a -- in a supervisory

6 relationship with the regional directors of operations.

7 Q. Okay.  And are you personal familiar with Mr.

8 Augustin?

9 A. I am.

10 Q. Okay.  While you were regional director for the

11 southeast region, how frequently would you have contact

12 with Mr. Augustin?

13 A. Via the telephone maybe a couple times a month,

14 once or twice a month, and in his shop two to three

15 times a year.

16 Q. Okay.  And was it part of your job

17 responsibilities as regional director to check in with

18 franchisees in Florida such as Mr. Augustin?

19 A. Yes.

20 Q. Okay.  When you did have discussions with Mr.

21 Augustin, whether over the phone or in person, what

22 kinds of things would you discuss with him?

23 A. We talked a lot about certification, you know,

24 what he could do to become certified, and how that might

25 be able to, you know, help him grow sales, etcetera.

1      We had frequent conversations about, you know,

2  lack of reporting and, you know, urging him to submit

3  his numbers.  Not necessarily that I would have been

4  involved from a credit and collections side, but as the

5  operations manager, the lack of sales data would make it

6  difficult for me to really engage him in any meaningful

7  conversation, so -- so I would urge him to report

8  figures, you know, even if he couldn't pay fees on those

9  figures just for the sake of us being able to have some

10  reasonably intelligent operational conversations.

11      Q.  Okay.  You mentioned certification.  What does it

12  mean in the MAACO system to be certified?

13      A.  It means that you are effectively following the

14  MAACO operating system.  And it means that you are

15  achieving certain standards -- thank you -- in terms of

16  three criteria, and those criteria are:  the quality of

17  work that you produce, the service that you provide, and

18  the imagine that you project.

19      Q.  Okay.

20          THE COURT:  May I interpose a question?

21          Mr. Engle, does a customer know whether an

22  enterprise is certified or not certified?

23          THE WITNESS:  Typically not.

24          THE COURT:  They don't.

25          MS. AMARANTE:  I'm now going to mark --

1          THE COURT:  There's no marketing effort of

2    any kind or advertising aspect that says this is a

3    certified MAACO place?

4          THE WITNESS:  Not -- not from the retail

5    prospective.  On our national fleet account side, it was

6    -- it was something that was a part of our national

7    fleet marketing for our larger accounts.

8          THE COURT:  I see.

9    BY MS. AMARANTE:

10   Q.  And following up on that, Mr. Engle, is

11   certification a prerequisite in order for a franchisee

12   to be able to service a fleet account?

13   A.  Certain ones, yes.

14   Q.  Okay.  And who makes the decision whether or not

15   it's a prerequisite for a particular fleet account?

16   A.  The fleet account.  Very few of those, by the

17   way.  There might be three to five fleet accounts in the

18   entire system of hundreds that it's a strict requirement

19   to be certified.

20   Q.  Okay.  So franchisees who are not certified can

21   also potentially service fleet accounts; is that

22   correct?

23   A.  Certainly.

24   Q.  Okay.  And does being certified guarantee that a

25   certain MAACO center will be able to service fleet

1   accounts?

2     A.  No.

3     Q.  Who makes the decision whether or not a

4   particular MAACO center is going to get business from a

5   fleet account?

6     A.  The fleet account.

7         MS. AMARANTE:  I'm now going to offer as

8   Plaintiff's Exhibit 24 a document which says, "The Path

9   to Certification" on the top.  I've given a copy to

10   defense counsel.  This is Exhibit 24.

11  BY MS. AMARANTE:

12     Q.  Mr. Engle, is this document familiar to you?

13     A.  Certainly.

14     Q.  And what is it?

15     A.  This is basically what we would call our

16   introduction kit to certification for a franchisee.

17   That explains all of the steps in terms of the process

18   upon which you use to go through and become certified as

19   well as all of the requirements associated with the

20   certification process.

21     Q.  Okay.  Did you explain the certification process

22   to Mr. Augustin?

