```
 1               IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                            - - -
   MAACO FRANCHISING, INC.,    :
 3                             :
               Plaintiff,      :   09-cv-04548
 4                             :
        v.                     :   Philadelphia, Pennsylvania
 5                             :   March 18, 2010
   PIERRE PHILIPPE AUGUSTIN,   :   11:55 a.m.
 6 et al.,                     :
                               :
 7             Defendants.      :

 8                     TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE LOUIS H. POLLAK
 9               UNITED STATES DISTRICT JUDGE
                            - - -
10 APPEARANCES:

11  For the Plaintiffs:   CONSTANTINE T. FOURNARIS, Esquire
                          WIGGIN AND DANA LLP
12                        Two Liberty Place
                          50 South 16th Street, Suite 2925
13                        Philadelphia, PA  19102

14                        ERIKA L. AMARANTE, Esquire
                          WIGGIN AND DANA LLP
15                        One Century Tower
                          P.O. Box 1832
16                        New Haven, CT  06508-1832

17  For the Defendants:   JEFFREY D. BUKOWSKI, Esquire
                          STEVENS & LEE
18                        111 N. 6th Street
                          P.O. Box 679
19                        Reading, PA 19603

20  Audio Operator:       MEGAN MCDEVITT

21  Transcribed by:       LAURA A. JIMENEZ
                          Jimenez Reporting
22                        & Transcription Service
                          1501 Larkin Road
23                        Boothwyn, PA 19061
                          Telephone:  (610) 235-9046
24                        Email:  Laura@Jimenez-Reporting.com

25 Proceedings recorded by electronic sound recording,
   transcript produced by transcription service.
```

```
 1              (The following was heard in open court at
 2    11:55 a.m.)
 3              THE COURT:  Good morning.
 4              MR. FOURNARIS:  Good morning, Your Honor.
 5              MR. BUKOWSKI:  Good morning.
 6              MS. AMARANTE:  Good morning, Your Honor.
 7              THE COURT:  Sorry to hold you up.  Please
 8    sit down.  I think it's the defense's turn.
 9              MR. BUKOWSKI:  Yes, Your Honor.  We call
10    Philippe Augustin, Your Honor.
11              THE COURT:  All right.  Philippe Augustin.
12              MS. AMARANTE:  Your Honor, may I be heard
13    before the witness takes the stand, please?
14              THE COURT:  Yes.
15              MS. AMARANTE:  MAACO has moved to preclude
16    Mr. Augustin's testimony in this matter.  And that's all
17    been briefed in the motion in limine to preclude
18    evidence and for sanctions and regarding past instances
19    of misrepresentations and verified pleadings as well as
20    allegations of destruction of documents.  And so that's
21    all been briefed, and we continue to believe that Mr.
22    Augustin's conduct has been egregious and warrants an
23    order precluding him from testifying in his defense here
24    today.
25              And to the extent THAT the Court denies that
```

1    request, I would respectfully ask Your Honor to advise

2    Mr. Augustin of his obligations of truthfulness and

3    candor before the Court so that we can avoid --

4              THE COURT:  Which obligation?  How did you

5    define it?

6              MS. AMARANTE:  Of truthfulness to the Court.

7              THE COURT:  Well, you're really moving to

8    preclude the defendant from testifying?

9              MS. AMARANTE:  Well, that is something that

10   we included as a remedy in our motion in limine and for

11   sanctions.  And we do believe that the circumstances

12   outlined in those papers warrant that.

13             THE COURT:  Do you think that would consist

14   with the adversary process?

15             MS. AMARANTE:  Well --

16             THE COURT:  That's the kind of line of work

17   we're in here, you know.

18             MS. AMARANTE:  I understand, Your Honor.

19   You know, MAACO's position is that it's not consistent

20   with that --

21             THE COURT:  Let me put it this way:  Suppose

22   I were to grant your motion.  Do you think that would be

23   a help to you or a hindrance?

24             Let me suggest that I am not the only

25   court -- I'm not the only court in this courthouse.

1   Above me there's a Court of Appeals.  How do you think

2   the Court of Appeals would feel about a civil action --

3   assuming you prevail in the trial court after having

4   precluded the defendant from testifying.  How do you

5   think the Court of Appeals might view a trial proceeding

6   in which the defendant had not been permitted to testify

7   in his own behalf?  Do you think the Court of Appeals

8   would look kindly at that?

9          MS. AMARANTE:  You raise a good point, Your

10  Honor.  And MAACO will withdraw the request for purposes

11  of the preliminary injunction hearing.

12          But we do wish to note that the witness

13  should not be allowed to speak on behalf of Palm Beach

14  Auto for instance, which is --

15          THE COURT:  That the witness what?

16          MS. AMARANTE:  Should not be allowed to

17  speak on behalf of Palm Beach Auto as an entity, which

18  has not appeared and has been defaulted and thereby has

19  admitted the allegations in the complaint.  And he is

20  also not an officer or director of that entity.

21          THE COURT:  Well, I take it defense counsel

22  will agree that Mr. Augustin cannot represent the

23  company unless you are.  Are you --

24          MR. BUKOWSKI:  No.  You're right, Your

25  Honor.  We are not representing Palm Beach Auto.  And he

```
 1   knows what he knows and whatever --
 2               THE COURT:  Yes.
 3               MR. BUKOWSKI:  -- I don't think he's
 4   speaking on behalf of Palm Beach Auto.  I'm going to ask
 5   him questions representing him and his wife and Phil's
 6   Auto Body, you know, who I represent.
 7               THE COURT:  Right.
 8               MR. BUKOWSKI:  And to the extent the
 9   Court --
10               THE COURT:  Well, I will -- perhaps I should
11   make it clear.
12               Mr. Augustin, sir, you are represented by
13   counsel representing yourself and Mrs. Augustin.  But
14   your attorney does not represent Phil's Auto Body.
15               MR. BUKOWSKI:  We do represent Phil's Auto
16   Body.  It's Palm Beach Auto and Collision Center, Inc.,
17   that we do not.
18               THE COURT:  I'm sorry.  Palm Beach cannot be
19   represented by you, sir.  To the extent that Palm Beach
20   has any role in this, you can't speak for it.
21               Well, happily the plaintiff has withdrawn
22   the motion to preclude Mr. Augustin from testifying, so
23   you may call him to the witness stand.
24               MS. AMARANTE:  Thank you, Your Honor.
25               MR. BUKOWSKI:  Thank you, Judge.
```

```
 1                THE COURT:  Good morning, sir.

 2                MR. AUGUSTIN:  Good morning.

 3                PHILIPPE AUGUSTIN, WITNESS, SWORN.

 4                COURTROOM CLERK:  You can have a seat.

 5   Please just state your full name and spell your last

 6   name for the record.

 7                THE WITNESS:  My name is Philippe Augustin.

 8   Last name is A-U-G-U-S-T-I-N.

 9                COURTROOM CLERK:  Thank you.

10                      DIRECT EXAMINATION

11   BY MR. BUKOWSKI:

12      Q.  Good morning, Mr. Augustin.

13      A.  Good morning, Counselor.

14      Q.  Please tell the Court where you presently reside.

15      A.  I reside in 2293 Seaford Drive in Wellington,

16   Florida 33414.

17      Q.  And are you married?

18      A.  Yes.

19      Q.  To whom?

20      A.  To Virginia Augustin.  She's in the back of the

21   court.

22      Q.  Okay.  And do you have children?

23      A.  I have a daughter, a beautiful daughter.  She's

24   in third year of college right now.

25      Q.  Where does she go to school?
```

1      A.   She's going for Florida Atlantic University and

2   she play tennis for the --

3                THE COURT:  I'm sorry.  What university?

4                THE WITNESS:  Florida Atlantic University.

5                THE COURT:  All right.  Okay.

6                THE WITNESS:  And she's a tennis player for

7   the university.

8   BY MR. BUKOWSKI:

9      Q.   Okay.  Can you please tell us about your prior

10  experience in the auto body and collision repair

11  business prior to any relationship with MAACO?

12     A.   Well, I work for Boston Body Works for almost

13  13 years.  In that capacity, I was the general manager

14  of the auto body shop, so I know the industry very,

15  very, very well.

16           I was a member of MASS Auto Body Association.  So

17  in that capacity, we -- I was in charge, you know, order

18  parts.  I was in charge of four or five technicians.  I

19  do all the paperwork, so that's my background.

20     Q.   And you were living in the Boston area at the

21  time?

22     A.   I was living in Randolph; that's south from

23  Boston, Massachusetts.

24     Q.   Okay.  And when you said the MASS Auto Body, is

25  that Massachusetts Auto Body Association?

1      A.   Yeah.   We create that, and because we have so

2   much issue with the insurance, the insurance wants to

3   control the industry, so we create MABA.

4      Q.   Okay.   And how long did you live in the Boston

5   area?

6      A.   Well, I live in Boston area for 23 years moving

7   from Montreal.

8      Q.   When did you move from Montreal?

9      A.   In 1981.

10      Q.   Okay.   Where were you born and raised?

11      A.   I was born in Haiti, Port-au-Prince, a place

12   called Avenue Jour Bon.

13      Q.   Okay.   And what -- and when did you move to

14   Montreal?

15      A.   I moved in Montreal in 1980.

16      Q.   Did you attend high school and college?

17      A.   Yes.

18      Q.   Where?

19      A.   I went to college in Boston, Newbury College.

20      Q.   And did you graduate?

21      A.   Yes, in business accounting.

22      Q.   Okay.   What year was that?

23      A.   In 1986.

24      Q.   Okay.   What was your employment after college?

25      A.   That's the job I have for Boston Body Works, and

1   I work there for 13 years.

2      Q.   And what was your last position at Boston Body

3   Works?

4      A.   I was the general manager for Boston --

5      Q.   Okay.

6      A.   -- Body Works.

7      Q.   Okay.  And in that position, that's when you

8   described what you were doing for running the business;

9   is that right?

10      A.   Yes.

11      Q.   Okay.  How did you first come to have a

12   relationship with MAACO?

13      A.   Well, when I left Boston Body Works, and I have

14   an offer to work for the church, we're -- you know,

15   we're in charge of 190 churches.  And at that time, that

16   was a very good job, but I want to be on my own and

17   that's when I applied in 2000 with -- for MAACO to get a

18   franchise.

19      Q.   Okay.  Let's step back a second.  What was the

20   opportunity for the church?

21      A.   I -- I used to work as an accountant for the

22   church in Boston.

23      Q.   Okay.

24      A.   So we were -- we have like 190 churches we were

25   in charge of.

1    Q.   Okay.  But then sometime while you were doing

2    that, you came -- the MAACO franchise opportunity came

3    along?

4    A.   Yes.

5    Q.   Okay.  And I think you said 2000?

6    A.   I think it's 2000.  And then when I go online and

7    I was looking for franchise in that field, and that's

8    when I applied for MAACO.  And I had a conversation with

9    MAACO.  They asked me to send in $10,000.  You know, and

10   then when I was ready to send the money, they asked me

11   to drive from Boston to Philly, to King of Prussia.  And

12   when I drive, I only spend 10, 15 minutes.  That was the

13   end of it, and I drove back.

14   Q.   And what was the purpose of that visit to King of

15   Prussia?

16   A.   I don't know because when I was in class, nobody

17   drive to King of Prussia.  Everybody mailed the checks.

18   But I have to drive to meet the gentleman for 10,

19   15 minutes.

20   Q.   Okay.  And what did you discuss at the meeting?

21   A.   Well, I discuss at the meeting, he give me a tour

22   of MAACO, and then he told me, you know, they're going

23   to look for a place to me.  And then I say, you know, I

24   need a place in Boston because that's where my business

25   was, since, you know, I've been living there for

1    22 years.  And that's -- that's when he take me around.

2    He said just welcome to MAACO.  He told me thank you

3    very much.  He take the money, and that's it.

4        Q.  And how much was it?

5        A.  $10,000 deposit.

6        Q.  And did you get a MAACO franchise in Boston?

7        A.  No.  We try.  Every time we get a place,

8    something else happen and then I been looking like that

9    for two years.  We cannot get a place in Boston.

10       Q.  Eventually was another franchise opportunity

11   available?

12       A.  There was one available and that was in Lake

13   Park, Florida.  When I was working -- the gentleman was

14   working before Doug Engle call me.  I forget his name.

15   When he mention Florida, I said, "I'm not looking for

16   Florida."  I said, "I'm not moving to Florida."

17            And then a week later, he called me and said,

18   "Philippe, this is a good opportunity for you and we

19   will help you to move and start a business."

20       Q.  And is that what you did?

21       A.  That's what we did.  We (indiscernible)

22   equipment.  I flew with me, my wife, and my daughter to

23   stay there.  We check the place out.  And we went back,

24   and before I decide to have my daughter and my mother to

25   came back with me, and they say, "Well, you know, take a

1    chance."  And I said we will.

2        Q.  Okay.

3            MR. BUKOWSKI:  May I approach, Your Honor?

4            THE COURT:  Yes, indeed.

5    BY MR. BUKOWSKI:

6        Q.  I've handed you what I believe -- none of the

7    Plaintiff's Exhibits are marked, but they're on the

8    witness stand.  I think it's Plaintiff's Exhibit 2 is

9    the franchise agreement.  Is that Exhibit 2 that you

10   have before you?  Is that the franchise agreement that

11   you and your wife signed with MAACO?

12       A.  I believe so.

13       Q.  And what's the date of that?

14       A.  It said October 4, 2002.

15       Q.  Does that sound about right?

16       A.  Yes.

17       Q.  Okay.  And it was sometime in the year 2000 you

18   believe that you gave a $10,000 deposit?

19       A.  Yes, definitely.

20       Q.  Okay.  At the time you became a MAACO franchisee

21   in 2002, what was -- what did you have to pay MAACO?

22       A.  I take -- I give MAACO about like $47,000,

23   something like that, yeah.

24       Q.  In, you know, a check or cash?

25       A.  Check.

1    Q.   Okay.

2    A.   Yes.

3    Q.   And do you know what that amount represented?

4    A.   Well, the amount is for -- for the franchise per

5    se, and there was another amount they wanted me to sign

6    while I was in class for the equipment and I never

7    signed that because I want to make sure when I go to

8    Florida everything was -- was there for me.

9    Q.   And was it?

10   A.   No.

11   Q.   Where was it; do you know?

12   A.   Well, this is a -- a bad experience when we moved

13   to Florida because we supposed to open the place on

14   November 4th.  When we moved there and there was two

15   other gentlemen from MAACO.  There was no supply.  There

16   was no equipment.  The only thing that was there for us

17   was the springboards.

18        So everything was stalling because the previous

19   owner left the place to the manager.  Everything was

20   gone.

21   Q.   Was this an existing MAACO franchise?

22   A.   Yes.  That was an existing MAACO owned by Jonas

23   August.

24   Q.   Okay.  And you ended up in that same facility?

25   A.   Yes, sir.

1    Q.   Okay.  And what did you do for equipment?

2    A.   Well, what I did for equipment at that time there

3  was no frame machine because I -- I built all the

4  equipment myself.

5    Q.   Okay.

6    A.   I get -- accomplish on everything I bought.

7    Q.   What was the rent for?  Let me back up.

8         What was the address of your MAACO franchise?

9    A.   804 Old Dixie Highway, Suite 4, Lake Park,

10  Florida 33403.

11    Q.   And did you pay rent?

12    A.   Yes, and --

13    Q.   What was the rent amount?

14    A.   Well, when I came that morning, on Monday

15  morning, I gave the landlord $10,000.  According to Bill

16  Chafey (ph), I'm suppose to give him the first and last,

17  so I give him a check for $10,000.  And that's how we

18  started.