23     A.  Yes.

24     Q.  And looking at the second page of the document,

25   which is Plaintiff's Exhibit 24, what does this document

1   show?

2      A.   Some of the broad requirements from an imagine

3   service and equipment prospective that are required to

4   meet certification standards.

5      Q.   Okay.  And looking particularly under the heading

6   of service, the third line down, there's reference to

7   customer service response scores, average 92 percent or

8   greater during the last three months.  Do you see that?

9      A.   I do.

10     Q.   What does that refer to, Mr. Engle?

11     A.   It refers to our measurement for customer

12   satisfaction meaning customers at car delivery were

13   given a card upon which they would call to register

14   their warranty and answer a few questions.

15          There were two requirements for certification,

16   one being that a minimum of 15 percent of your customers

17   actually returned the card and then of those that

18   participated in the survey, 92 percent of them would

19   recommend you to a friend.

20     Q.   Okay.  And did you explain these criteria to Mr.

21   Augustin when he was discussing certification with you?

22     A.   Yes.

23     Q.   Okay.  Did Mr. Augustin's center meet that

24   92 percent recommendation requirement that you just

25   discussed?

1   A.  They didn't meet either of the two, the

2   15 percent or the 92.

3   Q.  Okay.  And did you discuss that as a requirement

4   that Mr. Augustin would need to fulfill for

5   certification?

6   A.  Yes.

7   Q.  And did you take any additional actions to help

8   the Augustins's MAACO center get certified?

9   A.  Yes, on several occasions.  The first time that

10  Mr. Augustin asked about certification was in about May

11  or June of '05, and then I forwarded this to him for our

12  review.  I shared with him that while you're nowhere

13  near you need to be on the service side of the point

14  you're specifically talking about, while you're working

15  on improving that, I'll be happy to, you know, begin

16  working with you on the -- on the quality side in the

17  meantime in hopes that we could kind of, you know, do

18  those things concurrently.

19  Q.  And did you evaluate the quality of the

20  workmanship in Mr. Augustin's MAACO center?

21  A.  I did.  Within about a month of that first phone

22  call, we did -- if -- if you would refer to the first

23  page of this document, number 4 is called the operations

24  benchmark visit.  That's basically the operations

25  director's inspection to give feedback on where you

1    stand relative to certification.

2        Q.   Okay.

3                THE COURT:  I'm not sure that I see it.

4                MS. AMARANTE:  I think on the first page,

5    the witness was referring to number 4 on the checklist.

6                THE COURT:  Okay.  Sorry.  It's inside.

7    Right.

8    BY MS. AMARANTE:

9        Q.   And Mr. Engle, when you performed those

10   operations benchmark visits and evaluations, what did

11   you find?

12       A.   I found that the work needed improvement in

13   several categories that -- that we discussed.

14       Q.   Okay.  Do you recall sitting here today what some

15   of those categories needing improvement were?

16       A.   Yeah.  Other than the service one from -- from a

17   quality work prospective, it was primarily over spray

18   and dirt in the finish for overall paint jobs.

19       Q.   Okay.  And did you discuss those concerns with

20   Mr. Augustin?

21       A.   Yes.

22       Q.   Okay.  How many times did you visit the

23   Augustins's MAACO center to do an operations benchmark

24   visit and evaluate the quality of his cars?

25       A.   After this one, on two more occasions.

1    Q.  And did you see improvement in the quality of the

2    work on each subsequent visit?

3    A.  No.

4    Q.  In your mind, was it a close call whether the

5    Augustins's MAACO center qualified for certification?

6    A.  No.  There was no effort.  He -- he seemed to

7    think certification was simply a matter of asking for

8    it.

9    Q.  And did you give Mr. Augustin feedback on how to

10   improve his chances of becoming certified?