19    Q.   Okay.

20    A.   And that's the first time I met the landlord.

21    Q.   And whose name did you mention?

22    A.   Bill Chafey.

23    Q.   And who is he?

24    A.   Bill Chafey, he was in charge to selling me the

25  business.

1    Q.  Okay.

2    A.  Yes.

3    Q.  And was your rent $5,000 a month?

4    A.  No.

5    Q.  What was it?

6    A.  When I get the statement from the landlord, the

7    rent was $5,000 plus $3,000; that was $8,000.  When I

8    asked him about the $3,000, they said it was operating

9    expenses.  So the amount was $8,000 instead of $5,000.

10   Q.  And that was paid to the landlord?

11   A.  Yes.

12   Q.  Okay.

13   A.  That was $8,000.

14   Q.  Okay.  And had someone told you that the rent

15   would be $5,000?

16   A.  Bill Chafey told me the rent was $5,000.

17   Q.  Okay.  Did your rent ever go up during the period

18   of time that you were operating the MAACO franchise?

19   A.  Yes.  It then go up $11,000 and some change, I

20   believe.

21   Q.  That was -- the $11,000 figure was the rent at

22   the time MAACO terminated your franchise?

23   A.  That's correct.

24   Q.  Okay.  Did you ever ask MAACO for assistance in

25   helping to reduce the rent?

1    A.   Yes, I did.  I spoke to so many people, Bill

2   Chafey, Doug Engle, Bill Bass.  I talked to Dianna

3   Dieciedue, she's (indiscernible) department.  I spoke to

4   Grace.  Grace wasn't in charge to help me.  I spoke to

5   all of them to talk to Norman Thomas who was the owner,

6   is still the owner of that building, and then nothing

7   was never done for me, to help me out there.

8    Q.   Did you talk to the landlord directly about it?

9    A.   I did spoke to the landlord directly about it,

10   and that's why I called MAACO to talk to them because

11   like I said you, I never know the landlord.  I never

12   negotiate the rent with the landlord when I was in

13   Boston.

14    Q.   Okay.  While you were a MAACO franchisee, what do

15   you contend MAACO did failing to live up to its

16   contractual obligation?

17    A.   A lot of stuff.  And I can tell you the first

18   thing.  First of all, when I moved there was no

19   equipment.

20    Q.   Okay.

21    A.   So I spent two weeks without being able to do any

22   business whatsoever.  The only time I had a chance with

23   that, that's when they let Tony Martino send some paint

24   supply for me and he never charged me anything.

25         There was no equipment over there.  When I

1    called -- and finally, I called three months and one of

2    the gentlemen from MAACO asked me to come.  He say he

3    never see anything like that.

4        Q.  And who is Tony Martino?

5        A.  I think -- he said, "Boy, boy."

6        Q.  Who's Tony Martino?

7        A.  Tony Martino was the founder of MAACO.

8        Q.  And he is now deceased?

9        A.  Exactly.

10       Q.  Okay.  Now, let's fast forward to the 2008-2009

11   timeframe.

12       A.  Okay.

13               THE COURT:  Before we do that --

14               MR. BUKOWSKI:  Sure.

15               THE COURT:  Would you just find out a word

16   from the witness as to what kind of equipment it was

17   that wasn't there?

18               MR. BUKOWSKI:  Yes, Your Honor.

19   BY MR. BUKOWSKI:

20       Q.  Can you please tell the Court what equipment you

21   need to run a MAACO franchise and what was and wasn't

22   there when you arrived?

23       A.  In order for you to the run any body shop, the

24   first equipment you need, you need a frame machine.

25       Q.  A what?

```
 1      A.   A frame.

 2      Q.   A frame machine?

 3      A.   A frame machine.  In order for you to set up and

 4  measure when there's an accident.  You definitely need

 5  that.

 6           There was another one but they stole all the

 7  chairs and the equipment from that, so that's cannot be

 8  used.

 9      Q.   Someone stole it?

10      A.   Someone stole it.

11      Q.   You're not saying MAACO stole it?

12      A.   I'm not saying MAACO stole it.

13      Q.   Okay.

14      A.   But before I move.

15           The second thing we need, they didn't supply

16  so --

17      Q.   Such as?

18      A.   Pad, material, paper; all those things were gone

19  that was in there.

20      Q.   Okay.

21      A.   For me.  The only thing that was there was the

22  spray booth.  It was there when I moved in.

23      Q.   There was a spray booth?

24      A.   There was a spray booth there.

25      Q.   What about other equipment that was missing?
```

1    Anything else?

2        A.   Most of them were gone.

3        Q.   What was missing?

4        A.   Well, like I say to you, the frame machine, they

5    got another one, the chairs were gone.  All the supply

6    were gone.  All of the paint were gone.  The paper for

7    you to paint the car, they all were gone.

8        Q.   In 2008, 2009, in your view, did MAACO do

9    anything that failed to live up to its contractual

10   obligations to you as a franchisee?

11       A.   Yes, indeed.

12       Q.   What was that?

13       A.   Well, first of all, when they -- Mr. Engle came,

14   we talking about certification.  And certification was

15   the big thing at MAACO at that time.  Not when we

16   started.  I think that started in 2004, 2005.

17           And Mr. Hyatt who was here yesterday worked for

18   two previous MAACO before he works for me.  And he

19   helped those two previous MAACO get certification

20   because he was the painter for them.  When Mr. Hyatt

21   worked for me, we talk to Doug.  Doug came.  He said,

22   "Philippe, there's some adjustments you need to do.  The

23   thing you need to do, you have to buy the more expensive

24   paper."  I said, "That's fine."  We will have that so we

25   can be certified because when we're certified we can get

1   the fleet account because when we get the fleet account

2   through MAACO, the check was directed to MAACO, not to

3   us.

4        Q.   Okay.

5        A.   So MAACO -- MAACO auto body, they get that money.

6   So because we're not to be able to certify, Doug came

7   only one time.  Every time we tried to call for

8   certification, there was something else happening.

9   Either the guy's not working, he lost his job, always

10   something for us to get certified.

11        Q.   Okay.  Are you aware of any fleet accounts that

12   you either lost or could not obtain because you lacked

13   certification?

14        A.   I can -- you never can count.  I have a very good

15   relationship with Enterprise.  I know the general

16   manager.  We want to sign a contract with Enterprise.

17        Q.   Is that the rental car company?

18        A.   That's correct.

19        Q.   Okay.

20        A.   Okay.  Because we don't have the certification,

21   we don't have that contract.

22        Q.   Okay.

23        A.   So there's Federal Express.  We got -- we can --

24   I can go so many of them.

25        Q.   Okay.  That's fine.  Let's change subjects here.

1          What other ways did MAACO fail to live up to its

2     contractual obligations?

3          A.   When we move, we got this sign outside that's

4     suppose to light up.

5          Q.   It's supposed to be lit up?

6          A.   The sign.   Exactly.

7          Q.   A sign with the MAACO name on it?

8          A.   That's correct, yeah.

9          Q.   Okay.

10         A.   At night people can see it.   That's never done

11    for seven years.

12         Q.   And did you ask them to do it?

13         A.   I asked them so many times.

14         Q.   Did they say they would do it?

15         A.   They say they would do it, and they never did it.

16    And guess what?  For the new guy, now the sign light up.

17         Q.   The sign is lit up now?

18         A.   Yes.

19         Q.   Okay.   And we talked about the rent already.

20         A.   Yeah.   We talking about the rent, I think, you

21    know.   And, I think, like I said to you, I think the

22    other guy got (indiscernible) MAACO leadership they got

23    for him.   I don't know how much he's paying that now,

24    but I was paying $11,000 and they never do anything

25    about it.

1    Q.   Okay.  You did receive a letter from MAACO giving

2  you notice of default?

3    A.   Yes, I did.

4    Q.   That was in December of 2008?

5    A.   Yes.

6    Q.   What was the financial condition of your business

7  at the time?

8    A.   It was very bad.

9    Q.   Why is that?

10    A.   Well, we had the -- you know, a civil recession,

11  I cannot get fleet account, and everything was just

12  going down south.  And we tried to ask them for help.

13  We cannot get help from the landlord to, you know,

14  reduce the rent.  And we cannot get the fleet account.

15  That was the business way down.

16        But I did answer that letter also.

17    Q.   Yes.  I was just going to ask you that.

18            MR. BUKOWSKI:  May I approach again, Your

19  Honor?

20            THE COURT:  Surely.

21            (Pause in proceedings.)

22  BY MR. BUKOWSKI:

23    Q.   The letter you sent, was that in -- also in

24  December of 2008?

25    A.   I believe, or January.  Because I think it

1    probably December when I told him Happy New Year or

2    start out with Good New Year together.  Yes, I believe

3    so.

4        Q.   And you heard me reading from portions of that

5    letter yesterday, right?

6        A.   Yes, indeed.

7        Q.   I just want to find it here because I have a copy

8    but -- okay.  And again, this one doesn't have an

9    exhibit sticker on it, but I have it marked, I think it

10   was -- I want to say 18, but I'm not certain.

11           I have -- Exhibit 18, Plaintiff's Exhibit 18 is a

12   letter you to Ms. Dieciedue dated December 16th, 2008?

13       A.   Yes.  That was before 2009, yes.

14       Q.   And this is the letter that you sent in response

15   to her letter giving you notice of default?

16       A.   Yes.

17       Q.   And the part that you were just referring to was

18   the last two paragraphs on the second page; is that

19   right?

20       A.   Okay.

21       Q.   In the second to last paragraph, you talk about

22   the failure to send out someone for certification; is

23   that right?

24       A.   That's correct.

25       Q.   Okay.  And then in the last paragraph it

1   says, "Please have the person with whom I need to

2   negotiate payment arrangements contact me to work out a

3   payment plan for monies owed."  Is that right?

4       A.  Yes.

5       Q.  Did someone contact you to work out a payment

6   plan?

7       A.  No.

8       Q.  The notice of default mentioned failure to

9   provide weekly reports.  Can you explain that to the

10  Court?

11      A.  Well, the weekly report was done, and there was

12  one time we have some trouble for computers.  And then

13  when we talked to the IT guy, his name is John, he tried

14  everything that's possible.  Finally, he said,

15  "Philippe, you got to invest in new computers."  And

16  then we finally invest in new computers, and after that

17  MAACO got all these report.

18      Q.  You do admit, I think in your response letter

19  there, Exhibit 18, that you owe some money to MAACO?

20      A.  Yes, indeed.

21      Q.  And you --

22      A.  Yeah, I won't deny that.

23      Q.  And you wanted --

24      A.  Yeah.

25      Q.  -- to make payment --

1    A.   Yes.

2    Q.   -- but did you dispute some of the amount?

3    A.   Yes.  I did dispute that because when we did the

4    audit, the accountants come from MAACO.  And when I

5    spoke to Dianna, I told her I had my accountant go

6    through the same audit, and they refused that

7    categorically.

8    Q.   At some point, you got a second notice of

9    default; is that right?  A supplemental notice of

10   default?

11   A.   Yes.

12   Q.   And what was your response to that?

13   A.   Well, I spoke to Dianna again.  But between that

14   period we -- I sent some money for them, within that

15   period of the default.

16   Q.   Do you remember how much?

17   A.   I don't remember how much.  But they received

18   money from that.  When I received that, and that's when

19   I told her, I said, "Look, in -- I know I'm in really

20   bad situation, that in the process to sell the

21   business."

22   Q.   Yes.  Tell us about that.

23   A.   Yeah.  And what I do -- and Bill Bass contact me.

24   Q.   And who is Bill Bass?

25   A.   Bill Bass was the director of operation for

1   MAACO.  He was in Puerto Rico at that time.  He

2   said, "Philippe, when I come back, I'll be in Philly."

3   And he said, "And I will call you because I want to

4   resolve that."

5       Q.  Okay.

6       A.  His words to me, he said, "Philippe, I use to run

7   my own business.  I want to make sure.  You spent about

8   nine years, two years waiting to get a MAACO and seven

9   years with MAACO.  I want to make sure you sell that

10   business."  At that time, he call me, he give me a

11   telephone number.

12       Q.  Okay.

13       A.  The telephone number he gave me, he said, "Call

14   David Stefan.  He's interested about your business."

15   When I called David Stefan, he did came and talk to me.

16          But the thing MAACO never know, I hired a brokers

17   to sell the business also.  Where I give you all my

18   financial statements.  And the workers was dedicated to

19   two people to sell the business for -- between $200,000

20   and $250,000.

21       Q.  Were your ever -- did you ever sell your

22   business?

23       A.  No, because I don't have the time to sell it.  By

24   the time we were in process to work with David Stefan,

25   working for the brokers, that's when MAACO shut the

1  telephone down.

2      Q.  Okay.  What, if anything, did Mr. Bass of MAACO

3  tell you regarding the notices of default?

4      A.  And what he said to me, he said I don't have to

5  worry about that.  As long we sell the business, he want

6  to make sure I get some money.  I pay my bills because I

7  said to him, "I have my vendors I owe.  I got customers

8  give me money.  I cannot just walk away from them like

9  this."  I said, "I got to make sure I pay my vendors and

10  the suppliers I owe."  He said, "That's fine."  That's

11  why he sent David Stefan, and I was negotiate with two

12  other people to get the MAACO franchise.

13      Q.  Were you surprised when you received the notice

14  of termination?

15      A.  That was in the -- the last time I spoke to

16  Ms. Dieciedue, she called me.  She said, "Philippe, you

17  know we owe you some money.  How we going to resolve

18  that?"  And I said to her, "I think we're getting

19  close."  I said, "I'm talking to David Stefan, and I got

20  a couple people who want to buy the business."  I said,

21  "As soon as I sell the business, you will get all your

22  money."

23          In less than two hours, they shut down the

24  telephone.

25      Q.  And what was the date of that?

1    A.   The date of that was April 9, 2009.

2    Q.   Okay.  And --

3    A.   That happens about 2 o'clock in the afternoon.

4    Q.   Okay.  And that's when you received the notice

5  of -- well, what -- did you receive the notice of

6  termination first or --

7    A.   I think I received that before, but they never

8  shut that down.  She called me after the fact to say,

9  "Are you making prepare to pay us?"  I said, "Yes."  I

10  said, "I'm selling the business."

11        I said, "Bill Bass send me David Stefan to buy

12  the business."  I said, "I got two other peoples

13  interested in the business."  I said, "Give me time to

14  sell the business, and everything will be okay."  And

15  then in less than two hours she just shut it down.

16    Q.   And what do you mean she shut it down?

17    A.   Well, MAACO is in charge of the telephone even

18  when you're paying the telephone.

19    Q.   Really?

20    A.   Exactly.  Even when you paying the telephone,

21  MAACO is in charge of telephone.  What happened, we

22  tried to use the telephone and realized there was no

23  communication.  And I called, I think it was Bell South

24  at the time before AT&T, I believe so, or AT&T bought

25  Bell South, either or.

1      And when I call and the gentleman said, "Let me

2  check on that for you."  And then he said to me, "Sir,

3  there something is wrong.  There's somebody from King of

4  Prussia shut down the telephone."  And that's when I

5  realized the situation.

6      Q.  And then what did you do?

7      A.  Well, when I get that shut down, the gentleman

8  was on the telephone.  I said, "Can you help me to get,

9  you know, phone line."  He said, "I'd be glad to."  In

10  ten minutes the phone went back on.