11   A.  Yes.

12   Q.  And did he follow your advice?

13   A.  No.

14   Q.  Okay.

15           MS. AMARANTE:  Your Honor, absent objection,

16   I'm going to move to have Plaintiff's Exhibit 24

17   admitted as a full exhibit.

18           MR. BUKOWSKI:  I have no objection, Your

19   Honor.

20           THE COURT:  All right.

21           (Whereupon, Plaintiff's Exhibit No. 24 was

22           admitted into evidence.)

23           MS. AMARANTE:  And then I'd like to mark as

24   Plaintiff's Exhibit 25 an e-mail chain dated

25   December 3rd, 2007.  And that will be --

```
 1                  (Whereupon, Plaintiff's Exhibit No. 25 was
 2                  marked for identification.)
 3    BY MS. AMARANTE:
 4        Q.   Is this document familiar to you, Mr. Engle?
 5        A.   Yes.
 6        Q.   Okay.  And you'll see in the middle of the first
 7    page, there's an e-mail from you to Dianna Dieciedue
 8    dated December 7th, 2007.  Do you see that?
 9        A.   Yes.
10        Q.   And do you recall writing this e-mail to Ms.
11    Dieciedue?
12        A.   I -- I do.
13        Q.   Okay.  Why did you write this letter to Ms.
14    Dieciedue?
15        A.   This was after Philippe alleging that operations
16    has done nothing to help him get certified, and I think
17    I clearly voiced my frustration here in bold as I just
18    did a moment ago that -- that he seemed to think
19    certification was -- was just simply asking for it and
20    put the responsibility on me to get him certified
21    instead of acknowledging that it was his responsibility
22    to -- to ultimately do what needed to be done.
23        Q.   Okay.  In all your interactions with Mr.
24    Augustin, did he ever tell you that he thought he had
25    not received adequate training from MAACO?
```

1    A.  No.

2    Q.  Did Mr. Augustin ever tell you that he was not

3    receiving adequate support from MAACO?

4    A.  No.

5    Q.  And if Mr. Augustin had had these concerns about

6    the level of training or support he was receiving, as

7    vice president -- as regional director, would you know

8    about those concerns?

9    A.  I would have expected to be the person who was

10   told that, yes.

11   Q.  Once Mr. Augustin received notices of default

12   from MAACO in 2008 and 2009, did MAACO give Mr. Augustin

13   an opportunity to sell the MAACO center before

14   termination?

15   A.  Yes.

16   Q.  And why was he given that opportunity?

17   A.  From a franchisor prospective, it's always easier

18   to -- to -- to sell a store when it's still open.  So

19   there's some benefit to us, but there's also benefit, of

20   course, to the -- to the franchisee to help them get out

21   with, you know, some financial stake.

22   Q.  Do you have any information about the price that

23   Mr. Augustin was asking for his MAACO center?

24   A.  We had several conversations on this subject,

25   yes.

1    Q.   Okay.  And what was the substance of those

2  conversations?

3    A.   The first time he started at three fifty, and I

4  believe the lowest price he ever would consider was in

5  the two fifty range.

6    Q.   What was your reaction to those asking prices for

7  the MAACO center?

8    A.   That not only would the business not sell at that

9  price, no broker with any reasonable sense would even

10  bother to give you a lead at that price.

11    Q.   Okay.  And did you discuss the asking price with

12  Mr. Augustin?

13    A.   Yes.  My conversation with Philippe in that

14  regard would certainly not have been to tell him what he

15  should sell his business for.  My conversation would be

16  at this point you are not going to get out of this

17  whole.  You should think about getting out of this with

18  something other than nothing.

19        So I never talked specifically about a

20  recommended price, but I certainly mentioned the obvious

21  fact that any business that sells has to sell based upon

22  the strength of the profit and loss.  And for a business

23  that on paper that is shown losing money, you're not

24  going to sell it for two fifty to three fifty.  The only

25  way that's possible is with a cash buyer because no

1   financial institution would -- would lend you credit in

2   that regard.