11      And then MAACO asked me to put the sign down.  I

12  put all the sign down.  My business always Phil's Auto

13  Body anyway in the first place.  That's how I registered

14  the business.  I was doing to be a MAACO, and then I put

15  Phil's Auto Body.

16      Q.  So you took the MAACO sign down --

17      A.  Yes.

18      Q.  -- on April 9th, 2009?

19      A.  No, not on April 9.  I think April 10 or

20  April 11.  We called somebody to bring the sign down.

21      Q.  Okay.  And did you put another sign up?

22      A.  No.  That's very interesting.  We try to put a

23  sign, "Phil's Auto Body."  In order for you to do that,

24  you've got to go to the town of Lake Park.

25      Q.  Okay.

```
 1      A.   There's a sign, a big sign on the building, and
 2   then we just have to say Phil's Auto Body.  The
 3   inspector came, and I have a very good relationship with
 4   the town of Lake Park.  So they give me that sign.
 5          For this second sign, the landlord need to sign
 6   for it, and then somehow they were talking with MAACO
 7   who have somebody else.  They never sign.
 8      Q.   But you had one sign?
 9      A.   Only one sign.  But I don't have the street sign.
10      Q.   But it says, "Phil's Auto Body"?
11      A.   Yes.
12      Q.   Not "MAACO"?
13      A.   Not MAACO.
14      Q.   Okay.  After April 9th, did you continue to do
15   business as a MAACO franchisee?
16      A.   No.
17      Q.   What did you do?
18      A.   We -- we have Phil's Auto Body.  We continue our
19   business as Phil's Auto Body.  We take care of
20   customers.  We take care of vendor.  We take care of
21   suppliers.
22          And then a lot of people, we called them because
23   there is no way they can get in touch with us.  As a
24   matter of fact, I remember April 10th what's so funny,
25   we got so many people coming to the shops because they
```

1  keep -- they call.  They cannot find what's going on

2  with their cars.

3     Q.  Did you have current customers on April 9th?  You

4  had people with cars in your shop?

5     A.  Yeah.

6     Q.  Okay.  And did you continue to service them?

7     A.  Yes.

8     Q.  Okay.

9              THE COURT:  We're going to have to recess --

10             MR. BUKOWSKI:  Okay.

11             THE COURT:  -- at this time.  I'm sorry.

12  Well, we won't be able to -- I'm sure complete this

13  after lunch, but I won't be able to meet with you until

14  2:30.  So I will see you then.

15             MR. BUKOWSKI:  Okay.

16             THE COURT:  You'll be back with us at 2:30,

17  Mr. Augustin?

18             THE WITNESS:  Yes, Your Honor.

19             MR. BUKOWSKI:  Okay.  And then we'll be

20  brief and wrap up then this afternoon.

21             THE COURT:  All right.

22             (Whereupon, a luncheon recess was taken at

23             12:30 p.m.)

24             (Whereupon, the proceedings resumed at 2:34

25             p.m.)

```
 1              THE COURT:  Good afternoon.
 2              MR. BUKOWSKI:  Good afternoon, Your Honor.
 3              MS. AMARANTE:  Good afternoon.
 4              THE COURT:  Please sit down.
 5              (Pause in proceedings.)
 6              THE COURT:  Do you want to resume your
 7  direct examination?
 8              MR. BUKOWSKI:  Your Honor, while Mr.
 9  Augustin's taking the stand, I'm not sure what the
10  Court's schedule is.  I just wanted to alert the Court
11  that the Augustins have a flight scheduled back to
12  Florida tonight at 6:15, which we think -- my plan is to
13  finish within 15 minutes and counsel has indicated they
14  think they probably could finish in less than an hour.
15  I don't know how much time the Court has this afternoon,
16  but we're hoping to finish today.
17              THE COURT:  Well, certainly nothing will
18  interfere with your flight back at 6:15.
19              MR. BUKOWSKI:  Okay.
20              THE WITNESS:  Thank you, Your Honor.
21                 DIRECT EXAMINATION CONTINUED
22  BY MR. BUKOWSKI:
23     Q.  Mr. Augustin --
24              THE COURT:  I hope we'll be through well
25  before that; well before.
```

1          MR. BUKOWSKI:  That's my hope, too, Your

2   Honor.

3   BY MR. BUKOWSKI:

4     Q.  Mr. Augustin, before the lunch break, we were

5   talking about your business after the April 9th, 2009,

6   franchise termination date; do you recall that?

7     A.  Yes.

8     Q.  Okay.  I believe we were talking about where I

9   had asked you about whether or not you continued to do

10  business using the MAACO name?

11    A.  I did not.

12    Q.  Okay.  Did you contact customers who had their

13  vehicles at your shop on the date of the termination of

14  the franchise?

15    A.  Yes, we did.

16    Q.  How did you do that?

17    A.  We did as a former MAACO.  We are at Phil's Auto

18  Body right now.

19    Q.  Well, I mean, what -- how did you contact them?

20    A.  Oh, because we got the telephone number.

21    Q.  How?

22    A.  By telephone.

23    Q.  Okay.  And what did you tell them?

24    A.  Well, we tell them, you know, we're no longer

25  involved with MAACO.  MAACO, you know, stop everything

1   from us.  So we still got their vehicle.  They don't

2   have to worry about anything, so we're going -- whatever

3   we have to finish, and they were happy with that.

4       Q.  Okay.  And you did finish servicing those

5   vehicles?

6       A.  Yes.

7       Q.  Okay.  And then you mentioned Phil's Auto Body.

8   What is that?

9       A.  Phil's Auto Body, that's before I moved and went

10  to Florida, my lawyer who was still Alan Zangen create

11  that corporation, Phil's Auto Body, and that's what we

12  using at that time.

13      Q.  Okay.  And so is that how you promoted your

14  business?  Well, let me be specific as to timeframe.

15          On April 10th, the day after the termination

16  notice, under what name were you conducting business?

17      A.  Phil's Auto Body.

18      Q.  Okay.  And where was your business located?

19      A.  804 Old Dixie Highway, Lake Park.

20      Q.  The same location that you operated the MAACO

21  franchise?

22      A.  Yes, indeed.

23      Q.  Okay.  At some point, did you stop doing business

24  under Phil's Auto Body?

25      A.  Yes.

1       Q.   Okay.

2               THE COURT:  Before we go, can I interject a

3   question?

4               MR. BUKOWSKI:  Yes, Your Honor.

5               THE COURT:  You say after April 9th you did

6   business as Phil's Auto Body?

7               THE WITNESS:  Yes, Your Honor.

8               THE COURT:  But did you have a sign up

9   saying, "Phil's Auto Body"?

10              THE WITNESS:  Yes.  We have two sign.  We

11  have one sign on the building that say, "Phil's Auto

12  Body."  We go to the town of Lake Park to put a new

13  sign, "Phil's Auto Body," but the landlord have to sign

14  the paperwork in order for us to have "Phil's Auto

15  Body."  And for some reason he have contact with MAACO

16  and he never want to sign.  So that's why we can't have

17  the sign for "Phil's Auto Body."  But we did have one

18  big sign on the building say, "Phil's Auto Body."

19              THE COURT:  I see.  Okay.

20  BY MR. BUKOWSKI:

21      Q.   And prior to the termination you had two -- did

22  you have two signs?

23      A.   Yes.

24      Q.   And both of them said, "MAACO"?

25      A.   Yes.

1    Q.   Okay.  And those signs came down after the

2    termination?

3    A.   That's correct.

4    Q.   Okay.  Very good.  At some point, did MAACO ask

5    you to take -- to leave the premises so they could take

6    over and put a new franchisee there?

7    A.   I believe they contact my lawyer, that was Alan

8    Zangen.

9    Q.   Okay.

10   A.   They never contact me personally.  I don't

11   remember they -- nobody contact me after that.

12   Q.   Okay.  At some point you did vacate the premises?

13   A.   Yes.

14   Q.   When was that?

15   A.   That was June 30.

16   Q.   Okay.  And from the period of time between

17   April 9th and June 30th, were you conducting business at

18   the 804 Dixie Highway location?

19   A.   Yes.

20   Q.   Under Phil's Auto Body?

21   A.   Yes, indeed.

22   Q.   Were you promoting that business at all using the

23   name, "MAACO"?

24   A.   The only time we used MAACO we say formerly

25   MAACO.

1    Q.   What do you mean by that?

2    A.   Because he used to be MAACO on the application.

3   We say "formerly MAACO."  We use, "Phil's Auto Body."

4    Q.   But who did you tell formerly MAACO?

5    A.   We have an ad and on 102.3 FM, and we -- we did

6   -- we did say that.

7    Q.   Okay.  And when did that ad run?

8    A.   Just for, I think, 15 or 30 days.

9    Q.   Okay.  And why did you run that ad?

10    A.   Well, we have a lot of people.  We have a lot of

11   contact.  They -- they cannot get in touch with us.  So

12   we have to get the new telephone number to which other

13   people.

14    Q.   Why couldn't they get in touch with you?

15    A.   Because MAACO shut down the telephone.  The

16   telephone we have that was (561) 845-2228 was shut down.

17   This is the telephone everybody knows me for almost

18   eight years.

19    Q.   Okay.

20         THE COURT:  Your sign that said, "Phil's

21   Auto Body," did that also say, "formerly MAACO"?

22         THE WITNESS:  No.

23   BY MR. BUKOWSKI:

24    Q.   So what was your concern?  That people wouldn't

25   know how to get in touch with you?

1      A.   Yes.

2      Q.   Okay.

3      A.   A lot of customers, they were very panicking

4  because they cannot get in touch with us and we have

5  their vehicles.

6      Q.   And so are those the customers that you had

7  previously said came down to the shop?

8      A.   That's right.  Because some of them made deposits

9  on the car, like $500, a $1,000, and they tried to call

10 the phone.  The phone wasn't working.

11     Q.   Okay.  Now, at some point, did you stopped doing

12 business as, "Phil's Auto Body"?

13     A.   That's correct.  On June 30, yes.

14     Q.   Okay.  What did you do after that?

15     A.   What I did after that and -- me -- when the

16 telephone shut down, I have a meeting with all my guys

17 working and I explained to them the situation with

18 MAACO.  And then when we shut down, we find a place.

19 That was Mr. Hyatt and (indiscernible) to find other

20 place; that was 1009 Newman Road.

21     Q.   And what is 1009 Newman Road?

22     A.   1009 Newman Road, that's a -- they have a place

23 where we can get the license for the town of Lake Park

24 that's allowed to open another business.

25     Q.   Okay.  And what was the name of that other

1  business?

2      A.  Palm Beach Auto Painting and Collision Center.

3      Q.  Okay.  And is that the business that was formed

4  and Mr. Hyatt signed the incorporation documents?

5      A.  Yes.

6      Q.  Okay.  And when did Palm Beach Auto Painting

7  start conducting business?

8      A.  I believe in the first week of July.

9      Q.  In the 1009 Newman Road?

10     A.  Yeah.  After July -- July 4th because that was a

11  long weekend.  Yeah, I believe so.

12     Q.  Okay.  And did you sign the lease?  Or was a

13  lease signed with the landlord there?

14     A.  Yeah, Mr. Hyatt signed the lease.

15     Q.  Okay.  Why did Mr. Hyatt sign the lease?

16     A.  Well, the concern -- they were worried about the

17  people losing their job.  That was the main concern

18  because, you know, we were in the civil recession.  And

19  I think that's the reason he signed the lease, he want

20  to take over and do the business over there.

21     Q.  And did you continue to be involved in the

22  business?

23     A.  Somehow.  But what I was doing most likely, I was

24  selling cars because I got a friend of mine.  That's

25  where we start selling cars and to make money to support

1   my family.

2       Q.   But were you also involved in the repair

3   business?

4       A.   I don't know how to do the job at all.  I don't

5   do mechanical.  I don't know how to paint car.  I don't

6   know how to do body works at all.

7           The only thing involvement I have sometime when

8   Mrs. Hyatt was there or is not there, I would estimate.

9   That's the only thing.

10      Q.   But were you the owner of the business?

11      A.   Somehow because I invest in the business.

12      Q.   Okay.  And, in fact, we'll get into it, but you

13  later sold your stock in the business?

14      A.   Yes, indeed.

15      Q.   Okay.  Well, we'll come back to that later.

16          When you were -- when the business -- what was

17  the business of Palm Beach Auto and Collision?

18      A.   They were just like a -- we tried to make it a

19  high class collision services.  Because when we do that

20  I have a friend of mine that work on high class car like

21  Lamborghini, Ferrari, Mercedes-Benz, and he start

22  bringing this car.  That was the plan we have to have

23  Palm Beach Auto Painting.

24      Q.   Okay.  We heard some testimony yesterday about

25  the Polaris software that MAACO provided.  Did Palm

1   Beach -- well, first, did Phil's Auto Body use the

2   Polaris software?

3       A.   I never used Polaris software myself.   Before

4   even we have MAACO, we used to have Audatex.   That's

5   another software.

6       Q.   Can you spell that?

7       A.   A-U-D-A-T-E-X.   Just like to make sure that the

8   same thing that the insurance company use because with

9   Polaris, you cannot do anything with Polaris.   That's

10  something simply for MAACO.

11      Q.   Okay.   And if I understand you correctly, you

12  used the Audatex even while you were a MAACO franchisee?

13      A.   Yes, indeed.

14      Q.   And then Phil's Auto Body continued to use it?

15      A.   Yes.

16      Q.   Audatex?

17      A.   Audatex, yeah.

18      Q.   Did it use Polaris?

19      A.   I never used it myself.   Maybe one of those

20  people where I be use Polaris, but I never used Polaris

21  after we closed that day, April 9th.   I never used

22  Polaris myself.

23      Q.   Okay.   Do you know whether other people in your

24  company used Polaris after that date?

25      A.   Maybe.   I don't know.   Because sometime you can

1   put Audatex to Polaris.

2       Q.   Okay.

3       A.   Yeah.

4       Q.   Do you know whether your name was -- would show

5   up if somebody used Polaris?

6       A.   Yes, because my name was there by default.

7       Q.   What do you mean by that?

8       A.   Essentially, if somebody got an estimate, even

9   I'm not there in the estimate, you would see, "Phil."

10      Q.   Okay.

11      A.   Automatically it's by default.

12      Q.   Okay.  Now, in -- going -- fast forward to

13  July 2009, the Palm Beach Auto business, did that

14  business use Polaris?

15              MS. AMARANTE:  Objection.

16              THE WITNESS:  No.

17              MS. AMARANTE:  Objection.  Your Honor, this

18  witness -- we've covered this this morning that this

19  witness cannot testify on behalf of what Palm Beach Auto

20  did.  That business has been defaulted.  He's not an

21  officer or director of the business.  He can testify as

22  to what he did, but it will not be testimony with

23  respect to what Palm Beach Auto did.

24              THE COURT:  I'll sustain the objection.

25  BY MR. BUKOWSKI:

1       Q.   Did you ever use the Polaris software after

2   July 2009?

3       A.   No.

4       Q.   Okay.   Let's shift subjects briefly.

5            What involvement, if any, did your wife Virginie

6   have in the business when it was a MAACO franchisee?

7       A.   None whatsoever.

8       Q.   Okay.   What about with Phil's Auto Body?

9       A.   None whatsoever.

10      Q.   What about when you were doing business at 1009

11  Newman Road?

12      A.   None whatsoever.

13      Q.   Okay.   What about the use of the MAACO

14  trademarks?   There was some testimony -- and I guess I

15  covered that somewhat in the use of the name.   Did you

16  use the MAACO trademark and the stylized name "MAACO" in

17  any of your -- to promote your business after April 9th,

18  2009?