3        So just in general, we had that conversation

4   that, you know, he needed to get a little more serious

5   about an asking price if he really wanted to sell the

6   center.

7   Q.   Okay.  And at some point, did MAACO provide Mr.

8   Augustin with the name of a potential buyer?

9   A.   We did.

10  Q.   Okay.  And who was that potential buyer?

11  A.   That was David Stefan.

12  Q.   Okay.  To your knowledge, did Mr. Stefan and Mr.

13  Augustin ever reach an agreement on a price for the sale

14  of the MAACO center?

15  A.   No.

16  Q.   And did you ever tell Mr. Augustin that he would

17  not be terminated because he was negotiating to

18  potentially sell the MAACO center to another franchisee?

19  A.   No.

20  Q.   Do you have any understanding as to why Mr.

21  Augustin and Mr. Stefan did not reach an agreement for

22  the sale of the MAACO center?

23  A.   Because of the asking price.

24            MS. AMARANTE:  Thank you, Mr. Engle.  I have

25  no further questions.

                     CROSS-EXAMINATION

BY MR. BUKOWSKI:

   Q.   Mr. Engle, when was the last time you attempted

to certify or do an operations benchmark visit on Mr.

Augustin's franchise?

   A.   Myself personally?

   Q.   Yes.

   A.   Either late '06 or early '07.

   Q.   And did you personally only show up once to do

that?

   A.   No.

   Q.   Okay.  But that was -- late '06 or '07 was the

last time you were there?

   A.   Was the last time.

   Q.   Okay.  What was Mr. Bill Bass's position for

MAACO in the spring of 2009?

   A.   He was the regional director for the southeast.

   Q.   Okay.  Well, had you moved up by that point?

   A.   I had moved up, and he had moved into my slot.

   Q.   Do you know when that occurred; when he moved

into that southeast director position?

   A.   I can't recall the exact date because he moved

from the California territory.  No, I don't remember.

   Q.   Okay.  How much did MAACO charge David Stefan for

his franchise?

```
 1        A.   I don't know.
 2                   MR. BUKOWSKI:   Okay.   That's all I have.
 3                   THE COURT:   All right.
 4                   MS. AMARANTE:   One additional question, Your
 5   Honor.
 6                        REDIRECT EXAMINATION
 7   BY MS. AMARANTE:
 8        Q.   Mr. Engle, do you know if the price that MAACO
 9   charged Mr. Stefan for the franchise included equipment
10   that was at the location of the former MAACO center?
11        A.   I don't know.
12        Q.   Okay.
13                   MS. AMARANTE:   No further questions.
14                   THE COURT:   All right.   I take it you have
15   nothing further?
16                   MR. BUKOWSKI:   No, Your Honor.
17                   THE COURT:   Thank you, Mr. Engle.   By
18   attrition you wound up as the briefest witness; eloquent
19   but brief.
20                   MR. FOURNARIS:   No one's complaining.
21                   THE COURT:   Well, I do understand that that
22   completes the plaintiff's case?
23                   MS. AMARANTE:   Yes, Your Honor.
24                   THE COURT:   All right.   Well, I don't know
25   how far we can get tomorrow, but my understanding is you
```

1    have just one witness, do you?

2              MR. BUKOWSKI:  Yes, Your Honor.

3              THE COURT:  Mr. Augustin?

4              MR. BUKOWSKI:  Yes.

5              THE COURT:  Is Mrs. Augustin here or has she

6    left.

7              MR. BUKOWSKI:  Yes, she is.

8              MR. FOURNARIS:  Yes, she is.

9              THE COURT:  Mrs. Augustin, how do you do?

10             MS. AUGUSTIN:  Hi, how are you.

11             THE COURT:  Hi.  Well, we missed you last

12   time, but I'm glad you're here.

13             MS. AUGUSTIN:  Thanks.

14             THE COURT:  So we can meet tomorrow at 11:45

15   and that will be three quarters of an hour before lunch.