19      A.   No.

20      Q.   What's that?

21      A.   No.

22      Q.   Okay.   We also heard about the MAACO manuals.

23  Did you use the MAACO manuals?

24      A.   I never used a MAACO manual at all.

25      Q.   Okay.

1    A.   Never.

2    Q.   Do you know what information is in those manuals?

3    A.   I never read them because when I went to class, I

4    never read anything in class because I got a good

5    experience.  Like I said to you, 13 years experience

6    working in the most advance body shop in Boston.  I

7    never used that manual at all.

8    Q.   Well, we heard testimony about the MAACO training

9    yesterday.  Can you describe that training?  How long --

10   first, how long was the training?

11   A.   Yeah.  I was there for three and a half weeks.

12   Q.   Where was that?

13   A.   That was in King of Prussia.

14   Q.   At MAACO's headquarters?

15   A.   At MAACO headquarters.

16   Q.   Okay.  And what did they teach you there?

17   A.   Well, it was an embarrassment for me when I went

18   there.  It was almost four weeks.  Lost four weeks, I

19   can call it, the lost four weeks.

20   Q.   Why do you say that?

21   A.   Well, first of all, they -- first they teach you

22   how to answering the telephone.

23   Q.   What do you mean?

24   A.   To say, "Good morning, MAACO.  How can I help

25   you?"  That's what they teach you the first day.

1    Q.  Okay.

2    A.  On the telephone.  After that, they drive you

3    around going to New Jersey, visit new shops.  They never

4    teach you how to write an estimate.

5         At one point, I remember we went to a shop in New

6    Jersey and there's a car pull it.  It was -- I think

7    it's very expensive car.  And then the teacher asked

8    four guys if we have to repair the front bumper, how

9    much it will cost to repair that bumper.  And then one

10   of the guys said $150; some say, you know, $200.  They

11   were just like guessing.  And I said to this guy, "Those

12   are a tri-stage pin.  How can you do it for 150?"  And

13   they say, "What is a tri-stage?"

14   Q.  What are you saying?  Tri-stage?

15   A.  Tri-stage because you've got single stage, double

16   stage, and tri-stage.  And that's when the teacher tried

17   to explain to him what is a tri-stage.

18        So they don't -- you know, the training is just

19   like -- to me it was a waste of time.

20   Q.  Did you learn anything in the MAACO training that

21   you didn't already know?

22   A.  No.

23   Q.  Let's talk about other body shops and collision

24   centers near your former franchise.

25             MR. BUKOWSKI:  May I approach, Your Honor?

```
 1              THE COURT:  Yes, indeed.
 2  BY MR. BUKOWSKI:
 3     Q.  Do you have Plaintiff's Exhibit 12 in front of
 4  you; is that right?
 5     A.  That's correct.
 6     Q.  What is that?
 7     A.  This is a map that it show the Old Dixie in West
 8  Palm Beach.
 9     Q.  Okay.
10     A.  Location of (indiscernible) MAACO, Delray.
11     Q.  Okay.  Can you tell me what other body shop and
12  collision centers, non-MAACO, other than the Newman
13  Road, your business on Newman Road, what other non-MAACO
14  businesses are in the area of your former MAACO
15  franchise?
16     A.  Probably five or six and without the fly by
17  night.
18     Q.  Well, can you name some of them?
19     A.  Well, you've got Dave's Auto Body.
20     Q.  Dave's Auto Body?
21     A.  Dave's Auto Body.  You've got Ed Morse.  You got
22  Jim Price.  You got Mullinax Ford, A1A Auto Body.  I
23  mean, you got Diamond's Auto Body who's next to MAACO.
24     Q.  And how far away from your former MAACO franchise
25  are these businesses?
```

1    A.  You've got about three body shop or four in the

2  same suite and same Old Dixie Highway.  Four of them is

3  in Old Dixie Highway.  You got Mullinax Ford who is in

4  Old Dixie Highway and Northlake.  You got Jim Price.

5  From Jim Price to MAACO, you can walk across the street.

6  You go Diamond's to MAACO, you can just walk.  Ed Morse

7  you can just walk to MAACO.

8    Q.  Okay.  Was there another MAACO franchisee of

9  company owned MAACO location within ten miles of your

10  former franchise?

11    A.  Oh yeah.  You've got one on Church Street.  You

12  can look at that over here.  That's not far.

13    Q.  Is it shown on the map?

14    A.  Yeah.  You got -- I mean, I'm from Florida.  I

15  don't have to look at the maps to tell you where they

16  are.  As soon as you take I-95, you get off of

17  Okeechobee Boulevard.  You get west.  Your first left,

18  that's a MAACO franchise right there.  And there's one

19  in Military Trail, not far.

20    Q.  And those are within ten miles of your former

21  franchise?

22    A.  Yeah, less than ten miles.

23    Q.  Okay.  Did you have repeat customers at your body

24  shop?

25    A.  Well --

1          MS. AMARANTE:   Objection.   Can we clarify

2    which body shop?

3    BY MR. BUKOWSKI:

4        Q.   Well, you know, when you were a MAACO franchisee.

5        A.   Somehow.   The collision service is not like you

6    do an oil change.   The customer got to come in every

7    3,000 miles.   You got repeat customer when they are in

8    an accident.   You know, yes, we do, but sometimes two

9    years, three years.   If they need you.   That's why you

10   always have to look to get new business.   Because how

11   many times somebody going to have a collision?

12       Q.   Okay.   Now, let's focus on -- do you have

13   Plaintiff's Exhibit 10 in front of you?   I think I --

14   let me get --

15          (Pause in proceedings.)

16          THE WITNESS:   Yeah.

17   BY MR. BUKOWSKI:

18       Q.   All right.   Plaintiff's Exhibit 10, there was

19   some testimony about that yesterday.   Can you look at

20   the -- well, first of all, the first page looks like it

21   has the name of Jerome Dear on it.

22       A.   Yes.

23       Q.   And he's shown as the general manager of Palm

24   Beach Auto Painting and Collision, Inc.?

25       A.   Yes.

```
 1      Q.  Do you know Mr. Dear?

 2      A.  Very well.  He works for me.  I was -- I was in

 3  at MAACO for, I believe, two or three years, yeah.

 4      Q.  He worked for you at MAACO?

 5      A.  Yeah.  He used to work for me right there.

 6      Q.  At some point, did he cease working for you at

 7  MAACO?

 8      A.  Yeah.  Him and Mr. Hyatt they always in

 9  collision.

10      Q.  Who?

11      A.  Him and Mr. Hyatt, yeah.

12      Q.  Okay.  Did Mr. Dear work for you at Phil's Auto

13  Body after the --

14      A.  Yes.

15      Q.  -- franchise was terminated?

16      A.  Yes.

17      Q.  And did Mr. Dear work for Palm Beach Auto?

18      A.  He worked for Palm Beach Auto.  He quit because

19  Fayught (ph) let him go.  They have an argument and then

20  he came back again.

21      Q.  Okay.  On page 2 of Exhibit 10, that's the page

22  in the bottom right hand corner.  It says, "PA-001357."

23  Do you see that?

24      A.  Yes.

25      Q.  Do you see the "MAACO" name up in the upper left
```

1    hand corner?

2        A.  Yes.

3        Q.  Can you explain why that's there?

4        A.  Well, just --

5            MS. AMARANTE:  I'm going to object to the

6    line of the questioning to the extent that the witness

7    hasn't testified that he actually was involved in the

8    creation of this Palm Beach Auto document.

9            THE COURT:  Well, why don't you find out if

10   he has information about it about it.

11   BY MR. BUKOWSKI:

12       Q.  Do you have any information about -- maybe you

13   didn't have any involvement in this Palm Beach Auto

14   document.

15       A.  No.

16       Q.  You didn't?

17       A.  I don't know anything about it, no.

18       Q.  Okay.  If you turn to a couple pages back on the

19   page marked, "PA-001360."

20       A.  I have that.

21       Q.  Do you see that?  It says, "Shop, Phil's Auto

22   Body, Inc."?

23       A.  Yes.

24            MS. AMARANTE:  I'm going to object again

25   because the witness just testified he didn't have

1   anything to do with these documents.  I'm not sure how

2   he's reading off of them.

3           MR. BUKOWSKI:  Well, I think he testified he

4   didn't have anything to do with that page.  I'm going to

5   ask him what his involvement -- I'm going to find out

6   what his involvement is, Your Honor.

7           THE COURT:  Go ahead.

8           MR. BUKOWSKI:  Okay.

9   BY MR. BUKOWSKI:

10      Q.  You see the date on that page?

11      A.  Yes.

12      Q.  Now, what is that?

13      A.  07/02/09.

14      Q.  Is that July 2nd, 2009?

15      A.  Yes.

16          THE COURT:  I'm sorry.  Which page are you

17  now looking at?

18          MR. BUKOWSKI:  Page PA-001360.

19          THE COURT:  Okay.

20  BY MR. BUKOWSKI:

21      Q.  It says there, "Phil's Auto Body" under shop,

22  right?

23      A.  Yes.

24      Q.  Okay.  And that says, "Contact Jerome;" is that

25  Mr. Dear?

1    A.   Mr. Dear, yeah, that's him.

2    Q.   Okay.  And the owner of the vehicle's name is

3  Marie?

4    A.   Marie Louiconyure (ph).

5    Q.   How do you pronounce that?

6    A.   Louiconyure.

7    Q.   Oh my goodness.

8    A.   It's a French word.  Let knew spell it over here.

9    Q.   Okay.

10    A.   It's like Louicongur (ph), but that's

11  Louiconyure.

12    Q.   Do you know Ms. Louiconyure?

13    A.   I don't know her very, very, very well.

14    Q.   Was she a customer of yours at the -- when you

15  were at the MAACO?

16    A.   She's a good customer.  She's a very good friend

17  of mine.

18    Q.   Okay.  That's all I have on that one.  You can

19  set that aside.

20    A.   Okay.

21    Q.   Can you go to Exhibit 9.  It should be the one --

22  right here.

23    A.   Yeah.

24    Q.   This appears to be, I don't know, a repair order

25  or an invoice from a company called LKQ.

1      A.   Yes.

2      Q.   Are you familiar with a company named "LKQ"?

3      A.   Yes, indeed.

4      Q.   How do you know LKQ?

5      A.   Well, LKQ is a company who sell used parts.  So

6  every body shop anywhere in the United States, they know

7  about LKQ or Keystone.

8      Q.   And did you -- when you were operating the MAACO

9  franchise, did you purchase used parts from LKQ?

10      A.   Yes, indeed.

11      Q.   And was there a discount that MAACO franchisees

12  got?

13      A.   No.  Not that I -- no.  No.

14      Q.   Okay.  Did you --

15      A.   I know that very well.  There's no discount for

16  MAACO from LKQ.  Anybody who own a shop can buy parts

17  from LKQ.

18      Q.   Okay.  When you were doing business as Phil's

19  Auto Body, did you continue to buy parts from LKQ?

20      A.   Yes.

21      Q.   You see on Exhibit 9 it says, "Sold to" and

22  "Shipped to" it says MAACO of Lake Park --

23      A.   Yes, I see that.

24      Q.   -- 1009 Newman Road.  Did you ever do business at

25  1009 Newman Road at -- under the name MAACO of Lake

1    Park?

2       A.   No.

3       Q.   Okay.  You can set that aside.

4            Let's go to Exhibit 13.  What is Exhibit 13?

5       A.   This is a security agreement I have Mr. Frank

6    Samson.

7       Q.   Well, it's -- is that -- that's the first several

8    pages are security agreement, right?

9       A.   Yes, yes.

10      Q.   And then attached to that on the fourth page back

11   is a promissory note; is that right?

12      A.   (No response .)

13      Q.   At the top of the page it says, "Promissory

14   note," the fourth page.

15      A.   Yes.

16      Q.   Okay.  And the date of that is what?

17      A.   March 10, 2010.

18      Q.   And what's the amount of the note?

19      A.   Seventy thousand.

20      Q.   And the date on the security agreement is what?

21   On the first page.

22      A.   March 10, 2010.

23      Q.   And then several more pages back from the

24   promissory note appears to be a stock purchase

25   agreement; do you see that?

```
1     A.  Yes.

2     Q.  And --

3           THE COURT:  You're saying beyond the

4   promissory note?

5           MR. BUKOWSKI:  Yes.  Yes, Your Honor.  About

6   three or four pages beyond that.

7           THE COURT:  I got it.

8           MR. BUKOWSKI:  Okay.

9   BY MR. BUKOWSKI:

10    Q.  And then page 12 of that agreement --

11    A.  Yes.

12    Q.  -- under the name seller, it has your name,

13  right?

14    A.  Yes.

15    Q.  Is that your signature?

16    A.  Yes.

17    Q.  And next to you it says "Buyer, Frank Samson."

18  Is that Mr. Samson's signature?

19    A.  Yes.

20    Q.  And how do you know Mr. Samson?

21    A.  Well, I met Mr. Samson through a friend of mine,

22  and I knew him about a year ago.  And then he used to

23  come into the shop all the time.

24          He's a former teacher.  He teach computer science

25  and then he work with the RBMA, that's the Riviera Beach
```

1  Maritime Academy.  And he works for Viking, and that's

2  how I know him.

3      Q.  Okay.  And turning to the front of Exhibit 13,

4  the third page from the front on the security agreement.

5  On page 3, is that your signature above your typewritten

6  name?

7      A.  Yes.

8      Q.  And is that Mr. Samson's signature as debtor?

9      A.  Yes.

10     Q.  Okay.  And in the promissory note, the third page

11  of that, is that Mr. Samson's signature?

12     A.  What page?

13     Q.  The third page of the promissory note.

14     A.  Yes.

15     Q.  Okay.  And is this -- are these documents that

16  you signed on or about March 10th, 2010?

17     A.  Yes.

18     Q.  Okay.  What -- so did you agree to sell your

19  stock in Palm Beach Auto?

20     A.  Yes, indeed.

21     Q.  And what was the price?

22     A.  $70,000.

23     Q.  Wasn't the -- if you look at page 2 of the stock

24  purchase agreement, paragraph 4, under "Purchase price."

25     A.  Yes.

1    Q.   What was the price?

2    A.   $75,000.

3    Q.   Okay.  And how was that to be paid?

4    A.   Well, he gave me a deposit of $5,000, and he have

5    to pay me $4,221 per month in 60 consecutive monthly

6    payment.

7    Q.   All right.  And did you receive a payment of

8    $5,000 from Mr. Samson?

9    A.   Yes.

10   Q.   Let me hand you what's been marked as

11   Defendants's Exhibit 3.  Can you identify Defendants's

12   Exhibit 3?

13   A.   Yes.

14   Q.   What is that?

15   A.   That's the check Frank Samson gave me.

16   Q.   Okay.

17   A.   The check.

18   Q.   For what?

19   A.   The check is for $5,000.

20   Q.   And what was that --

21   A.   Down payment of Palm Beach.

22   Q.   And did you make a photocopy of the check?

23   A.   Yes, that's it right here.

24   Q.   Okay.  After you agreed to sell your stock in

25   Palm Beach Auto to Mr. Samson, what involvement, if any,

 1   have you had in the Palm Beach Auto business?

 2       A.  The only thing I promise him, I would stay with

 3   him for 30 days to make sure everything, you know, work

 4   smoothly.  And if he got all the, you know, topnotch

 5   people like Jerome knows the business very well.

 6       Q.  Jerome who?

 7       A.  Jerome Dear.

 8       Q.  Okay.

 9           MR. BUKOWSKI:  I have nothing further, Your

10   Honor.

11           THE COURT:  All right.

12                   CROSS-EXAMINATION

13   BY MR. BUKOWSKI:

14       Q.  Good afternoon, Mr. Augustin.

15       A.  Good afternoon, Counsel.

16       Q.  I'd like to start off by going through some of

17   the ways that you indicated that MAACO had breached it

18   agreement to you earlier in your testimony today.  And

19   the first one is moving expenses.