16   Things are -- I would like to think that that would

17   complete the testimony, but if it doesn't, we'll have

18   to -- we'll have to do some collaborative thinking about

19   when the testimony can be completed.

20             Is there some possibility that Mr.

21   Augustin's testimony could be completed in that short

22   time?

23             MR. BUKOWSKI:  We will make every effort to

24   do that, Your Honor.

25             THE COURT:  All right.  Fine.  Good.  Every

1  effort is all that can be asked.  All right.

2          Folks, we will recess until 11:45 and we

3  will be here in this courtroom.  So if you want to leave

4  your materials here, feel free to do so.

5          MR. BUKOWSKI:  Thank you, Your Honor.

6          MS. AMARANTE:  Thank you, Your Honor.

7          (Proceedings concluded at 6:23 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         I N D E X

 2    PLAINTIFF'S WITNESS   DIRECT    CROSS    REDIRECT   RECROSS

 3    Thomas Monaghan

 4         By Ms. Amarante   4

 5         By Mr. Bukowski            71

 6    Dianna Dieciedue

 7         By Ms. Amarante   102                122

 8         By Mr. Bukowski            116

 9    Sheik Hyatt

10         By Ms. Amarante   125                149

11         By Mr. Bukowski            143

12    Shereena Hyatt

13         By Ms. Amarante   152

14         By Mr. Bukowski            159

15    Douglas Engle

16         By Ms. Amarante   162                176

17         By Mr. Bukowski            175

18                           *  *  *

19                       E X H I B I T S

20    PLAINTIFF'S EXHIBITS                 MARKED   ADMITTED

21    P-1  - Assignment and Assumption of
             Franchise Agreement................6         7
22
      P-2  - Franchise Agreement - 10/04/06.............10
23
      P-3  - MAACO-Polaris 2000 Software
24           Agreement.................................26

25    P-4  - Training Class Memo.......................26
```

1                    E X H I B I T S (cont'd)

2   PLAINTIFF'S EXHIBITS                    MARKED   ADMITTED

3   P-5  - Manual Receipt............................28

4   P-6  - Maintenance Manual........................32/44

5   P-7  - Termination of Franchise
          Agreement - 04/09/09...............40      42
6
    P-8  - Final Judgment............................44
7
    P-9  - LKQ Order Form............................49
8
    P-10 - Palm Beach Auto Business Card......10      52
9
    P-11 - Defendants' Joint Answer and
10         Counterclaim (offered only)

11  P-12 - Map......................................57

12  P-13 - Security Agreement.......................67

13  P-14 - Letter - 07/27/09........................67

14  P-15 - Notice of Default - 12/03/08

15  P-16 - Letter - 08/10/04.......................108

16  P-17 - Letter - 08/17/06.......................108

17  P-18 - Response to Notice of
          Default - 12/03/08.......................112
18
    P-19 - Supplemental Notice of
19         Default - 03/04/09...............112     114

20  P-20 - Only Exhibits A, C, and E of the
          Declaration of Sheik Hyatt...............127
21
    P-21 - Commercial Lease Agreement (offered only)
22
    P-22 - Motion (offered only)
23
    P-23 - Declaration of Shereena Hyatt.....152
24
    P-24 - The Path to Certification.................170
25
    P-25 - Email Chain - 12/03/07............171

1                    E X H I B I T S

2   DEFENDANTS'S EXHIBITS                    MARKED   ADMITTED

3   D-1 - Email Chain........................91        101

4   D-2 - Email Chain........................96        101

5   D-3 - Check..............................97

6

7                         *  *  *

8                      CERTIFICATION

9

10       I, Laura A. Jimenez, do hereby certify that

11   the foregoing is a true and correct transcript from the

12   electronic sound recordings of the proceedings in the

13   above-captioned matter.

14

15   _____         _____

16   Date                    Laura A. Jimenez

17

18

19

20

21

22

23

24

25