20           Do you remember testifying that someone at MAACO

21   had promised to pay your moving expenses from Boston to

22   Florida?

23       A.  Yes, indeed.

24       Q.  And you don't have anything in writing showing

25   that that promise was ever made to you, do you, Mr.

1  Augustin?

2     A.  No, I do not.

3     Q.  And in any event, that promise would have been

4  over seven years ago, correct?

5     A.  It was more than seven years.  I would say that,

6  yeah.

7     Q.  And so once you realized MAACO wasn't going to

8  reimburse you your moving expenses, you continued to

9  operate the franchise for another seven years in any

10  event, correct?

11    A.  Yes.

12    Q.  Okay.  Let's take a look at Plaintiff's Exhibit 2

13  which is your franchise agreement.

14    A.  Uh-uh.

15    Q.  I'm going to ask you to turn to page 8.

16    A.  (Witness complies.)

17    Q.  Page 8, section 22.

18    A.  Yes.

19    Q.  Okay.  And here this paragraph says, "Entire

20  agreement.  This agreement, the documents referred to

21  herein and the attachment hereto, if any, constitute the

22  entire, full, and complete agreement between MAACO and

23  franchisee."  Do you see that paragraph?

24    A.  Yes.

25    Q.  Okay.  And where in the franchise agreement is

1   there any mention of MAACO paying your moving expenses

2   from Boston?

3        A.   Well --

4        Q.   Is it in the franchise agreement, Mr. Augustin?

5        A.   Because what happened is, I was in Boston --

6        Q.   It's a yes or no question, Mr. Augustin.  Is it

7   in the franchise agreement?

8        A.   I was in Boston.  That's why.

9        Q.   Does the franchise treatment contain anything

10  about MAACO paying your moving expenses from Boston?

11       A.   It won't apply from --

12       Q.   Yes or no, Mr. Augustin.

13       A.   Not over here, but Bill Chafey --

14       Q.   It's not in the agreement, is it?

15       A.   Yeah, but Bill Chafey --

16       Q.   You're right.  It's not in the agreement, is it,

17  Mr. Augustin?

18       A.   No.

19       Q.   Thank you.  You've answered my question.  Let's

20  move on.

21       A.   Okay.

22            MS. AMARANTE:  I'm now going to offer as

23  Plaintiff's Exhibit 26 a document called, "Disclosure

24  Acknowledgment Statement."

25            THE WITNESS:  Thank you.

```
 1   BY MS. AMARANTE:
 2      Q.  Mr. Augustin, is this your signature at the
 3   bottom?
 4      A.  Yes.
 5      Q.  Of this document?
 6      A.  Uh-uh.
 7      Q.  And your wife, Mrs. Virginie Augustin, signed it?
 8      A.  Yes.
 9      Q.  Dated August 16th, 2000, correct?
10      A.  Yes.
11      Q.  And do you see in paragraph 1 where it talks
12   about your recognition and understanding that there are
13   business risks --
14      A.  Sure.
15      Q.  -- involved in opening a MAACO?
16          And in paragraph 3 it says, "The franchisee
17   agrees and states that the decision to enter into this
18   business risk is in no manner predicated upon any oral
19   representations, assurances, warranties, guarantees, or
20   promises made by the company as to the likelihood,
21   success of the franchise."  Do you see that?
22      A.  Yes.
23      Q.  And there is space at the bottom that paragraph
24   for you to indicate if any oral promises have been made
25   to you.  Do you see that?  The blank -- the line where
```

1    the "None" is indicated?

2        A.  Sure.

3        Q.  Okay.  And is that your handwriting that wrote

4    "None" on that line?

5        A.  And I'm not sure of that.

6        Q.  Okay.  But, in any event, you signed a document

7    that indicated --

8        A.  I did sign it.

9        Q.  -- that no oral representations had been made to

10   you?

11       A.  Yes.

12       Q.  Thank you.

13           Mr. Augustin, you also talked about the lack of

14   equipment at the MAACO center in Lake Park when you took

15   it over, correct?

16       A.  That's correct.

17       Q.  And you testified that you chose not to pay MAACO

18   for the equipment, right?

19       A.  I did not say that.  I did choose not to pay

20   MAACO for the equipment?

21       Q.  Well --

22       A.  What I state that I was -- I was in Boston, and

23   when I move for the period, for the classes period, Bill

24   Chafey want me to sign for the equipment.  When I

25   contact my lawyer in Florida, he said, "Philippe, I

 1   don't want you to sign for equipment you don't have, you

 2   don't see."  And that's when I did not sign for the

 3   equipment.

 4       Q.  You never paid MAACO for any equipment at that

 5   MAACO center, did you?

 6       A.  I did not.  No.  Let me take that back.  That is

 7   a check for $2,000.  They got -- I sent a check for

 8   $2,000 to the bank, not MAACO.  But I sent a check to

 9   the bank.

10       Q.  So --

11       A.  The Bank of California.

12       Q.  Okay.  Did you pay MAACO for any equipment at the

13   MAACO center?

14       A.  I did not.

15       Q.  Okay.  And yet somehow you testified that it was

16   a breach of the agreement for MAACO not to provide you

17   with equipment that you hadn't paid for?

18       A.  There was no equipment.

19       Q.  And you didn't pay for any equipment --

20       A.  My lawyer --

21       Q.  -- right?

22       A.  -- my lawyer -- like I state to you, my lawyer

23   told me not to sign for it because here I'm coming from

24   all the way to Boston, Massachusetts, and I moving to

25   Florida in a new place.  I don't know the place.  The

 1    place wasn't secure.

 2         So when I came over here with my wife and my

 3    daughter to Florida, the place wasn't secure.  I came to

 4    the business, there wasn't even no key for me at

 5    8 o'clock.  There wasn't even a key for me to open the

 6    place.  There was two MAACOs guys outside and myself.

 7    We can't even open the business.  By the time we opened

 8    the business, everything was gone.

 9    Q.  Mr. Augustin, I understand that you have a plane

10    to catch, so I'd ask if you could answer my questions

11    and not give speeches because otherwise we're not going

12    to get through this.

13    A.  I will.  I will.

14    Q.  So you didn't pay MAACO for any equipment,

15    correct?

16    A.  I did say that.  I did not pay MAACO.

17         MS. AMARANTE:  I'm offering now -- and let

18    me offer Plaintiff's Exhibit 26 as a full exhibit at

19    this time absent objection.

20         MR. BUKOWSKI:  No objection.

21         THE COURT:  All right.

22         (Whereupon, Plaintiff's Exhibit No. 26 was

23         admitted into evidence.)

24         MS. AMARANTE:  And then I'm marking

25    Plaintiff's Exhibit Number 27, which is an analysis of

1    investment.

2                    (Whereupon, Plaintiff's Exhibit No. 27 was

3                    marked for identification.)

4    BY MS. AMARANTE:

5        Q.   Mr. Augustin, on the last page of this document,

6    that's your signature and your wife's signature; is it

7    not?

8        A.   Yes, indeed.

9        Q.   Okay.  And this is a document that MAACO gave you

10   to indicate what you should expect to have to invest in

11   your MAACO center, correct?

12       A.   That's correct.

13       Q.   Okay.  And let's look at the second page of the

14   document.

15       A.   Uh-uh.

16       Q.   It shows $52,000 in the box that says, "Analysis

17   of investment."  Franchise agreement, the total payments

18   to MAACO for the franchise agreement would be about

19   $52,000; is that correct?

20       A.   Yes.

21       Q.   And in addition to that, there's another $127,000

22   listed for equipment purchase; do you see that?

23       A.   Sure.

24       Q.   So that's in addition to the franchise fee that

25   you would have paid to MAACO.  You also knew that you

1   would be expected to pay approximately $127,000 for

2   equipment for your MAACO center, correct?

3      A.   If the equipment with there, yes.

4      Q.   And you never paid MAACO for any equipment, did

5   you?

6      A.   I did not.

7      Q.   You also testified earlier today that MAACO

8   failed to provide you with a new sign that had the

9   lights working.  Do you recall that testimony?

10      A.   Yes.

11      Q.   Again, if we look at the last page of what's been

12   marked Plaintiff's Exhibit 27, the analysis of

13   investment.  Numbered paragraph 8 says, "Sign package,

14   $8,000."  Do you see that?

15      A.   I saw that.

16      Q.   Yes.  So this indicates that a package of new

17   signs would generally run approximately $8,000 and you

18   knew that when you signed this document, correct?

19      A.   That's correct.  Can I say something --

20      Q.   And you never --

21      A.   -- to that?

22      Q.   -- paid MAACO $8,000 for the signs that you think

23   you should have been given for free, did you?

24      A.   No, it's not for free.  I paid MAACO for new sign

25   when they change the emblem.  This document, MAACO

1   changed the emblem, and I paid for new sign because the

2   old MAACO emblem was kaput.  So we have no sign.  So if

3   this document for when they changed the sign, I paid for

4   the new sign.  I paid for the new equipment.  I paid for

5   all the thing inside the center.

6        So this document, that was an old MAACO.  When

7   they got the new MAACO, they change the sign, I paid for

8   the sign.  They change the sign.  MAACO change all the

9   time.  This is 2000.

10       When we move on in that place, I paid for the

11  sign because if you look at emblem MAACO, MAACO change

12  three times since I -- I've been there.  They got the

13  old MAACO.  They change the sign, I think in 2004, 2005,

14  where I paid them and after that when Driven Brands took

15  over, everything change again.  I pay for that sign.

16  Q.  Okay.  So it's your testimony that you paid MAACO

17  for a sign that they never sent you?

18  A.  MAACO not only -- the sign to be lit up.  That 's

19  what we're talking about.  I never talking -- the sign

20  was there.  There was a MAACO before that.  I did

21  mention that in my direct testimony.  The sign was there

22  before.

23       The only thing we discussed with MAACO all the

24  time, every time I asked for something I don't get it.

25  When I get something -- when Tony Martino, the founder

1    of MAACO was alive because he giving me cell phone, he

2    give me everything, and after I spoke to Tony Martino,

3    that's why Bill Chafey get fired and send then the

4    attorney against me because that's why it is.  It is

5    what it is.

6         I paid for the new sign when the emblem changed.

7    This is old document.

8    Q.  Okay.  Let me see if I can extract out any

9    responsive pieces of that.

10        You paid for a sign and you received the sign?

11   Is that what you just testified to?

12   A.  There was a lot of sign we received because they

13   want to change the --

14   Q.  Okay.

15   A.  -- emblem.

16   Q.  So MAACO did provide you with a lot of signs?

17   A.  I paid for it.

18   Q.  And you paid for them?

19   A.  I did pay for it, yeah.  But the only thing I

20   have issue with MAACO all the time and because my sign

21   never lit up, when somebody driving at night, they

22   cannot see it.

23        And I give you a good example, the new owner

24   right now, he already got his sign lit up and I've been

25   there for seven years.  I've been fighting with MAACO

1  for that.

2      Q.  Well, let's go back to Plaintiff's Exhibit 2,

3  which is the franchise agreement.  So me where in this

4  written integrated document it says that it's MAACO's

5  job to make sure that your sign lights up.

6      A.  Well, Okay.  All right.

7      Q.  Go ahead.  Look through the franchise agreement.

8  Show me where that is.

9      A.  Maybe it's not there.  But let me tell you

10  something why it's not fair.  It's not sign for me, but

11  there's sign for a new guy.

12      Q.  Okay.  So it's not in the franchise agreement, so

13  let's move on.

14      A.  It is not.

15      Q.  Thank you.

16      A.  It's not.

17      Q.  Mr. Augustin, another one of your gripes with

18  MAACO this morning was that they didn't help you reduce

19  your rent with your landlord at the 804 Old Dixie

20  Highway; is that correct?

21      A.  Yes.

22      Q.  Okay.

23          MS. AMARANTE:  I am going to -- I'm going to

24  offer Plaintiff's Exhibit 28 as a full exhibit absent

25  objection.

```
 1            MR. BUKOWSKI:  What is it?
 2            MS. AMARANTE:  The analysis of investment.
 3            MR. FOURNARIS:  That's 27.
 4            MR. BUKOWSKI:  I thought that was 27.
 5            MS. AMARANTE:  I thought I said 27.  I'm
 6  sorry.  I'm offering Plaintiff's Exhibit 27 as a full
 7  exhibit.
 8            MR. BUKOWSKI:  I have no objection.
 9            (Whereupon, Plaintiff's Exhibit No. 27 was
10            admitted into evidence.)
11            MS. AMARANTE:  And now I'm marking
12  Plaintiff's Exhibit 28, which is a document
13  entitled, "Assignment of Lease."
14            (Whereupon, Plaintiff's Exhibit No. 28 was
15            marked for identification.)
16  BY MS. AMARANTE:
17     Q.  Mr. Augustin, this is your signature on this
18  document here on the assignment of lease?
19     A.  Yes.
20     Q.  And it's dated September 19, 2002, correct?
21     A.  That's correct.
22     Q.  And with this document, is it accurate to say
23  that you're taking an assignment of the lease from the
24  former franchisee Jonas Augusta (ph), correct?
25     A.  I believe so.
```

1   Q.   Yes.  And MAACO is not a party to this lease, is

2   it?

3   A.   It wasn't a party to the lease, no.

4   Q.   Correct.  And if you'll look at the third

5   paragraph on the first page, assignment of lease --

6   A.   Uh-uh.

7   Q.   -- it starts with, "Execution of this document."

8   Do you see that?

9   A.   What page are you?

10   Q.   On the very first page of the document, third

11   paragraph down.

12   A.   Yes.

13   Q.   It starts with, "Execution of this document."

14   A.   Uh-uh.

15   Q.   "With execution of this document, assignee,"

16   that's you, Mr. Augustin, correct?

17   A.   Uh-uh, yes.

18   Q.   "Agrees to pay the lessor first month's rent plus

19   sales tax," and in parenthesis it says that the first

20   month's rent plus sales tax will be $7,287.22, correct?

21   A.   Sure.

22   Q.   Okay.  So you knew when you signed this that the

23   rent was going to be $7,287 at least for the first

24   month, correct?

25   A.   I don't know that, and let me tell you why I

1   don't know that.  That was -- said $7,000, but the

2   original lease I have, it was $5,000.  The amount will

3   make it $7,000 was the operating expenses.  Never

4   explained that to me.

5        If you look at the statement from the landlord,

6   they got a $5,000 rent.  That's what I thought I would

7   pay.  I never thought about the operating expenses to

8   bring that to $7,000.

9   Q.  Right.

10  A.  Yeah.

11  Q.  Well, let's take a look.

12  A.  Yes.

13  Q.  On the bottom right hand corner there will be a

14  page that says, "MFI 00156," and it's Exhibit B to the

15  lease agreement that you took assignment of.

16  A.  What page is that?

17  Q.  It's MFI 00156 at the bottom.

18  A.  Yes.

19  Q.  So this is a rent schedule that shows the base

20  rent for the location and it indicates that each year

21  the base rent would increase, right, Mr. Augustin?

22  A.  But if you look at the bottom, I did not sign

23  that.  That's Jonas August.  That JA.

24  Q.  Okay.  This --

25  A.  If you look at the bottom of it, this say JA.

1    That wasn't mine.  It's-- my name is Philippe Augustin.

2       Q.  I'm asking you if this document shows the rent

3    schedule --

4       A.  Yes, it did.

5       Q.  -- and shows that the base rent will increase

6    over time.

7       A.  Yes.

8       Q.  Okay.

9       A.  Yes, that was there.  I just want to point it out

10   for you that wasn't me that initial it.  That was the

11   previous owner.

12      Q.  Well, Mr. Augustin, when you took assignment of

13   the lease, you took on Mr. Augusta's obligation under

14   the existing lease, didn't you?

15      A.  You know what, let me tell you what I was

16   confused with all the MAACO thing.

17      Q.  Didn't you?

18      A.  Yeah, I'm just --

19      Q.  Didn't you take on Mr. August's obligations under

20   the existing lease agreement?

21      A.  I will respond that to you, Counsel.  Let me tell

22   you what's confuse when we buy the business.  We don't

23   buy the business from Jonas.  So we bought it from

24   MAACO.  So this is where all this confusion came up.  We

25   don't buy it directly from Jonas, the guy who left and

1    went on his way.  We bought it from MAACO.

2          So that's a lot of documents while I was in

3    Boston I don't have.  That's why I'm trying to point it

4    out, Counsel.  The JA, that was Jonas August.  We

5    never -- I probably never have that information.  That's

6    why I tried to believe.

7          If you look at 00156, it's JA.  That's not me

8    sign that.

9    Q.  So your testimony --

10   A.  I'm not a member of that.

11   Q.  So your testimony is that you took an assignment

12   of a lease and signed this document on the first page on

13   September 19th, 2002, without ever looking at the lease

14   itself?

15   A.  Well, I said to you I probably not look at that

16   (indiscernible).  I probably would not even have that

17   page.

18   Q.  Let's look at what's marked, "MFI 00137."  The

19   third paragraph on that page.

20   A.  Yes, I get it.

21   Q.  The third paragraph on that page references the

22   minimum operating expenses and halfway in the paragraph

23   it says, "Lessee's minimum operating expenses for the

24   first year of the lease will be approximately $1,440 per

25   month."  Do you see that?

1      A.  What page are you?  00137?

2      Q.  Yes, 00137, third paragraph --

3      A.  Yes, I got that.

4      Q.  -- talks about --

5      A.  Yes.

6      Q.  -- the minimum operating expenses --

7      A.  Uh-uh.

8      Q.  -- and midway through the paragraph says that the

9  minimum operating expenses for the first year of the

10  lease would be about $1,440 a month.

11      A.  Uh-uh.

12      Q.  Do you see that?

13      A.  Yes.

14      Q.  And that's in addition to the base rent which was

15  on the schedule that we were just looking at, correct?

16      A.  Sure.

17           MS. AMARANTE:  Absent objection, I'd look to

18  move for Plaintiff's Exhibit 28 to be admitted as a full

19  exhibit.

20           MR. BUKOWSKI:  No objection.

21           THE COURT:  All right.  It will be admitted.

22           (Whereupon, Plaintiff's Exhibit No. 28 was

23           admitted into evidence.)

24           MS. AMARANTE:  And I'm now going to mark

25  Plaintiff's Exhibit 29 which is a lease amendment number

1.

            (Whereupon, Plaintiff's Exhibit No. 29 was
            marked for identification.)

BY MS. AMARANTE:

   Q.   And if you'll turn with me, Mr. Augustin, to the
third -- well, second page of this document.  Is that
your signature that appears?

   A.   Yes.

   Q.   Witnessed by Mr. Jerome Dear?

   A.   That's correct.

   Q.   And on the third page of the document, there's an
Exhibit A, Revised Rent Schedule.  And your signature
appears there as well; doesn't it, Mr. Augustin?

   A.   Yes.

   Q.   So back to the first page, this lease amendment
number one was signed by you on February 15th, 2007,
correct?

   A.   That's correct.

   Q.   And you also signed the rent schedule indicating
the base monthly rent for the premises and showing that
it would increase each year, correct?

   A.   That's correct.

   Q.   On the rent schedule right under the rent
indications it says, "The above numbers do not include
operating expenses or sales tax," correct?

1     A.   That's correct.

2     Q.   And for the first year, the monthly base rent is

3 $6,680; do you see that?

4     A.   Yes.

5     Q.   Let's go back to the first page of the document.

6 Paragraph number 2 on the first page, Mr. Augustin.

7     A.   Uh-uh.

8     Q.   "Lessee's minimum operating expenses through

9 December 31st of the first option year, will be $3,096

10 per month."  Do you see that?

11     A.   Yes.

12     Q.   And you signed this document as well, right?

13     A.   Yes.

14     Q.   Okay.  So if we add the base rent of $6,600 and

15 the minimum operating expenses of $3,000, right there

16 we're at about $10,000 a month for your rent, correct?

17     A.   That's correct.

18     Q.   In February of 2007, you agreed to that.  You

19 signed this document, right?

20     A.   Yes.

21     Q.   And MAACO was not a party to this lease amendment

22 either, is it?

23     A.   It was in the first one.  Not this -- not this

24 one.

25     Q.   MAACO's not a party to this lease amendment,

1  right?

2  A.  We're talking about the 2007?

3  Q.  2007.

4  A.  No.

5  Q.  Yet you blame MAACO for the fact that you had to

6  pay the rent that you agreed in this document to pay,

7  don't you?

8  A.  I don't blame MAACO for that.  I asked MAACO

9  before even I signed the lease to talk to the landlord

10  to decrease the rent and make it clear to them there's

11  no way I can survive with $11,000 rent.  I don't blame

12  MAACO for that.  That's what I said.

13  Q.  Okay.  Well --

14  A.  I don't blame MAACO for it.

15  Q.  -- let's go back to Plaintiff's Exhibit 2 which

16  is the franchise agreement.

17  A.  Uh-uh.

18  Q.  And I'll asking you to show you where in that

19  agreement it says that it's MAACO's job to go to your

20  landlord and try to reduce your rent.

21  A.  There's none of that, but I explained that to you

22  before.

23  Q.  Okay.  Thank you.

24  A.  Because I was in Boston, there were doing all

25  this work for me.

1    Q.  Yes, I understand.

2    A.  That's what I said.

3    Q.  Let's turn to --

4         THE COURT:  May I inquire how long you

5    expect cross to go on?

6         MS. AMARANTE:  Your Honor, I likely have

7    another 30 to 40 minutes.

8         THE COURT:  Okay.

9         MS. AMARANTE:  And defense counsel went

10   longer in his direct than he had predicted.  So I

11   apologize, but I would like to still have the full

12   45 minutes that I had original predicted.

13        THE COURT:  All right.  Go ahead.  I'm going

14   to hold you pretty strictly to that.

15        MS. AMARANTE:  Okay.  So that would take

16   us --

17        THE COURT:  Forty minutes will take you

18   to --

19        MS. AMARANTE:  Forty minutes from now.

20   Okay.

21        THE COURT:  -- ten minutes past four.

22        MS. AMARANTE:  Okay.  Thank you.

23   BY MS. AMARANTE:

24   Q.  Mr. Augustin, when the landlord wouldn't

25   renegotiate the reason with you, you just stopped paying

1    him, didn't you?

2        A.  No, I did not.

3        Q.  Okay.  Well, let's look at Plaintiff's Exhibit 8

4    which is in the pile there.

5        A.  Yeah.

6        Q.  It's already been marked.

7        A.  Yeah.

8        Q.  And this document shows that the landlord sued

9    you for unpaid rent, correct?

10       A.  That's correct.

11       Q.  Okay.  And at the time of this judgment adding up

12   the amounts in paragraphs 2 and 3, you owed

13   approximately $75,000 in back rent; is that fair?

14       A.  $75,000?

15       Q.  Yes.

16       A.  No.  Not no $75,000.

17       Q.  Well, paragraph 2 talks about $43,000 in

18   accordance --

19       A.  Uh-uh.

20       Q.  -- with a stipulation, and then paragraph 3 talks

21   about an additional $33,000 for the $11,000 in rent that

22   you hadn't paid for April, May, and June of 2009,

23   correct?

24       A.  It wasn't $75,000 because I got a judgment, and I

25   think I have it over here.  The amount was like $28,000.

1    Q.   Yes.   Because the paragraph 4 says that

2    defendants have paid the sum of $45,000.

3    A.   But it wasn't $75,000.

4    Q.   Okay.   You paid forty-five and then the judgment

5    on paragraph 6 is for twenty-five?

6    A.   No.   Because the rent was gone because I was in

7    the building.   That's why.   But it wasn't $75,000.   He

8    wasn't paying the full $11,000 every month, but he was

9    getting paid because when we went to the Court and the

10   judge decide for me to stay in business and for him to

11   get just -- keep paying $5,000 or $5,500 every two weeks

12   and that's what we did.

13   Q.   When MAACO sent you the notice of default in

14   December of 2008, you admit that you owed MAACO some

15   money at that time, don't you?

16   A.   Yes, indeed.

17   Q.   You just disputed the amount, right?

18   A.   Yes.

19   Q.   And when you asked for someone to call about

20   payment plans, Dianna Dieciedue did call you to talk

21   about how to pay down that debt, correct?

22   A.   No.   She did not call me to pay about the debt.

23   I spoke to somebody else in the finance company to call

24   me.   Me and Dianna, we never on the same page.

25   Q.   Dianna Dieciedue told you to start paying current

1    and then she would talk to you about a payment plan for

2    the past due stuff, correct?

3        A.   Somebody else told me that.  Not Dianna, because

4    no.  No.

5        Q.   And you didn't start paying current, did you?

6        A.   I'm still paying MAACO at the time.

7        Q.   Well --

8        A.   Even before I left, MAACO got the check they

9    cashed.

10       Q.   Let's look at Plaintiff's Exhibit a 15 --

11       A.   Uh-uh.

12       Q.   -- which is the notice of default.

13       A.   Sure.

14       Q.   And this document indicates that --

15       A.   Wait a moment.  I don't have it yet.  Do you have

16   another copy, please?

17       Q.   Exhibit 15 isn't there?

18       A.   I'm looking for it.

19                UNIDENTIFIED SPEAKER:  There you go.

20                THE WITNESS:  Thank you.

21   BY MS. AMARANTE:

22       Q.   So the notice of default indicates approximately

23   $59,000 due and owing on December 3rd, 2008, correct?

24       A.   That's correct.

25       Q.   Okay.  And by the time you received the notice of

1   termination in April of 2009, the amount had almost

2   doubled, correct?

3       A.   Just about.

4       Q.   And according to the notice of termination as

5   well, you were still failing to submit weekly reports of

6   gross receipts, correct?

7       A.   That's correct.

8       Q.   And the bad economy didn't prevent you from

9   submitting weekly reports, did it?

10      A.   No.  Because the -- I just state that before I

11  spoke to the IT, John, because the computer wasn't good,

12  so I have to buy new computer.  When I get the new

13  computer, they got all -- all the reports.

14      Q.   Yes.  And you could have completed the weekly

15  reports by hand, couldn't you have, Mr. Augustin?

16      A.   No, you can't do it by hand.

17      Q.   And where is there a document in writing showing

18  that you responded to Ms. Dieciedue's notices of default

19  by saying that your computer precluded you from

20  submitting the weekly reports?

21      A.   When I spoke to John about that.  They know about

22  it.  MAACO knows about it.

23      Q.   But is there a document in writing --

24      A.   No.

25      Q.   -- that shows that?

1     A.  No.

2     Q.  So you didn't stay current like MAACO told you to

3 and you didn't submit weekly reports, and by April 2009

4 by MAACO's report -- by MAACO's records, you owed almost

5 $100,000; is that correct?

6     A.  I was disputing that.  Part of it was the audit.

7 And what I said in my statement earlier, MAACO sent

8 their own accountant.  When I went to get my accountant,

9 MAACO refused to do that.  That was the audit.

10        In the second part of the audit, there was a

11 yellow form.

12     Q.  Okay.  But the amount, by the time of

13 termination, had grown to almost $100,000 by MAACO's

14 records.  I'm not asking you to agree with what their

15 records show.  I'm saying by MAACO's records you owed

16 almost $100,000 at the time of termination.

17     A.  Yes, by their records, yes.

18     Q.  And it was growing substantially since the first

19 notice of default in December, correct?

20     A.  Yeah, I would say so.

21     Q.  Yes.  Okay.

22     A.  Uh-huh.

23     Q.  So let's review.  You weren't paying MAACO even

24 though you acknowledged in your response to the notice

25 of default that money was due, some money was due, and

1    you weren't paying your landlord.  Isn't it true, Mr.

2    Augustin, that you also weren't paying your employees at

3    the time?

4        A.   I always pay them.

5        Q.   Okay.  Who's Tony Griffin?

6        A.   Tony Griffin, that was one of my former employee.

7        Q.   And isn't it true that he's suing you for back

8    wages saying that you failed to pay him?

9        A.   That's not back wages he sue me.

10       Q.   He's suing you to --

11       A.   No, not for back wages.  He sue me, he claim, for

12   overtime; not back wages.  All my employees always get

13   paid.  Even if I don't get paid, all my employees get

14   paid.

15           He sue me for overtime where I -- I got all the

16   document from ADP because I don't want do the payroll.

17   ADP does the payroll.

18               THE COURT:  Isn't overtime a form of wages?

19               THE WITNESS:  Yeah.  But he get paid for

20   that.  I sent all this information to my lawyer.  He

21   got -- get paid.  Because he got fired by me, that's why

22   he get upset.  But he get paid.  I get all the forms by

23   ADP.

24               THE COURT:  I'm just talking about I thought

25   you were disagreeing with counsel --

```
 1                    THE WITNESS:  Yeah.  He got -- he got all
 2    the, you know, my ADP --
 3                    THE COURT:  -- about being sued for wages.
 4                    THE WITNESS:  -- he got over time.  All my
 5    employees always get paid.
 6    BY MS. AMARANTE:
 7       Q.  Okay.  But it is true that --
 8       A.  All my employees.
 9       Q.  -- Tony Griffin is suing you --
10       A.  Yes.
11       Q.  -- for unpaid wages?
12       A.  Yeah.  He sued me, I think, for $27,000 or
13    something like that.  He's talking about
14    back 2003, 2004.  At that time he's not even working for
15    me because he left and came back.
16            All my employees always get paid.  I don't get
17    paid.
18       Q.  Okay.  And, Mr. Augustin, isn't it true that you
19    didn't pay Mr. Hyatt for all of his wages that were due
20    and owing when he quit Palm Beach Auto?
21       A.  I did pay Mr. Hyatt.  The only check I don't
22    have -- I still have it in my document over here because
23    he stole the computer.  Mr. Hyatt stole the computer
24    from the business.
25       Q.  That computer belonged to Sherwin William, didn't
```

1  it, Mr. Augustin?

2    A.  We got the computer back from Sherwin Williams.

3        MS. AMARANTE:  I'm going to offer as

4  Plaintiff's Exhibit 30 a copy of a complaint that was

5  filed in September 2009 by Tony Griffin v. Phil's Auto

6  Body.

7        THE WITNESS:  Sure.

8        MR. BUKOWSKI:  Objection; relevance, Your

9  Honor.

10        THE COURT:  Overruled.

11 BY MS. AMARANTE:

12    Q.  So, Mr. Augustin, this is the lawsuit we were

13 just discussing wherein Tony Griffin sued you for unpaid

14 wages, correct?

15    A.  Yes.

16    Q.  Okay.  And you testified that it was several

17 years ago.  So I just wanted to establish for the record

18 that the complaint is actually dated September, 2009,

19 correct?

20    A.  Sure.

21    Q.  You never had a purchase and sale agreement

22 signed with David Stefan for your franchise, for you

23 MAACO center, did you, Mr. Augustin?

24    A.  No.

25    Q.  And you never even agreed on a price with

1    Mr. Stefan, did you?

2        A.   We talk about the price.

3        Q.   And you asked $350,000 for the sale of the MAACO

4    center, correct?

5        A.   That's correct.

6        Q.   Okay.  And did you ever lower that price?

7        A.   No.

8        Q.   Okay.  So you wanted to sell a business that you

9    bought from MAACO for about $45,000 and you wanted to

10   sell it to Mr. Stefan from $350,000; is that accurate?

11       A.   Yes.

12       Q.   And you never provided Mr. Stefan with any

13   financial documents to substantiate your $350,000 asking

14   price for the franchise, did you?

15       A.   I did not because when Mr. -- when David Stefan

16   came and talked to me about it, he said he had a

17   conversation with MAACO.  He have lunch with the

18   President of MAACO, and then he said he's going to take

19   the franchise and that's why.

20            MS. AMARANTE:  I'm now going to offer what's

21   been marked as Plaintiff's Exhibit 31, which is an

22   e-mail from Mr. David Stefan to you, Mr. Augustin.

23            THE WITNESS:  Uh-uh.

24   BY MS. AMARANTE:

25       Q.   Mr. Augustin, Mr. Stefan sent you this e-mail on

```
 1   Friday, April 17th, correct?

 2       A.  That's correct.

 3       Q.  And this is your e-mail address,

 4   PAUGUS@earthlink.net, correct?

 5       A.  That's correct.

 6       Q.  So April 17th, 2009, MAACO had already terminated

 7   your franchise agreement by now, correct?

 8       A.  April 9th, yeah.

 9       Q.  So by April 17th, they'd already terminated your

10   franchise agreement, correct?

11       A.  I do believe so.

12       Q.  Yes.  And --

13       A.  Yup.

14       Q.  -- and Mr. Stefan writes, "Philippe, do you

15   intend on getting things to me or should I just forget

16   it," correct?

17       A.  That -- yes, that's correct.

18       Q.  And so Mr. Stefan is still looking for some

19   financial documentation from you regarding your sale of

20   the MAACO center, correct?

21       A.  That's correct.

22       Q.  And you still had not provided him with any

23   documentation to justify your $350,000 asking price, had

24   you?

25       A.  No.
```

1    Q.  You testified earlier that Mr. Bill Bass told you

2    not to worry about the notices of default since you were

3    trying to sell the franchise, did you --

4    A.  That's correct.

5    Q.  Well, Mr. Bass didn't tell you that you'd have

6    forever to try to sell the business, did he?

7    A.  He's the one who sent me David Stefan to buy the

8    business from me.

9    Q.  Well, Mr. Bass didn't tell you that you could

10   stop paying MAACO entirely, stop submitting your weekly

11   reports, never give information to Mr. Stefan regarding

12   the sale of the business, and continue free and clear

13   just because you were claiming that you were trying to

14   sell your MAACO center; did he tell you that?

15   A.  No.

16   Q.  Okay.  And at the same time, Ms. Diecidue

17   repeatedly told you that the default notices were

18   serious business and that you needed to cure, correct?

19   A.  Yes, she did.

20   Q.  Mr. Augustin, after your franchise agreement was

21   terminated, you continued to operate at the same

22   location until June 30th, 2009, correct?

23   A.  That's correct.

24   Q.  Okay.  And you testified that the sign was

25   changed to Phil's Auto Body, right?

1      A.   That's correct.

2      Q.   But you were still using the same equipment,

3    weren't you, Mr. Augustin?

4      A.   My equipment.

5      Q.   You were still using the same computers, right?

6      A.   That was my computer.

7      Q.   And you were still -- had Polaris software loaded

8    on those computers, correct?

9      A.   I wasn't using them.

10     Q.   Regardless, it was on the computers, right, Mr.

11   Augustin?

12     A.   Yes, yes.

13     Q.   And you were advertising to customers that you

14   were formerly MAACO, correct?

15     A.   Yes, indeed.

16     Q.   You even had a show on a Haitian radio station

17   and you were advertising that you were formerly MAACO in

18   the language of Creole to those Haitian listeners,

19   correct?

20     A.   I don't recall that.

21     Q.   But you did testify about advertising on 102.3 FM

22   that you were formerly MAACO, correct?

23     A.   That's correct.

24     Q.   Let's look at Plaintiff's Exhibit Number 2 which

25   is the franchise agreement.

1    A.   (Witness complies.)

2    Q.   And I'm going to asking you to turn to page 6,

3  section 15A.  Let me know when you're there, sir.

4    A.   I'm here.

5    Q.   Okay.  "Obligations upon termination or

6  expiration.  A.  Franchisee shall immediately cease to

7  operate the business franchised under this agreement and

8  shall not thereafter directly or indirectly represent to

9  the public or hold itself out as a present or former

10  franchisee of MAACO."  Do you see that?

11    A.   Sure.

12    Q.   And you agreed to this when you signed this

13  franchise agreement on October 4th, 2002, right?

14    A.   Yes.

15    Q.   You didn't have to sign this franchise agreement,

16  did you, Mr. Augustin?

17    A.   No.

18    Q.   You could have opened an independent auto body

19  painting and repair shop, Phil's Auto Body, and you

20  could have run your own business, right?

21    A.   Sure.

22    Q.   You could have opened a different franchise and

23  another brand, correct?

24    A.   Uh-uh.

25    Q.   But you opened a MAACO and you agreed to the

1    terms of this agreement, didn't you?

2        A.   Sure.

3        Q.   I want to ask you to pull out Plaintiff's

4    Exhibit 9 and 10 for me, please.

5        A.   (Witness complies.)

6        Q.   Okay.   Together -- I'm just going to ask some

7    general questions about 9 and 10 together.   But did you

8    know your counsel first produced these documents to

9    MAACO last Monday, March 8th?

10       A.   Those two documents?

11       Q.   Yes.

12       A.   I don't know.

13       Q.   And did you know that these documents were

14   contained in a mass production of over a thousand

15   documents that MAACO received for the first time Monday,

16   March 8th?

17       A.   (No audible response.)

18       Q.   And you do know that the preliminary injunction

19   hearing in this case was originally scheduled for last

20   Thursday, March 11th, right?

21       A.   That's correct.

22       Q.   Okay.   So after months of discovery requests and

23   demands from MAACO, you and your counsel finally

24   produced more than a thousand documents from Palm Beach

25   Auto approximately three days before the hearing, right?

1    A.   I believe so.

2    Q.   And the delay in producing these documents was an

3 effort to conceal your business activities from MAACO

4 and this Court, wasn't it?

5    A.   No.

6    Q.   Well, your only answer and brief in opposition to

7 this preliminary injunction motion was an effort to

8 conceal your activities from MAACO and this Court,

9 wasn't it?

10   A.   No, I don't have nothing to conceal.

11   Q.   Okay.  Mr. Augustin, isn't it true that you asked

12 Sheik Hyatt to be the director and officer of Palm Beach

13 Auto precisely so that you could hide your involvement

14 from MAACO and from this Court ultimately?

15   A.   Like I said earlier, that was Mr. Hyatt decision

16 to move the equipment to a better shop because he always

17 open -- want to open his own shop.

18   Q.   You asked him to incorporate Palm Beach Auto in

19 his name as a straw man so that you could operate it and

20 hide that activities from MAACO; isn't that right?

21   A.   I did not tell him that, to conceal anything from

22 MAACO, no.

23   Q.   Plaintiff's Exhibit 32 is the original answer

24 that you filed in this litigation, Mr. Augustin.  Your

25 counsel filed.  I'll ask you to turn to page 24 of the

1    document.

2         That's your signature, right, Mr. Augustin?

3    A.   That's correct.

4    Q.   Okay.  And in the verification, you verify that

5    the factual statements set forth in the foregoing

6    documents are true and correct to the best of my

7    knowledge, and you are aware that any of the foregoing

8    statements, if they are willfully false, you are subject

9    to punishment; is that what that verification says?

10   A.   Sure.

11   Q.   Okay.  And this document is dated November 12th,

12   2009, correct?

13   A.   Yes.

14   Q.   Let's look at page 7, paragraph 40.  This

15   paragraph states, starting from the fourth sentence, "It

16   is admitted that Mr. Augustin provided financial support

17   to Palm Beach Auto.  By way of further response, Palm

18   Beach Auto is operated by Sheik A. Hyatt.  On limited

19   occasions when Palm Beach Auto's employees have been

20   unavailable, Mr. Augustin has answered Palm Beach Auto's

21   telephone and greeted its customers."

22         Did I read that accurately?

23   A.   Sure.

24   Q.   And that wasn't true on November 12th when you

25   verified it to be true, was it, Mr. Augustin?

1      A.   Was not -- say it again.

2      Q.   That was not true.  It's not true and it was not

3  true on November 12th, 2009, was it?

4      A.   I just state that before.  I say I answered the

5  telephone.  I state that earlier.  I say I write

6  estimate.  But I don't do -- have to do, you know, body

7  works or anything.  I said that earlier.

8      Q.   Isn't it true that from the time that Palm Beach

9  Auto opened you were the owner and the sole operator of

10  that business?

11      A.   I was because I invest in it, yes.

12      Q.   Okay.  So when it says Palm Beach Auto is

13  operated by Sheik A. Hyatt --

14      A.   Uh-uh.

15      Q.   -- that's a lie, isn't it, Mr. Augustin?

16      A.   Technically, he was the owner because I -- I just

17  invest in the business.

18      Q.   Mr. Augustin, the statement that Palm Beach Auto

19  is operated --

20      A.   Uh-uh.

21      Q.   -- by Sheik A. Hyatt is a lie, isn't it?

22      A.   I don't see why it is a lie, ma'am.

23           THE COURT:  Well, would you say that it was

24  true?

25           THE WITNESS:  Well, I was the investor, Your

1   Honor.

2                    THE COURT:  Pardon?

3                    THE WITNESS:  I was the investor of the

4   business, but he was the president of the business.

5                    THE COURT:  The question you were asked was

6   whether Sheik Hyatt was the operator.  Did he run the

7   business?

8                    THE WITNESS:  He was running the business,

9   but I was there occasionally.  He was running the

10  business, yes.  Him and his wife was running the

11  business.

12  BY MS. AMARANTE:

13      Q.  So it's your testimony here today, Mr. Augustin,

14  that you were not operating Palm Beach Auto?

15      A.  I was there occasionally sell used car.

16      Q.  Okay.

17      A.  Mr. Hyatt and his wife, I was there because I was

18  investing in the business.  I wasn't operating.

19      Q.  So it's your testimony here today that you were

20  not running the day-to-day operations of Palm Beach

21  Auto?

22      A.  Not really.  Was like I spent five, six hours

23  over there.

24      Q.  Mr. Augustin, please pull out Plaintiff's

25  Exhibit 11, which is the joint answer that your counsel

1    filed on your behalf on February 24th, 2010.

2        A.   (Witness complied.)

3        Q.   I'm going to ask you to look at -- you'll see

4    page numbers at the top right corner, page blank of 27.

5    Please go to page 26 of 27.

6        A.   26?

7        Q.   Page 26 of 27.  And that's your signature --

8        A.   Yes.

9        Q.   -- on a verification --

10       A.   Yes.

11       Q.   -- that's similar to the one you signed for the

12   first answer, right, Mr. Augustin?

13       A.   Yes, uh-uh.

14       Q.   Okay.  Let's go to page 7 of the document, and

15   I'm going to ask you to look at paragraph 41.

16       A.   Uh-uh.

17       Q.   I'll read the second sentence.  "It is admitted

18   only that following the termination of the franchise

19   agreement by MAACO, Mr. Augustin opened a new collision,

20   repair, and auto painting shop located at 1009 Newman

21   Road, Lake Park, Florida."  Do you see that?

22       A.   Yes.

23       Q.   And so you opened Palm Beach Auto after the

24   termination of your franchise agreement, right?

25       A.   You can say that, yes.

1    Q.   You said it in your answer.  Let's look at

2    paragraph 42, second sentence:  "It is admitted only

3    that Mr. Augustin owns and operates Palm Beach Auto, a

4    Florida corporation."  Do you see that sentence?

5    A.   Sure.

6    Q.   And that was true, right?

7    A.   Sure.

8    Q.   But it was also true on November 12th, 2009,

9    wasn't it, Mr. Augustin?

10   A.   November --

11   Q.   12th, 2009, when you verified your first answer

12   that did not indicate that you owned and operated Palm

13   Beach Auto.  It was true then, too, right?

14   A.   Yeah.  I should say, yes.  Yeah.

15   Q.   Let's look at the next page, paragraph 43 --

16   A.   Uh-uh.

17   Q.   -- second sentence:  "It is admitted only that

18   Mr. Augustin has been involved with Palm Beach Auto

19   since its opening and up to and including today."  Do

20   you see that, Mr. Augustin?

21   A.   Including today.

22   Q.   Right.  Up to and including the day you filed

23   this answer.

24   A.   Okay.  Yeah.

25   Q.   And so that's a true statement as well, right?

1    A.   Yeah.

2    Q.   But it wasn't in your first answer on

3  November 12th, 2009, was it?

4    A.   (No audible response.)

5    Q.   Let's turn to page 12, paragraph 78, second

6  sentence:  "It is admitted only that without Mr.

7  Augustin's participation and financial support, Palm

8  Beach Auto would not be operating."  Did I read that

9  accurately?

10    A.   Yeah.  What you say, yeah.  Uh-uh.

11    Q.   And where in this February 24th, 2010, answer

12  does it say that Sheik Hyatt is the operator of Palm

13  Beach Auto?

14    A.   It did not say that.

15    Q.   It doesn't, right?

16    A.   No.

17    Q.   And he never was the operator of Palm Beach Auto,

18  was he, Mr. Augustin?

19    A.   He part of it, yes, because sometime I'm not

20  there.  Like I said to you, he was there with his wife.

21    Q.   Mr. Augustin, you intentionally verified your

22  first answer indicating that Mr. Hyatt was the owner and

23  operator of Palm Beach Auto in order to conceal your

24  business activities from MAACO and this Court, didn't

25  you?

1    A.   I wasn't concealing anything from MAACO.

2    Q.   Okay.  Well, and it wasn't until Mr. Hyatt called

3    MAACO's counsel and revealed the true ownership and

4    operation of Palm Beach Auto that you filed this amended

5    answer and changed your story about who owned and

6    operated the business, right?

7    A.   Because when my counsel called me because I told

8    him I was the investor of the business.

9    Q.   Okay.

10   A.   Yeah.

11   Q.   But it was after Mr. Hyatt came forward that you

12   suddenly took him out as the claimed owner and operator

13   of Palm Beach Auto?

14   A.   I don't -- I don't recall it's before or after.

15   I don't recall that.

16   Q.   Mr. Augustin, why should this Court believe

17   anything you say?

18   A.   Because I'm telling the truth.

19   Q.   Now or then?

20   A.   I always tell the truth.

21   Q.   Okay.

22   A.   I just -- something I don't recall.  I always

23   tell the truth.

24   Q.   Mr. Augustin, after you established Palm Beach

25   Auto, you instructed Inderia Bellino and Shereena Hyatt

1    to shred the business documents from your former MAACO

2    center, didn't you?

3        A.   Yes.

4        Q.   You directed the shredding of those business

5    documents because you didn't want MAACO to see the

6    records of your MAACO center, right?

7        A.   That's not the question because I still have the

8    records.  I have the records.  As a matter of fact, I

9    bring a lot of them over here.  I still got a lot of --

10   I still have the records.  I some of the records over

11   here I brought.

12       Q.   Okay.  Wait a second.  MAACO has been asking

13   through the course of this litigation from the

14   production of business records from your former MAACO

15   center, right?

16       A.   Well, they ask me --

17       Q.   Right?

18       A.   Yes.

19       Q.   And you have not produced a single business

20   record from your former MAACO center, have you?

21       A.   The reason they don't get that record, that want

22   me to pay $2,500 as to get that records and -- can I

23   just finish, Counsel?

24            They want -- they want to charge $2,500 to have

25   the forms -- a computer scientist get that record.  I

1    told him they're welcome to do so.  I told them I don't

2    have the money to pay because I know MAACO already have

3    all those documents.  I said they need it, they're

4    welcome to get to the computer to get everything they

5    want until now.  They can get whatever they want.

6        Q.  Mr. Augustin, for months in response to MAACO's

7    demands for production you failed to produce those

8    documents, correct?

9        A.  Yes.

10       Q.  And now you show up here and you're claiming that

11   there's documents on your counsel's table that we

12   haven't seen?

13       A.  I have some documents over here.  I didn't print

14   all of them out, but MAACO already have those documents.

15       Q.  But, nonetheless, you did orchestrate a mass

16   shredding of documents after you'd opened Palm Beach

17   Auto, correct?

18       A.  This is since 2002 --

19       Q.  And --

20       A.  -- we move.  We have documents.  We're talking

21   about since 2002.  So by the time we came to the new

22   location -- and I know I have the documents

23   electronically.

24       Q.  But --

25       A.  So that's what I just said to them, we have those

1   documents.

2   Q.  Mr. Augustin, you knew that litigation with MAACO

3   was a possibility when you engaged in that mass

4   destruction of documents, didn't you?

5   A.  No, I don't know that because we move in July.

6   After we close in June 30th, we move after -- July 4th

7   weekend and that's when this start.

8   Q.  And the destruction of documents occurred at the

9   end of July and into the fall, correct?

10  A.  I don't remember when, but we did that when we

11  move.  I don't remember the time.

12  Q.  Mr. Augustin, you testified that you used to work

13  as an accountant, correct?

14  A.  That's correct.

15  Q.  And you haven't produced in this case a single

16  consolidated financial statement for either your former

17  MAACO center or for Palm Beach Auto, right?

18  A.  That's correct.

19  Q.  And so do you remember yesterday when your

20  counsel was cross examining Mr. Monaghan and he made

21  some indication that MAACO could calculate its damages

22  from your behavior here by simply multiplying Palm Beach

23  Auto's revenues by nine percent and collecting those

24  royalties.  Do you remember that line of questioning?

25  A.  I believe so, yeah.

1      Q.   Okay.  And you haven't produced any documents so

2   far in this litigation that's been pending since October

3   that would allow MAACO to do that calculation, have you?

4      A.   From what -- from Palm Beach or from my former

5   MAACO.

6      Q.   From either, right?  You haven't produced any

7   financial statements or profit and loss statements from

8   either your former MAACO center or Palm Beach Auto, have

9   you?

10      A.   MAACO have those information.  They don't have it

11   from Palm Beach Auto Painting, but they have it from the

12   old MAACO.  They have all this old information from

13   MAACO.

14      Q.   But you haven't produced any profit and loss

15   statements or financial statements from Palm Beach Auto,

16   have you?

17      A.   No.

18           MS. AMARANTE:  Your Honor, I am striving to

19   be done by 4:10, so bear with me.

20   BY MS. AMARANTE:

21      Q.   Mr. Augustin, please turn to Plaintiff's

22   Exhibit 13, which is the security agreement with Frank

23   Samson.  Mr. Augustin, who prepared these documents?

24      A.   Alan Zangen.

25      Q.   He's your attorney in Florida?

1    A.   Yes.

2    Q.   He also prepared the documents that allowed Sheik

3    Hyatt to become a straw man and owner on paper of Palm

4    Beach Auto?

5    A.   He did.

6    Q.   And isn't it true that this document, where you

7    purport to sell your shares of Palm Beach Auto to Frank

8    Samson, is simply another sham just like Sheik Hyatt

9    owning Palm Beach Auto?

10   A.   No, it is not.

11   Q.   Well, let's review.  Frank Samson has no

12   experience in the automobile industry, does he?

13   A.   Well, a lot of MAACO owner have no experience to

14   own a MAACO.

15   Q.   That's a yes, isn't it, Mr. Augustin?  He has no

16   experience.

17   A.   Yeah.

18   Q.   And he's in his late 60's, right, Mr. Augustin?

19   A.   Yeah.

20   Q.   And isn't it true that you own a coffin business

21   with Mr. Samson?

22   A.   No.

23   Q.   You have business dealings with Mr. Samson?

24   A.   I don't have no coffin business.  I got --

25   Q.   Well --

1     A.   We have a business working on it but not coffins.

2     Q.   Okay.  You have a business with Mr. Samson?

3     A.   We don't have a business with Mr. Samson.  We

4  working on a business.  We don't have a business.

5     Q.   You're working in what business?

6     A.   A container business to rebuild Haiti, yeah.

7     Q.   These documents are signed on March 10, 2009,

8  correct?

9     A.   That's correct.

10    Q.   And that's one day before the preliminary

11  injunction hearing was originally scheduled for this

12  case, right?

13    A.   That's correct.

14    Q.   And you showed up the day of the injunction

15  hearing on March 11th and showed this to MAACO's counsel

16  for the first time, correct?

17    A.   That's correct.

18         THE COURT:  Did you say March 10th, 2009?

19         MS. AMARANTE:  I'm sorry, Your Honor.  2010.

20  I'm a year off.

21  BY MS. AMARANTE:

22    Q.   Yes.  They were signed on March 9th, 2010, and

23  the preliminary injunction hearing was scheduled for

24  March 11th, 2010, right, Mr. Augustin?

25    A.   Uh-uh.

1      Q.   Isn't it true that you were talking to Mr. Samson

2  about potentially buying your shares of Palm Beach Auto

3  for many months before March 10th?

4      A.   We were talking about that.   He was interested.

5  He's always in shop.

6      Q.   Why did you wait until March 10th to actually

7  sign these documents then?

8      A.   Because he wasn't ready.

9      Q.   Did Frank Samson have counsel when he was looking

10  over and signing these documents?

11      A.   I don't think he have counsel, but his daughter,

12  I think she's a big lawyer in California.

13      Q.   Okay.   I want to point out, the stock purchase

14  agreement which is the third document stapled together

15  here --

16      A.   Uh-uh.

17      Q.   -- on page 14 -- I mean, I'm sorry.   Page 10,

18  paragraph 14.

19      A.   Okay.

20      Q.   Has a covenant not to complete, doesn't it?

21      A.   Sure.

22      Q.   Okay.   And by selling your shares in Palm Beach

23  Auto, you're agreeing not to engage in any business in

24  the town of Lake Park, Florida, for a period of one year

25  following the closing, correct?

1    A.   That's correct.

2    Q.   Okay.  So that was a reasonable restriction in

3 your mind when you signed this document, right?

4    A.   I would say so.

5    Q.   Okay.  And then it also says, "In the event the

6 promissory note described in paragraph 4B should go into

7 default, than the covenant not to compete is not

8 enforceable," correct?

9    A.   That's correct.

10    Q.   Turning back to the first page where it says,

11 "Security agreement" --

12    A.   Uh-uh.

13    Q.   -- in this document you retain an interest in

14 Palm Beach Auto, correct, until the promissory note is

15 paid?

16    A.   Like I said to -- much like that, yes.

17    Q.   Yes.

18    A.   Uh-uh.

19    Q.   So you retain an interest, and upon Mr. Samson's

20 default of any payment on the promissory note you get

21 the business back, don't you?

22    A.   Yes.

23    Q.   And isn't it true under these documents that if

24 he misses one payment on the promissory note, you get

25 the business back, right?

     A.   Yes.

     Q.   So let's look at the promissory note on the first
page, second paragraph.

          First of all, let me ask:  The down payment which
we saw as Defendants's Exhibit 3, I think, the check --

     A.   Uh-uh.

     Q.   -- that was simply $5,000 that Mr. Samson paid
you, correct?

     A.   That's correct.

     Q.   Have you cashed the check?

     A.   Not yet.

     Q.   Do you intend to cash the check, Mr. Augustin?

     A.   Yes, I do.

     Q.   And what bank account will you put that money
into?

     A.   Wachovia.

     Q.   On the promissory note, paragraph 2, the first
installment on the promissory note is due on April 10th,
2010, right?

     A.   Okay.

     Q.   Isn't that also the day after you are arguing
that the covenant not to compete with MAACO expires?

     A.   Yeah, that should be expired April 9th.

     Q.   Right.  That's not a coincidence, is it, Mr.
Augustin?

1       A.   Well, my lawyer prepared that.

2       Q.   Yes.  Well, in fact, so if Mr. Samson fails to

3  make the very first payment on this promisory note on

4  April 10th, he's in default and you take the business

5  back, right?

6       A.   Yes, but hopefully he will.

7       Q.   And since you're asking this Court to end any

8  injunction granted here today on April 9th, then in your

9  mind you'd be free and clear on April 10th to take the

10  business back from Frank Samson and run Palm Beach Auto

11  again when he defaults on that first payment on the

12  promissory note, right?

13       A.   That will be one year.

14       Q.   Yes.  And in fact, Mr. Augustin, isn't that what

15  you intended when you signed this straw transaction with

16  Frank Samson?

17       A.   No.

18       Q.   It's exactly what you intended.  And you don't

19  intend to cash the $5,000 check either, do you, Mr.

20  Augustin?

21       A.   I will cash it because I've been traveling, me

22  and my wife.  You know, I was here last week.  I flew

23  back and I came back over here again --

24       Q.   Okay.

25       A.   -- because I don't know if I was coming this

1   week.  Actually goes to this morning, so we set up a

2   secured flight this afternoon.  I've been traveling.

3   That's the thing.  I really don't have enough time.

4      Q.  Mr. Augustin, you have a side deal with your

5   friend and business partner, Mr. Samson, whereby he

6   agreed to write you a check for $5,000 and then default

7   on the promissory note on April 10th and give you back

8   your business free and clear.

9      A.  No, I did not.  No, that -- I don't have no --

10  no.

11     Q.  And conveniently, if that were the case, when

12  Mr. Samson does default on the promissory note,

13  conveniently, the covenant not to compete in your stock

14  purchase agreement also becomes unenforceable, right?

15  That's not a coincidence, is it, Mr. Augustin?

16     A.  Like I said to the lawyer set up that for me.

17               MS. AMARANTE:  I have no further --

18               THE COURT:  What does that mean?

19               THE WITNESS:  Well, the lawyer set up all

20  those sale agreements for me and this is a true --

21               THE COURT:  Without telling you what was in

22  it?

23               THE WITNESS:  What did you say, Your Honor?

24               THE COURT:  The lawyer set up the agreement

25  without telling you what it is?  What is in it?

1           THE WITNESS:  Well, we don't discuss that in

2   detail, but I told him I'm going to sell the business

3   because we can working and doing some kind of other

4   business.  Like I said earlier, to --

5           THE COURT:  Was this just a detail?

6           THE WITNESS:  Yes, Your Honor.

7   BY MS. AMARANTE:

8     Q.  And, Mr. Augustin, the lawyer who prepared these

9   papers for you is the same lawyer who prepared the

10  documents for Sheik Hyatt to sign saying that he was the

11  owner and operator of Palm Beach Auto, right?

12    A.  Yes, indeed.

13          MS. AMARANTE:  I have nothing further, Your

14  Honor.  And I think I made by deadline.

15          MR. FOURNARIS:  Erika, you need to do some

16  housekeeping on exhibits.  I think 29 through 32 maybe.

17          MR. BUKOWSKI:  Your Honor, we don't have any

18  other witnesses.  I have no further examination of Mr.

19  Augustin.

20          And we move to admit -- I think we

21  previously moved to admit Defendants's 1 and 2.  We move

22  to admit Defendants's Exhibit 3 and then rest.

23          THE COURT:  I don't think there's any

24  objection to Defendants's Exhibit 3.

25          (Whereupon, Defendants's Exhibit No. 3 was

```
 1                    admitted into evidence.)
 2              MS. AMARANTE:  There is not, Your Honor.
 3              I have some housekeeping to do as well.  I
 4   believe I failed to move to admit Plaintiff's Exhibits
 5   29 through --
 6              MR. FOURNARIS:  -- 32.
 7              MS. AMARANTE:  -- 32, and I'd like to do
 8   that now.
 9              And actually from yesterday, Exhibits 15 and
10   21 also need to be admitted.  I don't believe there's an
11   objection.
12              THE COURT:  All right.
13              (Whereupon, Plaintiff's Exhibit Nos. 15, 21,
14              and 29 through 32 were admitted into
15              evidence.)
16              MR. FOURNARIS:  No.  And we already have an
17   agreement on the exhibits as to the declaration of
18   Mr. Hyatt.
19              MR. BUKOWSKI:  Correct.
20              MR. FOURNARIS:  That is --
21              MR. BUKOWSKI:  20, 20.
22              MS. AMARANTE:  Right.  The exhibits attached
23   to Plaintiff's Exhibit 20, which was Mr. Hyatt's
24   declaration, Exhibits A, C, and E would be full exhibits
25   to this proceeding even though the declaration is not.
```

 1              MR. BUKOWSKI:  And we have no objection to

 2    that, Your Honor.

 3              THE COURT:  All right.  Fine.  They'll be

 4    admitted.

 5              (Whereupon, Plaintiff's Exhibit Nos. 20-A,

 6              20-C, and 20-E were admitted into evidence.)

 7              MS. AMARANTE:  Thank you, Your Honor.

 8              THE COURT:  Very good.  Well, thank you all.

 9              Mr. Augustin, you can step down and I think

10    you people can --

11              THE WITNESS:  Thank you, Your Honor.

12              THE COURT:  -- make your plane, and we are

13    in recess.

14              MR. FOURNARIS:  Thank you.

15              MS. AMARANTE:  Thank you, Your Honor.

16              (Proceedings concluded at 4:11 p.m.)

17

18

19

20

21

22

23

24

25

```
1                         I N D E X

2   PLAINTIFF'S WITNESS   DIRECT    CROSS    REDIRECT   RECROSS

3   Philippe Augustin

4       By Mr. Bukowski    6

5       By Ms. Amarante              58

6                           *  *  *

7                     E X H I B I T S

8   PLAINTIFF'S EXHIBITS                   MARKED   ADMITTED

9   P-15  - Notice of Default - 12/03/08..............114

10  P-20A - Exhibit A to
            Declaration of Sheik Hyatt................115
11
    P-20C - Exhibit C to
12          Declaration of Sheik Hyatt................115

13  P-20E - Exhibit E to
            Declaration of Sheik Hyatt................115
14
    P-21  - Commercial Lease Agreement................114
15
    P-26  - Disclosure Acknowledgement Statement......64
16
    P-27  - Analysis of Investment...........65        70
17
    P-28  - Assignment of Lease.............70         75
18
    P-29  - Lease Amendment Number 1.........76        114
19
    P-30  - Complaint - Griffin v. Phil's Auto Body...114
20
    P-31  - Email from David Stefan
21          To Philippe Augustin - 04/17/09..........114

22  P-32  - Answer...................................114

23                          *  *  *

24  DEFENDANTS'S EXHIBITS                  MARKED   ADMITTED

25  D-3   - Check...................................114
```

1                 <u>CERTIFICATION</u>

2      I, Laura A. Jimenez, do hereby certify that

3 the foregoing is a true and correct transcript from the

4 electronic sound recordings of the proceedings in the

5 above-captioned matter.

6

7 _____          _____

8 Date                    Laura A. Jimenez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25